**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

```
--------------------------------------------------------  x
DEVRY INC. and GLOBAL EDUCATION            :
INTERNATIONAL, INC.,                       :
                                           :    Hon. David H. Coar
        Plaintiffs,                        :
                                           :    No. 08-CV-3280
            v.                             :
                                           :    Magistrate Judge Keys
UNIVERSITY OF MEDICINE AND                 :
HEALTH SCIENCES - ST. KITTS,               :
                                           :
                                           :
        Defendant.                         :
--------------------------------------------------------  :
                                           x
```

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

**PRELIMINARY STATEMENT**

Defendant University of Medicine and Health Sciences - St. Kitts ("UMHS") respectfully

submits this memorandum of law in support of its motion to dismiss the complaint pursuant to

Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[1]

Plaintiffs' Complaint and the exhibits to the Complaint demonstrate, as a matter of law,

that UMHS is not making any trademark use of the surname "ROSS" and that its use of the

phrase "Founded by Dr. Robert Ross" and its statements that Dr. Robert Ross was also the

---

[1] There is a prior action pending in this District, *DeVry, Inc. and Global Educational Services, Inc. v. International University of Nursing, LLC*, 06 CV 3364 (Judge Guzman) in which plaintiffs previously sued an affiliate of UMHS, International University of Nursing, LLC, for, among other things, trademark infringement based on the use of the Robert Ross name. Unlike UMHS in this action, International University of Nursing actually used the Robert Ross name as part of the trade name and service mark "Robert Ross International University of Nursing" for a period of time. UMHS is not alleged to have Ross or Robert Ross as part of its name and mark. The prior case was tried before Judge Guzman in late June, 2008 and a schedule set for the submission of post-trial briefing.

founder and former owner of Ross University are protected classic or nominative fair uses. See the U.S. Trademark Act, 15 U.S.C. 1115(b)(4)(the "Lanham Act").

The Lanham Act's distinction between the use of descriptive terms, such as the name "Robert Ross," in their descriptive sense to communicate truthful and valuable commercial information concerning the quality, value, characteristics, and/or attributes of goods or services, on the one hand, and the use of such terms in a trademark sense to identify and distinguish between the sources of goods or services on the other, mandates the dismissal of this action as a matter of law.

Although the Complaint alleges in a conclusory manner that "UMHS uses the designation 'Ross'" in a trademark sense in the advertising and promotion of its medical school to potential students in the United States (Complaint, ¶ 46), the Complaint's factual allegations and the examples set forth in the exhibits to the Complaint show the contrary. These factual allegations and examples attached to the Complaint are limited to only two circumstances. The first is UMHS' use of the phrase "Founded by Dr. Robert Ross" on letterhead, signs and websites under the name and service mark University of Medicine and Health Sciences-St. Kitts which is a "classic" non-infringing fair use. The second is descriptive statements in publications by UMHS that Robert Ross was also the founder and former owner of "Ross University School of Medicine" which is a non-infringing nominative fair use of plaintiffs' trade name and mark. See, e.g. Complaint, ¶ ¶ 47-48, 51-53 and Exhibits G-L.[2]

These uses by defendant of its founder's name are protected fair uses under the Lanham Act and therefore the Complaint fails to state a claim for trademark infringement as a matter of law. This is true regardless of whether the uses might cause some likelihood of confusion. *KP*

---

[2] The Complaint does not allege that either of these descriptive uses of the name "Ross" is false.

*Permanent Make-Up v Lasting Impression I, Inc.*, 543 U.S. 111 (2004) (holding that a defendant

does not have the burden of negating the likelihood of confusion in asserting a fair use defense);

*Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1059 (7th Cir. 1995).

## ARGUMENT

It is a fundamental principle of trademark law that *descriptive* terms, including personal

names, used descriptively are "in the public domain" and "must be left free for public use."

*Minnesota Mining & Mfg. Co. v Johnson & Johnson,* 454 F.2d 1179, 1180 (C.C.P.A. 1972);

*Application of Colonial Stores, Inc.,* 394 F.2d 549, 551 (C.C.P.A. 1972); *Sands, Taylor & Wood

Co. v. Quaker Oasts Co.*, 978 F.2d 947, 951 (7th Cir. 1992)("no one should be able to appropriate

descriptive language through trademark registration").  UMHS' use of the name Robert Ross to

identify the person who established the business is such a use.

Indeed, the right of a person to refer to himself in business by his own name is so

sacrosanct that the Lanham Act (15 U.S.C. § 1115(b)(4)), expressly recognizes and preserves the

public's right to make fair use of personal names, and other descriptive terms, even as against a

trademark owner, when used in their *primary* descriptive sense.  Under the Lanham Act, the only

*intellectual property right* that a trademark owner can acquire with respect to a *descriptive* term

is the right to use the term in its *secondary* sense as a trademark.  Here, an inquiry as to whether

the complained of use is use of the Robert Ross name in its *primary* sense to identify the person,

or in a *secondary* trademark sense shows, as discussed below that UMHS' use of the phrase

"Founded by Dr. Robert Ross" clearly falls within the first category.  The alleged likelihood of

confusion as a matter of law does not overcome the descriptive fair use defense.

Similarly, UMHS' truthful statements that Dr. Robert Ross was the founder and former

owner of plaintiffs' Ross University School of Medicine is a protected nominative fair use of

plaintiff's trade name and mark and is not being used by UMHS as a mark or source identifier for its own services.

### A.    Legal Standard for Rule 12(b)(6) Motion to Dismiss the Complaint and the Allegations of the Complaint

Upon a motion to dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court while accepting as true "all of the factual allegations of the complaint" must determine whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 505 (7th Cir. 2008) ("Segal's initial assertion—that his complaint should not have been dismissed because he adequately pled the elements of this Lanham Act claim—confuses our civil procedure jurisprudence and need not detain us for very long. While it is clear that Federal Rules of Civil Procedure 8(a) requires that a complaint adequately plead facts to put a defendant on notice of the plaintiff's claim…it is equally clear that a complaint that satisfies Rule 8(a)'s pleading requirements might still warrant dismissal under Rule 12(b)(6) if the facts pled cannot result in any plausible relief."). In making this determination, the Court may also consider the attachments to the Complaint which become part of the complaint for all purposes in determining whether there are sufficient factual allegations to plausibly state a claim for relief. *Id. See also*, Fed. R. Civ. P. 10(c) and *Local 15, Int'l Bhd. Of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

The relevant allegations and exhibits attached to the Complaint in this action are as follows:

Plaintiffs DeVry, Inc. and Global Education Services, Inc. are the indirect owners of the Ross University School of Medicine located in the Caribbean country of Dominica and the Ross University School of Veterinary Medicine located in the Caribbean country of St. Kitts and Nevis. Complaint ¶ 8. Plaintiffs are the owners of various U.S. trademark registrations for the

27331/000/836832.3

trademarks ROSS and ROSS UNIVERSITY.  Complaint ¶¶ 9-21.  The Ross University Schools provide educational courses to students, including U.S. students, to prepare them for careers in medicine or veterinary medicine *Id*.

Defendant UMHS is a newly formed medical school located in the Caribbean nation of St. Kitts and Nevis. Complaint ¶¶ 38-40.   Defendant uses the name and mark University of Medicine and Health Sciences - St. Kitts.  *See, e.g.* Complaint, Exs H-J. UMHS has promoted its medical school services using letterhead and a sign that contains the words "Founded by Dr. Robert Ross" in a smaller typeface below its University of Medicine and Health Sciences - St Kitts trade name and service mark or its logo.  Defendant UMHS has also made statements in its brochures, web pages, advertising and correspondence that Dr. Robert Ross was "the founder and former owner of Ross University School of Medicine."  Complaint ¶¶ 51-54, Exhibits I-L. As an example, the President  of UMHS states in a letter:

> Dr. Robert Ross, founder and former owner of Ross University School of Medicine, is excited to announce the opening of his new medical school.  Back in 1979, Dr. Ross was one of the first pioneers in developing an off-shore medical school.  Under his guidance, Ross University grew into one of the largest medical and veterinary schools in the world.   His reputation in developing academic institutions and dedication to excellence is known world-wide.   Thousands of students have graduated from Ross University and are now licensed and practicing in the United States.   Dr. Ross is no longer affiliated with Ross University, but he does intend to apply his experience, knowledge, and resources in developing UMHS.

Complaint, ¶54, Ex. L.

## B.     History of Fair Use

At the outset, the common law only protected inherently distinctive terms as trademarks and did not protect descriptive terms at all.  *Estate of P.D. Beckwith, Inc. v Comm'r of Patents*, 252 U.S. 538, 543-44 (1920).  In accord with the common law, early federal statutes prohibited

the registration of personal names and other descriptive terms as trademarks.  Act of July 8, 1870, ch.230, §79; Act of Feb. 20, 1905, ch.592, §5(b); Act of Mar. 19, 1920, ch.104, §1(b).

In 1938, the first version of the Lanham Act was introduced.  At that time Congress decided to permit the registration of descriptive terms as trademarks if they could be shown to have acquired a secondary meaning as a source indicator.  At the same time, Congress created the "fair use" defense, which made clear that competitors would be able to continue to use the same descriptive terms descriptively to promote and advertise their products.  Thus, in contrast to inherently distinctive terms, descriptive terms are non-exclusive, even when registered, and thus remain in the public domain for use in their descriptive sense.

Accordingly, the Lanham Act's "fair use" defense (15 U.S.C. § 1115(b)(4)) provides an absolute defense to a claim of trademark infringement for an individual using his name other than as a mark in his business, as well as a qualified defense for a party using a descriptive term other than as a mark to fairly and in good faith describe his products.

In addition to this statutory "fair use" defense, the Courts have subsequently recognized another type of non-infringing use of another party's mark to describe or refer to that party. Thus, for example, a former Playboy Playmate of the month can use the Playboy marks to refer to her prior association with Playboy as a means of conveying information about herself. *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002).  This type of fair use has come to be known as a nominative fair use.

The infringing uses alleged in the Complaint fall into the two different categories of fair use discussed above.  As discussed more fully below, the alleged use of the phrase "Founded by Dr. Robert Ross" is the use of a descriptive term, not as a trademark, but merely for the purpose of describing some characteristic or quality of defendant's goods or services.  This is sometimes

6

referred to as a "classic" or "descriptive" fair use. *See e.g.*, *Packman v. Chicago Tribune Company*, 267 F.3d 628, 639 (7th Cir. 2001).[3]

As indicated above, the second category of fair use recognized by the courts is sometimes referred to as "nominative" fair use and occurs when the defendant uses the plaintiff's mark to refer to the plaintiff or its services. The second category of infringing use alleged in the complaint, the statements that Dr. Robert Ross is the founder and former owner of Ross University, fall within the category of nominative fair use of plaintiffs' ROSS UNIVERSITY marks. *See, e.g.*, *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002); *New Kids on the Block v. News Am. Publ'g*, 971 F.2d 302 (9th Cir. 1992); *Ty Inc. v. Publications Int'l, Ltd.,* 2005 U.S. Dist. LEXIS 23420 (N.D. Ill., February 5, 2005). UMHS' factual description of the experience of its founder and his role as the founder and former owner of plaintiffs' Ross University School of Medicine is a protected nominative fair use of plaintiffs' registered trademark.

C.    **The Phrase "Founded by Dr. Robert Ross" is a Classic Fair Use**

UMHS' use of the phrase "Founded by Dr. Robert Ross" as alleged in the Complaint is a classic fair use and non-actionable as a matter of law. 15 U.S.C. § 1115(b)(4),

1.    The Use Is Not a Trademark Use

In this case, UMHS is clearly not using Ross or Robert Ross as a service mark or as part of its trade name. The full name Robert Ross is used by UMHS only in the informational phrase "Founded by Dr. Robert Ross" on letterhead, its website or sign, or in literature describing Robert Ross and his prior accomplishments. Defendant's mark or trade name is "University of Medicine and Health Sciences - St. Kitts" or its acronym "UMHS". The phrase "Founded by Dr.

---

[3] There is no factual allegation in the Complaint that UMHS has ever used the name ROSS as part of its trade name or mark and no examples of such a use are attached to the Complaint.

Robert Ross" merely provides information about the founder of UMHS.  This phrase and the other references to Dr. Robert Ross in UMHS literature or on its website are clearly descriptive of the founder and are not being used as the service mark for the educational services of the school.  *See, e.g.*,  *Packman v. Chicago Tribune Company*, 267 F.3d 628, 639 (7th Cir. 2001) ("The Tribune's use of its well-known masthead also identifies the phrase as a newspaper headline reporting on an event and not as a Tribune trademark …");  *Madrigal Audio Labs., Inc., v Cello, Ltd*., 799 F.2d 814, 823 (2d Cir. 1986) (The Second Circuit ruled that a well-known designer of stereo equipment who had sold his business could use his name in "advertising, in a not overly intrusive manner, that he is affiliated with a new company").

Here, UMHS' use of the Robert Ross name is in informational text below the "University of Medicine and Health Sciences - St. Kitts" mark which is prominently displayed in large letters; and the use of the words "Founded By" connotes that the Robert Ross name is being used in its primary descriptive sense to identify Robert Ross the person, and not in a trademark sense. See Complaint Exhibits G, H.  See also, 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 3:3 (4th ed. 2004) (some of the common markers of whether a word is being used as a trademark are "larger-sized print, all capital letters or initial capitals, distinctive or different print style, color, and prominent position on label or advertising copy"); *Restatement, Third, Unfair Competition*, § 28 at comment a (the "nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks is also relevant").

2.    The Use is Descriptive

As noted above, UMHS' use of Robert Ross is a descriptive use.  In *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 989 (7th Cir. 2004), Judge Posner observes that use of personal names of the proprietor of a business are closely related to the rule regarding descriptive marks

8

because preventing a person from using his name to denote his business may deprive consumers of useful information.  *Id.  See also*, *815 Tonawanda St. Corp. v Fay's Drug Co., Inc.,* 842 F.2d 643, 648 (2d Cir. 1988) ("[F]or purposes of trademark analysis, personal names—both surnames and first names are generally regarded as descriptive terms").

In the facts and examples attached to the Complaint, UMHS is using the Robert Ross name in its primary descriptive sense to truthfully identify Robert Ross as the founder of UMHS. Thus, the second test of "fair use" is met here.

3.    UMHS' Use Is In Good Faith

As discussed above, 15 U.S.C. § 1115(b)(4) provides an absolute defense to infringement for a competitor using his own name other than as a trademark in his business and a qualified defense for a competitor using a descriptive term other than as a trademark to describe his products in "good faith."  Here the distinction is not material, as UMHS' use of the name of Robert Ross is other than as a mark and is in good faith.

In general, a good faith use of a personal name arises when a person has a legitimate connection with his business and/or products.  As noted by the Second Circuit in  *Madrigal Audio Labs., Inc.,* supra, 799 F.2d at 822, even when a personal name has been assigned to another as a mark, "it continues to serve the important function to its bearer of acting as a symbol of that person's personality, reputation and accomplishments" as distinguished from its secondary function of identifying goods.  Thus, in *Madrigal*, the Second Circuit ruled that, notwithstanding such a sale, a person is not precluded "from taking advantage of his individual reputation" by using his name in connection with his new business. *Id.*  That is the case here.

Similarly, the Seventh Circuit in *Benrose Fabrics Corp. v. Rosenstein*, 183 F.2d 355, 359 (7th Cir. 1950) (citing *Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U.S. 118 (1905)

has held:

> In the absence of contract, fraud or estoppel, any man may use his own name in all legitimate ways and as the whole or a part of a corporate name; it is only when the use is dishonest or fraudulent that the court may interfere; courts will not act where the only confusion, if any, results from similarity of names and not from the manner of use.

*See also Horlick's Malted Milk Corp. v. Horlick*, 143 F. 2d 32, at 35 (7th Cir. 1944) ("a man may use his own name reasonably and honestly for a legitimate purpose in his own business"); *Berghoff Rest. Co. v. Lewis W. Berghoff, Inc.*, 357 F. Supp. 127 (N.D. Ill. 1973), *aff'd,* 499 F.2d 1183 (7th Cir. 1974).

In contrast, bad faith arises when a person "enters a particular line of trade for no apparent reason other than to use a conveniently confusing surname to his advantage." Id., at 735, citing *R.W. Rogers Co. v. Wm. Rogers Mfg. Co.*, 70 F. 1017, 1018 (2d Cir. 1895) (defendant was a "decoy" for silver plating firm); *Max Factor & Co. v. Factor*, 226 F.Supp. 120, 121 (S.D. Cal. 1903) (defendant had no involvement in hosiery business using his name); *Champion Spark Plug Co. v. Champion*, 23 F.Supp. 638, 641 (E.D. Mich. 1938) (defendant did not manufacture spark plugs).

As is evident from the face of the complaint and the exhibits thereto, Robert Ross is using his name because of his personal history and reputation in the field of offshore medical schools. Robert Ross has a legitimate basis to use his name to identify himself in connection with his medical school, the "University of Medicine and Health Sciences, St. Kitts" and any such use, therefore, is in good faith.

> **D.    Defendant's References To Robert Ross As The Founder And Former Owner Of "Ross University" Constitute A Protected Nominative Fair Use**

The descriptive statements contained in the UMHS brochure (Complaint, Ex. I) and in correspondence (Complaint, Ex. L) that Dr. Robert Ross was the founder and former owner of

Ross University School of Medicine are unquestionably not trademark or service mark uses. As noted above, the use of plaintiffs' mark "Ross University" in these paragraphs has been described by some courts as a "nominative" fair use. Nominative fair use occurs when the defendant uses the plaintiff's mark to refer to the plaintiff or its services. *New Kids on the Block v. News Am. Publ'g*, 971 F.2d 302 (9th Cir. 1992).

Although the Seventh Circuit has not expressly addressed the issue of nominative fair use, the lower courts in this Circuit have followed the test set forth by the Ninth Circuit in the leading *New Kids on the Block* case for determining what is a nominative fair use. *See, e.g.*, *Ty Inc., supra*, 2005 U.S. Dist. LEXIS 23420 at pp. 8-10; *World Impressions, Inc. v. McDonald's Corp.*, 235 F.Supp.2d 831, 843 (N.D.Ill. 2002).[4] The Ninth Circuit's test for nominative fair use is a three-part test and requires defendant's showing that its product was not reasonably identifiable without the plaintiffs' mark (e.g. when the trademark is necessary to describe a person or provide information as to an attribute of a defendant's product or service), that defendant used no more of plaintiff's mark than was reasonably necessary and that it did not use the mark in a manner likely to suggest sponsorship or endorsement of its product by the plaintiff. *New Kids on the Block v. News Am. Publ'g, supra*, 971 F.2d at 308 (9th Cir. 1992).

UMHS' nominative uses of plaintiffs' ROSS UNIVERSITY marks in its description of the personal experience and qualifications of its founder, Dr. Robert Ross, satisfy this three prong test. First, there is no way for UMHS to describe the experience and qualifications of Dr. Ross without referring to the Ross University School of Medicine that he successfully founded and then subsequently sold. In this regard, the courts have noted that the defendant does not

---

[4] These cases either found there was no fair use, or that there were issues of fact regarding the nominative fair use defense, based on the use of plaintiff's stylized mark or other special emphasis being given to the plaintiff's mark which does not happen in UMHS' use of the "Ross University School of Medicine" mark that is shown in the exhibits to the Complaint.

have to go to an extreme to find a descriptive substitute for the plaintiff's name. *See, e.g. New Kids, supra*, 971 F.2d at 306 (finding that the only clear way to identify the band was by using its name "New Kids"). Second, all of these uses alleged in the complaint and depicted in the exhibits to the complaint use no more of plaintiff's mark than is reasonably necessary to identify Dr. Ross as the former owner of Ross University[5]. *See, also*, *Playboy Enterprises, Inc. v. Welles*, supra, 279 F.3d at 802 (finding that the defendant's use of the phrase "Playboy Playmate of the Year in 1981" was the only clear way to identify defendant and constituted nominative fair use of the Playboy trademarks and affirming the lower court's finding that there was no other way to for defendant to describe her former status "without venturing into absurd descriptive phrases").

Unlike the situations in the *Ty, Inc.* and *World Impressions* decisions in this district, UMHS is not using a stylized version of the ROSS UNIVERSITY trademarks and has not otherwise emphasized the name "Ross University School of Medicine" by increasing the font size or doing anything else to call undue attention to the name that might suggest an endorsement or sponsorship by Ross University. Finally, UMHS carefully states in every example alleged or shown in the Complaint that Dr. Ross is the former owner of Ross University School of Medicine and is no longer affiliated with that school. Accordingly, the Complaint alleges only a protected nominative fair use of plaintiffs' trademarks and therefore fails to state any claim for trademark infringement or unfair competition that is "plausible" on its face.

---

[5] It is a non-infringing fair use to advertise the qualifications of key employees by making truthful use of the trade name or trademark of the employee's former employer, e.g. "The X Company [defendant] is headed by William M. White, a co-founder of Alpha, Inc. [plaintiff] with over thirty years of business research experience in industry and government." *Business Trends Analysts v. Freedonia Group, Inc.*, 700 F. Supp. 1213 (S.D.N.Y. 1988), aff'd in part and rev'd in part, 887 F.2d 399 (2nd Cir. 1989).

E.     **Plaintiffs' Allegations of a Likelihood of Confusion Do Not Override the Fair Use Defense**

For many years, the Ninth Circuit, where much of the fair use jurisprudence was developed, took the position that "fair use" and "likelihood of confusion" were incompatible. *See, e.g.*, *Cairns v Franklin Mint Co.*, 292 F.2d 1139, 1151 (9th Cir. 2002). Accordingly, when confronted with a "fair use" defense, the Ninth Circuit proceeded to analyze "fair use" under its "likelihood of confusion" test to determine whether, notwithstanding a "fair use" of a descriptive term in its descriptive sense, such use might be likely to cause confusion with another's mark. If so, courts in the Ninth Circuit would proceed to bar such use, even a "fair use", because it was still likely to cause confusion.

The Seventh Circuit and other circuits had generally taken the more practical view that "fair use" is a defense to a claim of infringement, even if confusion with another's mark is likely, by following the Supreme Court's pre-Lanham Act decision in *William Warner & Co. v Eli Lilly & Co.*, 265 U.S. 526, 528 (1924). In that case, the Supreme Court held that "[a] name which is merely descriptive of the ingredients, qualities, or characteristics of an article of trade cannot be appropriated as a trademark and the exclusive use of it afforded legal protection. The use of a similar name by another to truthfully describe his own products does not constitute a legal or moral wrong, even if its effect is to cause the public to mistake the origin or ownership of the product." *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.39 1055, 1059 (7th Cir. 1995)

This split in how the Circuits analyzed "fair use", i.e., whether or not a confusion analysis was appropriate, or necessary, was resolved by the Supreme Court in *KP Permanent Make-Up v Lasting Impression I, Inc.*, 543 U.S. 111 (2004), which rejected the Ninth Circuit's view that the "fair use" of descriptive words should be subject to a likelihood of confusion test. Rather, as the Court aptly noted, "Congress said nothing about the likelihood of confusion in setting out the

elements of the fair use defense." Id., at 118. Specifically, the Court noted the common law's "tolerance for a certain degree of confusion on the part of consumers," as well as the Lanham Act's "similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words." Id., at 122. The Court found that while a plaintiff in an infringement case must always prove likelihood of confusion as part of its prima facie case, a defendant relying on the fair use defense need only prove that his use of the mark was in the mark's descriptive sense, i.e., other than as a trademark. Further, the Court determined that "consumer confusion must be compatible with fair use," as this is the consequence of preventing "anyone [from] obtain[ing] a complete monopoly on use of a descriptive term." Id., at 121-23. As such, the Court determined that the "risk of confusion will not rule out fair use." Id.

The courts in this Circuit have therefore consistently held that there is a fair use defense even if there could be to be some likelihood of confusion. *See, e.g., Ty, Inc. v. Publications Int'l, Ltd.*, 2005 U.S. Dist. LEXIS 23420 (N.D. Ill. 2005) (finding that the defense of classic (descriptive) fair use is valid even if there is some likelihood of confusion); *Ciociola v. Harley-Davidson, Inc.*, 2008 U.S. Dist. LEXIS 33815 (E.D. Wisc. 2008) (holding that a fair use defendant does not have to negate a finding of likelihood of confusion). Accordingly, plaintiffs' Complaint must be dismissed notwithstanding its allegations that there is a likelihood of confusion caused by UMHS' use of the name Robert Ross and its description of his prior ownership of plaintiffs' Ross University schools.

## CONCLUSION

UMHS' use of the name of its Founder and Chairman, Dr. Robert Ross, in a manner other than as part of its trade name or as a mark, is a protected fair use even if such use is

causing, or is likely to cause, some degree of confusion. Based upon the foregoing, the Complaint fails to state a claim for relief and must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.
J. Christopher Jensen
1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200

SMART & BOSTJANCICH
By:  s/ Patricia S. Smart
Patricia S. Smart
John Bostjancich
19 South LaSalle Street
Chicago, Illinois
(312) 857-2424
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of a true and correct copy of defendant's Memorandum Of Law In Support Of Defendant's Motion To Dismiss The Complaint is being accomplished pursuant to ECF as to the following Filing User:

> Arne Olson, Esq.
> OLSON & HIERL, LTD.
> 20 North Wacker Drive
> 36th Floor
> Chicago, Illinois 60606

this 18h day of July, 2008.


> s/ Patricia S. Smart
> PATRICIA S. SMART

27331/000/836832.3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ------------------------------------------------------------ x | |
| **DEVRY INC.** and **GLOBAL EDUCATION** : | |
| **INTERNATIONAL, INC.,** : | |
| : | **Hon. David H. Coar** |
| Plaintiffs, : | |
| : | **No. 08-CV-3280** |
| v. : | |
| : | **Magistrate Judge Keys** |
| **UNIVERSITY OF MEDICINE AND** : | |
| **HEALTH SCIENCES - ST. KITTS,** : | |
| : | |
| : | |
| Defendant. : | |
| ------------------------------------------------------------ x | |

APPENDIX OF CASE LAW FROM ELECTRONIC DATABASES
CITED IN MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Page 2      *Ciociola v. Harley-Davidson, Inc.*, 2008 U.S. Dist. LEXIS 33815
(E.D. Wisc. 2008)

Page 19     *Ty, Inc. v. Publications Int'l, Ltd.*, 2005 U.S. Dist. LEXIS 23420
(N.D. Ill. 2005)

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 2 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 1 of 17

LexisNexis® *Total Research System*                    Switch Client | Preferences | Sign Off | [?] Help

Search \ Research Tasks \ Get a Document \ Shepard's® \ Alerts \ Total Litigator \ Transactional Advisor \ Counsel Selector \    History | 🗐

Service:  Get by LEXSEE®
Citation:  2008 U.S. Dist. LEXIS 33815

*2008 U.S. Dist. LEXIS 33815, \**

EDWARD CIOCIOLA, Plaintiff, v. HARLEY-DAVIDSON INC. and HARLEY-DAVIDSON MOTOR COMPANY, INC., Defendants.

Case No. 06-C-00255

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN

2008 U.S. Dist. LEXIS 33815

April 24, 2008, Decided
April 24, 2008, Filed

**SUBSEQUENT HISTORY:** Amended by Ciociola v. Harley-Davidson, Inc., 2008 U.S. Dist. LEXIS 41981 (E.D. Wis., May 28, 2008)

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff, a free-hand paintbrush artist specializing in the detailing of motorcycles (artist), sued defendant motorcycle manufacturer alleging that the manufacturer infringed on the artist's scarecrow service marks by incorporating and using those marks in the marketing and sale of its products in violation of § 43(a) of the Lanham Act, 15 U.S.C.S. § 1125(a). The manufacturer filed a motion for summary judgment.

**OVERVIEW:** The artist had used the word "scarecrow" to identify the freehand painting and detailing services he provided to motorcycle owners and others for nearly 30 years. The artist would normally place a version of his scarecrow design on all motorcycles he painted. The manufacturer recently marketed a paint set for motorcycles featuring an image of a scarecrow with barbed wire, but under the manufacturer's well-known brand name (Harley Davidson). The artist contended that this paint set infringed on his mark. The manufacturer argued the fair use defense in its summary judgment motion. The court agreed with the manufacturer that the artist failed to establish a genuine issue of material fact as to any of the elements of the fair use defense. For example, the evidence showed that the manufacturer did not use the scarecrow image or term to identify the source of the products, particularly since the manufacturer's name was so prominently displayed. Also, the term was not used in a trademark sense, but in a descriptive sense to describe a particular product featuring a scarecrow. Finally, the manufacturer did not use the scarecrow term or image in bad faith.

**OUTCOME:** The court granted the motorcycle manufacturer's motion for summary judgment.

**CORE TERMS:** scarecrow, paint, blue, trademark, motorcycle, dealer, descriptive, catalog, summary judgment, fair use, rally, gas tank, color, accessory, barbed wire, consumer, vendor, flame, customer, bad faith, painted, clearance, genuine, shield, shop, red, non-trademark, hang, tag, appearance

**LEXISNEXIS® HEADNOTES**                                                        ⊟ **Hide**

Civil Procedure > Summary Judgment > Standards > General Overview 🔁
**HN1** ⭐ A district court must grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants 🔁
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔁
**HN2** ⭐ A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. A party opposing a properly supported summary

Case 1:08-cv-03280   Document 14-2   Filed 07/18/2008   Page 3 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                                    Page 2 of 17

judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading but rather must introduce affidavits or other evidence to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). To state it differently, a party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule 🔍
Civil Procedure > Summary Judgment > Evidence 🔍
HN3⛯To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. In the light most favorable simply means that summary judgment is not appropriate if the court must make a choice of inferences. The evidence must create more than some metaphysical doubt as to the material facts. A mere scintilla of evidence in support of the nonmovant's position is insufficient. More Like This Headnote

Civil Procedure > Summary Judgment > Standards > General Overview 🔍
HN4⛯The plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. More Like This Headnote

Trademark Law > Infringement Actions > General Overview 🔍
HN5⛯The infringement of an unregistered mark is actionable under § 43(a) of the Lanham Act, 15 U.S.C.S. § 1125(a). More Like This Headnote

Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview 🔍
HN6⛯See 15 U.S.C.S. § 1125(a).

Trademark Law > Federal Unfair Competition Law > Lanham Act > General Overview 🔍
Trademark Law > Infringement Actions > General Overview 🔍
HN7⛯In order to prevail on a Lanham Act claim, a plaintiff must establish that (1) his mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers. Plaintiffs must establish these two elements for both trademark infringement and unfair competition claims. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Classic Fair Use 🔍
HN8⛯In defending against a Lanham Act claim under 15 U.S.C.S. § 1125(a), in addition to contesting the validity of the mark at issue, the defendant may invoke the "fair use" defense by showing that the alleged infringement is a use, otherwise than as a mark which is descriptive of and used fairly and in good faith only to describe the goods or services of such party. 15 U.S.C.S. § 1115(b)(4). This defense is based on the principle that no one should be able to appropriate descriptive language through trademark registration. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview 🔍
Trademark Law > Infringement Actions > Summary Judgment > Appropriateness 🔍
HN9⛯In a trademark infringement case, the determination that a defendant's use was a non-trademark use in good faith, and the finding that consumers are not likely to be confused about the origin of a defendant's products are questions of fact. However, these issues may be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview 🔍
HN10⛯In order to prevail on a fair use defense in a trademark infringement case, the defendants must show that: (1) they used the phrase or image in a non-trademark use; (2) the phrase or image was descriptive of their goods or services; and (3) they used the phrase or image fairly and in good faith only to describe their goods or services. 15 U.S.C.S. § 1115(b)(4). More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview 🔍
HN11⛯For purposes of the fair use defense, in determining whether a term was used in a trademark use, the key question is whether the term was used to identify the source of the products. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview 🔍
HN12⛯Regardless of whether a suit is brought under 15 U.S.C.S. § 1114 for trademark infringement, or under § 43(a) of the Lanham Act, 15 U.S.C.S. § 1125(a), for unfair competition, the analysis of the applicability of the fair use defense is identical. More Like This Headnote

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 4 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 3 of 17

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview

HN13 In a trademark infringement case, a defendant need not negate confusion in order to prevail on a fair use defense. Even if the plaintiff has evidence of actual confusion, a showing of actual confusion is not dispositive on the issue of whether the defendant has used the term or the image in a non-trademark sense. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview

HN14 When the products involved in a trademark infringement case are similar, likelihood of confusion may amount to using a word in a misleading way, violating 15 U.S.C.S. § 1125(a)(1)--not because the likelihood of confusion makes the use nondescriptive, but because the confusion about the product's source shows that the words are being used, de facto, as a mark. And the fair use defense is available only to one who uses the words of description otherwise than as a mark. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview

HN15 The similarity of marks is not dispositive on the issue of whether a defendant in a trademark infringement case was using a term in a trademark sense. The fair use defense can still be applicable when the defendant uses a term identical to the plaintiff's mark. More Like This Headnote

Trademark Law > Subject Matter > Descriptive & Laudatory Terms > Descriptive Terms Defined

HN16 A descriptive term imparts information directly or is necessary to the description of the goods or services in question. This is in contrast to fanciful or coined devices, which are utterly undescriptive, and from suggestive devices, which combine elements of descriptiveness and of fancy. If a mark stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive. A person cannot appropriate the English language and thereby render others inarticulate. More Like This Headnote

Trademark Law > Subject Matter > Secondary Meaning > General Overview

HN17 Secondary meaning for a trademark exists only if most consumers have come to think of the word not as descriptive at all but as the name of the product. A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark. More Like This Headnote

Trademark Law > Subject Matter > Secondary Meaning > General Overview

HN18 The owner of a mark that has acquired secondary meaning does not acquire an exclusive right in the original, descriptive sense, but only in the secondary one associated with the markholder's goods. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview
Trademark Law > Infringement Actions > Summary Judgment > Appropriateness

HN19 Mere knowledge of a phrase is insufficient to establish that a defendant acted in bad faith and to preclude summary judgment under a fair use defense. Rather, good faith can be judged only by inquiry into the defendant's subjective purpose in using the term. More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > General Overview

HN20 The possible existence of confusion regarding certain marks does not negate the establishment of the fair use defense. More Like This Headnote

**COUNSEL:** [*1] For Edward Ciociola, doing business as Scarecrow Productions, Plaintiff: Michael T Hopkins, LEAD ATTORNEY, IP Special Counsel Ltd, Milwaukee, WI.

For Harley-Davidson Inc, doing business as Harley-Davidson Motor Co, Harley-Davidson Motor Company Inc, Defendants: Albert E Hartmann, LEAD ATTORNEY, Monica L Thompson, LEAD ATTORNEY, DLA Piper US LLP, Chicago, IL; Amy L Vandamme, LEAD ATTORNEY, Michael Best & Friedrich LLP, Milwaukee, WI.

**JUDGES:** WILLIAM E. CALLAHAN, JR., United States Magistrate Judge.

**OPINION BY:** WILLIAM E. CALLAHAN, JR.

**OPINION**

**DECISION AND ORDER**

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 5 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                           Page 4 of 17

## I. PROCEDURAL AND FACTUAL BACKGROUND

On March 3, 2006, the plaintiff, Edward Ciociola ("Ciociola"), filed a complaint alleging that the defendants, Harley-Davidson Inc. ("H-D, Inc.") and Harley-Davidson Motor Company, Inc. ("Harley-Davidson"), infringed on Ciociola's scarecrow service marks by incorporating and using these marks in the marketing and sale of its motorcycles and motorcycle parts and accessories. Ciociola asserts that the defendants' use of his service marks constitutes false designation of origin, sponsorship and/or affiliation, and unfair competition in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

Currently pending before the court **[*2]** is the defendants' motion for summary judgment which is fully briefed and is ready for resolution. For the reasons which follow, the defendants' motion for summary judgment will be granted.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendants' motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendants' motion for summary judgment contained responses to the defendants' proposed findings of fact as well as some additional proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendants' motion for summary judgment.

H-D, Inc. is a Wisconsin corporation with its principal corporate office located at 3700 W. Juneau Avenue, Milwaukee, Wisconsin. (Defendants' Proposed Findings of Fact ("DPFOF") P 4.) Harley-Davidson is a Wisconsin corporation with its principal corporate office located at 3700 W. Juneau Avenue, Milwaukee, Wisconsin. (DPFOF P 5.)

Harley-Davidson has been manufacturing and selling Harley-Davidson **[*3]** motorcycles since 1903. (DPFOF P 6.) Harley-Davidson, at all times relevant to this suit, offers a wide variety of products and services relating to its motorcycles, including parts, accessories, and custom paint sets. (DPFOF P 7.)

Ciociola is self-employed as a free-hand paintbrush artist specializing in the detailing of motorcycles. (DPFOF P 16.) Ciociola resides in Wisconsin. (DPFOF P 1.)

Ciociola has used the word "Scarecrow" to identify the freehand painting and detailing services he has provided to motorcycle owners and others since July 1980. [1] (Plaintiff's Proposed Findings of Fact ("PPFOF") P 1; DPFOF P 130.) Ciociola will normally place a version of the scarecrow design on all motorcycles he paints. The scarecrow design/artwork placed on each motorcycle is consistent in appearance, such as facial features, colors used, and style of dress, but is usually depicted in different poses or activities. [2] (PPFOF P 2.)

**FOOTNOTES**

[1] The defendants object to the plaintiff's proposed use of the term scarecrow "word mark," on the grounds that it is a legal conclusion that Ciociola has an enforceable trademark right in certain words or images.

[2] In order to aid the reader in visualizing Ciociola's scarecrow **[*4]** design, a version of Ciociola's scarecrow design from his website can be found in Appendix 1.

Ciociola provides his services at Honda and Harley-Davidson Dealers' showrooms, Harley-Davidson sponsored/sanctioned motorcycle events, Harley Owners Group ("H.O.G.") sponsored/sanctioned motorcycle events, and the plaintiff's studios in Wisconsin and North Carolina. (PPFOF P 3.) H.O.G. has nearly a million members, and is the largest factory-sponsored motorcycle organization in the world. (PPFOF P 5.) Harley-Davidson heavily markets to H.O.G. to promote the Harley-Davidson "lifestyle" and products. (PPFOF P 6.) One or more of Harley-Davidson's corporate affiliates sponsor various national, state, and touring rallies for members of H.O.G. at which Harley-Davidson's products are showcased. In prior years vendors were allowed to provide their goods and services to H.O.G. member rally participants by invitation. Currently, no vendors other than Harley-Davidson's corporate affiliates are permitted inside of H.O.G. rally venues, but other vendors may be allowed to participate outside the venue. (PPFOF P 7.)

Ciociola has painted between 15,000 and 22,000 motorcycles since 1980. (PPFOF P 8.) Ciociola **[*5]** has provided his services at over 400 motorcycle dealerships since 1980. (PPFOF P 9.) Ciociola normally makes 18 to 20 appearances per year at rallies and dealerships to provide his services. (PPFOF P 10.) Plaintiff may paint as many as ten (10) motorcycles in a day at an event, and he charges between $ 10 and $ 5,000 for his custom work. (DPFOF P 125.)

Ciociola has attended the annual Harley-Davidson sponsored motorcycle rally at Sturgis, South Dakota since 1996. (PPFOF P 12.) Attendance at the Sturgis rally usually exceeds 500,000 people. (PPFOF P 13.) Since 1996, Ciociola has attended Harley-Davidson/H.O.G. sponsored state rallies in Colorado, Georgia, Wisconsin, Illinois, Indiana, Kansas, Louisiana, New Jersey, Missouri, South Carolina, and Virginia. (PPFOF P 14.) The parties dispute whether Ciociola is a "Harley approved vendor." (PPFOF P 15; Def.'s Resp. to PPFOF P 15.)

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 6 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                Page 5 of 17

Ciociola attends every Harley-Davidson, H.O.G., and dealer event using the scarecrow word and design. His booth for such events has always incorporated signs using both the scarecrow word and design. (PPFOF P 18.) Plaintiff does not specifically advertise his dealer appearances, although certain dealers may advertise **[\*6]** his appearances using the word "Scarecrow" or the design in local papers. (DPFOF P 131.)

Ciociola maintains a current mailing list of over 4,000 customers to which he mails promotional materials and schedules on a yearly basis. (PPFOF P 19.) Since 1980, Ciociola has consistently used business cards, letterhead, invoices, and other such documents to promote his services utilizing the scarecrow word and design. (PPFOF P 20.)

Dealers often publicize Ciociola's appearance at a dealer event by placing display ads in newspapers. (PPFOF P 23.) Ciociola will send postcards to existing customers to advise them of an upcoming appearance at a local dealership. (PPFOF P 24.) Some dealers and customers do not know the plaintiff as Ed Ciociola, but as "Scarecrow." ³ (PPFOF P 25.)

## FOOTNOTES

3 The parties dispute how many dealers and customers know Ciociola as "Scarecrow." Ciociola asserts that "[m]any dealers and the majority of customers" know him as "Scarecrow." Although Ciociola has presented evidence that at least some dealers and customers know his as "Scarecrow," it is unclear whether this constitutes "many" or the "majority."

Ciociola places a version of his scarecrow design on every motorcycle he paints. **[\*7]** (PPFOF P 26.) Since 1998, Ciociola has maintained a web site at www.scarecrowart.com to promote his work and to post appearance schedules and other information. This website has had over 560,000 hits since its inception. (PPFOF P 27.)

Ciociola has been filmed painting motorcylces or other vehicles for television news stories produced by local network affiliates approximately ten times, including local affiliate stations in Kansas, Chicago, and Pennsylvania. (PPFOF P 28.) Ciociola has had newspaper articles written about him between 10 and 20 times. These articles typically refer to him as "Scarecrow" and highlight his work. (PPFOF P 29.) If someone conducts a Google search of the internet ten times with the words "motorcycle and scarecrow," Ciociola website "www.scarecrowart.com" is returned first and second on each occasion. (PPFOF P 30.)

A key component of Ciociola's offering is that the customer can watch him work, and he invites people to watch him work. (DPFOF P 121.) Ciociola does not pre-paint motorcycles or motorcycle parts, and he only works on motorcycles owned by customers or dealerships. (DPFOF P 122.) Ciociola does not produce or sell any motorcycle parts nor does he mass-produce **[\*8]** his ornamental designs. (DPFOF P 123.) Ciociola's motorcycle artwork involves custom designs. (DPFOF P 124.) Ciociola's works include many different designs, including cartoon characters, feathers, eagles, dream catchers, flames, wizards and dragons. (DPFOF P 126.)

Ciociola admits that he paints Harley-Davidson trademarks and logos on motorcycles, and even advertises this service on his website. (DPFOF P 127.) Ciociola cannot identify a single instance in which he has painted a scarecrow as the primary image on a gas tank, but would do so if a customer requested one. (DPFOF P 128; Hartmann Aff., Ex. H, Ciociola Dep. I 40:2-9, 41:19-42:16, 109:17-111:4.)

Ciociola's use of an image of a scarecrow in advertising takes several forms. (DPFOF P 133.) The most frequent design that Ciociola uses for advertising purposes is a "Painting Scarecrow" figure which is hunched over a group of paint cans. (DPFOF P 134.) Ciociola supplies this "Painting Scarecrow" image to dealers, and uses it on his business cards, and on his shirts and working clothes. (DPFOF P 135.) Some of Ciociola's business cards show other similar scarecrow figures, and some do not contain a scarecrow figure at all. (DPFOF P 136.) **[\*9]** The "Painting Scarecrow" is also the central image on the home page of Ciociola's website. (DPFOF P 137.) At certain rally appearances, Ciociola hangs a large, yellow banner with a "Standing Scarecrow" image. (DPFOF P 138.)

Regardless of the posture of the scarecrow image used by Ciociola, it is always depicted in clothing of bright primary colors and facial features, including eyes, nose, and a smiling mouth. (DPFOF P 139.) Ciociola sometimes places a small scarecrow in the ornamental designs that he paints on motorcycles. (DPFOF P 140.) These ornamental scarecrows feature elements consistent with those scarecrow images that Ciociola uses in advertising in that they are multi-colored, are always smiling, and have two eyes, a nose, and a mouth. (DPFOF P 141.) Ciociola's ornamental scarecrows are not the primary figure in his designs, instead, these little scarecrows are frequently depicted interacting with the subject of the artwork or other features of the motorcycle, such as pulling on an eagle's feathers (EC0282) or leaning on a Harley-Davidson(R) emblem (EC0279). (DPFOF P 142; Hartmann Aff., Ex. P, EC0255, EC0271-87.)

Before filing this lawsuit, Ciociola filed an application for **[\*10]** a "Scarecrow" mark design with the United States Patent and Trademark Office ("USPTO"). (DPFOF P 143.) The USPTO issued an office action requesting additional details from Ciociola, including a "concise description of the mark" (DPFOF P 144.) Ciociola abandoned the application for his "Scarecrow" design mark at the advice of his attorney. (DPFOF P 145.)

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 7 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 6 of 17

One category of motorcycle accessories offered to dealers by Harley-Davidson, the Color Shop, includes custom paint accessory collections (it also includes wheels). (DPFOF P 22.) One of Harley-Davidson's custom paint collections includes Radical Paint Sets, a coordinated set of replacement gas tanks, fenders, and other motorcycle parts designed as a unit to depict a theme. (DPFOF P 23.) These Radical Paint Sets are created and designed for a specific Harley-Davidson(R) motorcycle model and model year. (DPFOF P 24.) Each Radical Paint Set is produced in a limited edition, meaning that, at most, only a predetermined number of each set will be produced. (DPFOF P 25.)

Harley-Davison only sells Radical Paint Sets to its dealers, who then can sell them to customers. (DPFOF P 26.) Harley-Davidson has two dealer meetings each year. (DPFOF P 27.) [*11] At each of its bi-annual dealer meetings, Harley-Davidson typically introduces 14 to 20 new Radical Paint Sets. (DPFOF P 28.) Dealers are given a "New Products" catalog from which to order the newly introduced paint sets. (DPFOF P 36.) The paint sets are then listed in a yearly Parts and Accessories catalog sent to all dealers whether or not they attended the dealer show. (PPFOF P 37.)

Harley-Davidson's Color Shop determines the motorcycles for which Radical Paint Sets will be offered and works up the designs and graphics and maximum number that can be produced for each Radical Paint Set in advance of the dealer meetings. (DPFOF P 29.) The Radical Paint Sets themselves are manufactured by third-party vendors. (DPFOF P 30.) Ideas for the Radical Paint Set designs originate either from within Harley-Davidson, either from the Color Shop or from the Styling department (which is responsible for the overall look of Harley-Davidson(R) motorcycles), or may be suggested by the vendors. (DPFOF P 31.)

The images on Radical Paint sets frequently depict skulls and flames, which are popular designs for Harley-Davidson motorcycles. (DPFOF P 32.) Harley-Davidson searches for and uses images consistent [*12] with the Harley-Davidson mystique invoking power, freedom, back-road America and excitement. (DPFOF P 33.)

Within each bi-annual Radical Paint Set collection, Harley-Davidson designs a range of different motifs. (DPFOF P 34.) Once the design concept is determined for a specific Radical Paint Set, either Harley-Davidson or the vendor prepares a sample on paper, computer images, or a painted gas tank. (DPFOF P 35.) After the initial design is completed, the design is reviewed by Harley-Davidson's Styling department. (DPFOF P 36.) The Styling Department would approve designs, suggest changes to designs, or reject designs. (DPFOF P 37.) After Color Shop makes any changes requested by Styling, the designs get Styling's final approval, and Harley-Davidson works with the vendors to finalize the details required to accommodate the production process and costs associated with a specific set. (DPFOF P 38.) Ultimately the vendor creates the production sets of the Radical Paint Set-up to the maximum predetermined number for that design, individually numbers each set, and ships the Radical Paint Sets to those Harley-Davidson(R) dealers who place orders. (DPFOF P 39.)

Harley-Davidson introduces samples [*13] of the Radical Paint Sets at its bi-annual dealer meetings. (DPFOF P 40.) Following a dealer meeting, dealers have a short period afterwards (less than three weeks) to place orders after which time this window closes, the dealers can no longer order the Radical Paint Sets. (DPFOF P 44.) To introduce a new Radical Paint Set collection to the public, Harley-Davidson includes photos of the collection in the first annual or supplemental P & A Catalog following the dealer meeting when the collection is introduced. (DPFOF P 47.) Harley-Davidson may also display the sample motorcycles displaying the Radical Paint Sets at certain consumer events or rallies (such as the Sturgis rally). (DPFOF P 48.) Harley-Davidson(R) owners can only buy a Radical Paint Set from a dealer. (DPFOF P 49.) If a dealer does not have or cannot locate the Radical Paint Set from another dealer, the consumer will not be able purchase that product from a dealer. (DPFOF P 50.)

In its 2006 Genuine Motor Accessories and Genuine Motor Parts Catalog ("2006 P & A Catalog"), Harley-Davidson included a paint set called "Radical Paint Set for Softail(R) FX Springer(R) Models - Scarecrow, Black and Blue" ("Scarecrow, Black and [*14] Blue" or "'Scarecrow, Black and Blue' Radical Paint Set"). (DPFOF P 8.) The 2006 P & A Catalog was available during the period Fall 2005 through early 2006. (DPFOF P 94.) The "Scarecrow, Black and Blue" Radical Paint Set was offered as a one-time limited edition. (PPFOF P 39.) Dealers wishing to order one or more "Scarecrow, Black and Blue" Radical Paint Sets were required to place their orders within two weeks of the conclusion of the Denver dealer show in July 2005. (PPFOF P 40.)

In its 2006 P & A Catalog, Harley-Davidson included nineteen (19) Radical Paint Sets, and two (2) Exotic Paint Sets. (DPFOF P 95.) Other paint sets among those in the 2006 P & A Catalog were named "Exotic Paint Set for Softail(R) Standard and Night Train(R) Models - Alien Spider, Candy Blue;" "Radical Paint Set for Sportster(R) Standard Models - Electric, Red and Black Flames and Lightning Bolt;" "Radical Custom Sheet Metal Set for Fat Boy Models - 3-D Flame, Metallic Blue with Blue Pinstripe;" "Gambler, Gold and Black;" "Venom, Yellow with Blue Flame;" "Villain, Black and Red;" and "Sneaky, Red on Blue;" (DPFOF P 97; Hartmann Aff., Ex. D; Pl.'s Resp. to DPFOF P 69; Hartmann Aff., Ex. D.)

The ad copy for the [*15] "Scarecrow, Black and Blue" Radical Paint Set as printed in the 2006 P & A Catalog, and other related materials, was: "Good for keeping away pests. Especially minivans. With a hardcore black and blue color scheme, your Softail FX Springer motorcycle will have no problems keeping conformity at bay. The miniature chrome 'Bar & Shield' logo authenticates the special design, and only 150 hand-numbered sets are available. (Available October, 2005.)" (DPFOF P 9; Hartmann Aff., Ex. D, H0022.)

The plaintiff acknowledges that the 2006 P & A Catalog is "advertising for the ['Scarecrow, Black and Blue' gas]

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 8 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                                    Page 7 of 17

tank. It describes the tank. It's a written description of a visual object. It's related." (DPFOF P 10; Harmann Aff. Ex. I, Ciociola Dep. II 23:1-4.) The plaintiff also acknowledges that the "Bar & Shield" logo is a trademark associated with Harley-Davidson. (DPFOF P 11; Hartmann Aff., Ex. H, Ciociola Dep. I 112:18-24, 125:24-136:9.)

The "Scarecrow, Black and Blue" Radical Paint Set includes a gas tank in which the silhouette of a standing scarecrow is painted against a blue and black background, surrounded by a drawing of barbed wire. The words "Harley-Davidson" arch over the head of the scarecrow, [*16] and there is a small "Bar & Shield" on the left side of the image. ⁴ (DPFOF P 13; Hartmann Aff., Ex. D, H0023; AH Aff. Ex. E.)

**FOOTNOTES**

₄ In order to aid the reader in visualizing the "Scarecrow, Black and Blue" Radical Paint Set, a picture of the "Scarecrow, Black and Blue" Radical Paint Set can be found in Appendix 2.

The gas tank for each of the Radical Paint Sets in the 2006 P & A Catalog includes either a Harley-Davidson logo or the words "Harley-Davidson." (DPFOF P 100.) The Plaintiff admitted that he expected consumers would know that the "Scarecrow, Black and Blue" Radical Paint Set was produced by Harley-Davidson, as stated in his deposition:

A. You need to understand Harley-Davidson, Albert. People know what their Radical Paint Sets look like. They're identified by a trademark in the corner. It's not hard.

Q. You mean the bar and shield?

A. That's a trademark, correct.

Q. I just want to make sure we're talking about the same trademark. That's something that you think people know what that is when they see it?

A. Albert, the tank says "Harley-Davidson" on the side.

Q. The tank, you mean?

A. Yeah. Doesn't it?

Q. To my recollection, it does.

A. A trademark.

(DPFOF P 105; Hartmann Aff., Ex. I, Ciociola [*17] Dep. II 36:4-20.)

The "Scarecrow, Black and Blue" Radical Paint Set was introduced to dealers in 2005. (DPFOF P 51.) Harley-Davidson began to work on the "Scarecrow, Black and Blue" Radical Paint Set, as well as the other Radical Paint Sets introduced at the same dealer meeting, in 2004. (DPFOF P 52.)

New paint sets are physically displayed at the dealer shows, together with a "hang tag" describing the paint set. (PPFOF P 34.) The "hang tag" is 4 to 6 feet high and is displayed over or near each paint set. (PPFOF P 35.) The "Scarecrow, Black and Blue" Radical Paint Set, together with its hang tag, were displayed at the Harley-Davidson sponsored rally in Sturgis, South Dakota in August 2005. (PPFOF P 38.)

The "Scarecrow, Black and Blue" Radical Paint Set was conceived and designed internally at Harley-Davidson by David Braun ("Braun") and Donnie Cunningham ("Cunningham"). (DPFOF P 53.) Braun was formerly employed by Harley-Davidson as a Category Manager for the Color Shop category in Harley-Davidson's Accessories division. (DPFOF P 54.) Cunningham was a former contractor of Harley-Davidson in the Color Shop category in Harley-Davidson's Accessories division. (DPFOF P 55.) The inspiration [*18] for the design started with an old advertisement used by Harley-Davidson which included a scarecrow image. (DPFOF P 56.)

During his deposition, Braun described how he arrived at the idea for the "Scarecrow, Black and Blue" design as follows:

So, for going through our product plan, we wanted to do a scarecrow because when you think of, like we were saying before, you are always looking for something different besides skulls and flames, and paging through magazines I came across a real cool Harley-Davidson ad showing I think a, I don't have that ad in front of me, but from my memory, it was like a green and blue flame job on a Road King, and it was in the country scene where there was a scarecrow in the background on a rolling hill.

And I am an avid motorcycle rider and I love taking back roads, and scarecrows have that little bit of an evil edge to it, and it's also got the aspect of the open road to it, because when you are driving along the

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815

Page 8 of 17

country road, you have all the barbed wire fences from the farms and you will see a scarecrow every once in a while. And so it's part of the whole image of Harley of that open road feeling, a little edge to it, but it's also feeling of Americana.

And **[\*19]** so, I was like, wow, this is something that we have never done before. I saw that ad and I literally just physically ripped it out of the ad and I handed it to Donnie and was like, Donnie, let's do a scarecrow design. Here's a piece of, here's an image for your design influence. And then from there, you know, he sits by himself and he went to work and he came up with the reiteration.

(DPFOF P 57; Hartmann Aff., Ex. X, Braun Dep. 31:24-33:4.)

Cunningham incorporated barbed wire to frame his design, using as a model the barbed wire which he has tattooed on his arm. (DPFOF P 59.) Barbed wire is associated with Harley-Davidson and Harley-Davidson(R) riders: "barbed wire is that, kind of has that edge, you know, you see a lot of Harley riders with tattoos of barbed wire going around their biceps. As well as you see a lot of decals in the marketplace and so barbed wire is a kind of common theme that you see within the Harley culture." (DPFOF P 60; Hartmann Aff., Ex. X, Braun Dep. 55:19-56:1.)

Cunningham next searched on Google Images for a scarecrow pattern and located an image of a Halloween costume that he reduced to a dark silhouette with no details. (DPFOF P 61.) When asked to describe **[\*20]** the overall development process, for the "Scarecrow, Black and Blue" design, Cunningham testified as follows:

I started out with a blank tank on hard file, meaning piece of paper, just -- and then would pencil sketch. I believe I pencil sketched the barbed wire first and then went online and looked up -- you know, typed in -- went to Google, typed in scarecrows, and then I went to images and looked up whatever images just to see what was out there as far as, you know, scarecrow ideas. Nothing really popped up. There was very few pictures.

I remember there was one that was like a costume from like a costume store. I remember grabbing that one and showing that to Dave [Braun] saying, hey, is this something, you know, that you want me to do. But given the way the paint lays down and how the process of the tanks are painted, it didn't matter what the actual image looked like because they weren't going to paint, you know, straw coming out of -- it's just going to be a silhouette.

So basically I had to find, you know, the shape and, you know, the style hats that they wore, clothing that they wore; if there was a stick standing up above their head or below their head, how they kind of stood **[\*21]** out in the field. So I just took that one that was from the costume place, showed that to Dave. He said yes.

So then I pencil-sketched, you know, the shape of the scarecrow that you see here on the tank and then airbrushed it in the computer. I think the whole set was done -- I probably did that whole bike in maybe an hour, two hours. Because with the -- you know, the silhouette, basically I just take that outline, scan it in, the pencil sketch, trace it in Photo Shop, place it on there, you know, put a color over the top of it. So it didn't take much time at all.

(DPFOF P 68; Hartmann Aff., Ex. T, Cunningham Dep. 19:14-21:5.)

Braun was ultimately responsible for approving the name for the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF P 70; Hartmann Aff., Ex. X, Braun Dep. 46:3-7.) Braun testified that the his team came up with the name "Scarecrow, Black and Blue." (PPFOF P 48; Def.'s Resp. to PPFOF P 48.) When asked about the process for naming the "Scarecrow, Black and Blue" Paint Set, Braun testified as follows:

What we always tried to do is name it to match the description from a marketable standpoint because, obviously, it's got a scarecrow on it with barbed wire so it makes **[\*22]** sense to call it that. So from one, you want to name something that is descriptive to match the character of the design.

And then we will add, sometimes, the color prefix after it to help, you know, further make it more understandable. Black and blue is the color of the tank. It's black and blue and it's a scarecrow, so that's how we code things.

(DPFOF P 71; Hartmann Aff., Ex. X, Braun Dep. 46:11-22.)

Before this lawsuit, neither Braun nor Cunningham had heard of Plaintiff. (DPFOF P 76.) The parties dispute whether any of the other Harley-Davidson employees involved in the conception or execution of the "Scarecrow, Black and Blue" Radical Paint Set, including the manager of Harley-Davidson's Accessories department, Paul Wiers, had heard of the plaintiff. (DPFOF P 77; Plaintiff's Resp. to DPFOF P 77.) Both parties agree that after the design was already created, the Director of Styling, Ray Drea, recalls an employee of the Styling department, Paul Martin, mentioning a motorcycle "pinstriper" named "scarecrow." (DPFOF P 78; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.) At his deposition, Drea testified:

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 10 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815

Page 9 of 17

Q. Were you at any time aware of Scarecrow Ed Ciociola prior to **[\*23]** this litigation?

A. No. No, that's not true. I did after when we were doing design, and this is where it gets fuzzy for me, after the design was completed − −

Q. Design on the Scarecrow Black and Blue?

A. Yeah, meaning approved, that okay, we're going to go to paint, we're going to put this into production. And I can't remember if it was just prior to going into production or after it was in production that at that time Paul Martin had said to me hey, did you know that there is a pinstriper that goes by the name of Scarecrow.

. . .

Q. So who would have heard Paul's comment about Scarecrow the pinstriper?

A. The way I'm remembering it is that Dave Keene, Dave Braun and Donnie may have been there, but the other two I believe were there.

(Plaintiff's Resp. to DPFOF P 77; Drea Dep. 16:22-17:9, 27:11-15.)

As Drea remembered the conversation with Martin, Martin did not provide Drea with any details of the artist's work during this conversation. (DPFOF P 79; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.) Drea had not heard of a motorcycle artist named "scarecrow" before that conversation. (DPFOF P 80; Hartmann Aff., Ex. DD, Drea Dep. 16:22-17:16, 18:18-24, 20:9-14.) Drea did not **[\*24]** share Martin's comment with anybody in the Accessories division. (DPFOF P 85; Hartmann Aff., Ex. DD, Drea Dep. 27:11-24.)

Gene Ostrum ("Ostrum"), Director of Field Sales, Operations and Strategy for North America, has known Ciociola as "Scarecrow" for over 20 years. (PPFOF PP 16-17.) Ostrum usually meets Ciociola yearly at either a rally or dealer event. Ciociola has been providing painting and pinstriping services as a vendor when Ostrum has seen him. Ostrum has seen Ciociola at Harley-Davidson's Sturgis event 3 or 4 times. (PPFOF P 17.)

Ostrum was the Field Sales Manager for North America during the development of the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF P 87.) Ostrum had no knowledge of "Scarecrow, Black and Blue" Radical Paint Set, and had not even seen a picture of it, until approximately one week before his deposition. (DPFOF P 88.) 5 Ostrum never mentioned Plaintiff or his artwork to anybody in the Harley-Davidson Accessories or Styling departments. (DPFOF P 89.)

**FOOTNOTES**

5 The plaintiff notes that Ostrum attended the Harley-Davidson Dealer's show in Denver in July 2005, and may have attended the Sturgis rally in South Dakota the following month. The "Scarecrow, Black and **[\*25]** Blue" Radical Paint Set with the accompanying description placard were displayed at both events. (Plaintiff's Resp. to DPFOF P 88.)

The parties dispute whether Ciociola met other Harley-Davidson personnel at Harley sponsored/sanctioned events. 6 (PPFOF P 15; Def.'s Resp. to PPFOF P 15.)

**FOOTNOTES**

6 Ciociola asserts that he met Jim Ziemer, President and CEO, at the National H.O.G. Rally in Chattanooga, TN in August 2005; Willie G. Davidson, Sr., Vice President, in Rapid City, SD in August 2002; Ruth Crowley at the National H.O.G. Rally in Chattanooga, TN in August 2005; Julie, Harley-Davidson designer, at the H-D Fall Ride in Tomahawk, WI in September 2005; Gene Ostrum, Director of Field Sales, Operations and Strategy for North America, in Rapid City, SD in August 2004; Mavis Feldpausch at a York PA rally; and Pam Hahn at a Tomahawk, WI rally. (PPFOF P 15.)

Platinum One manufactured the "Scarecrow, Black and Blue" Radical Paint Set for Harley-Davidson. (DPFOF P 90.) Platinum One shipped the "Scarecrow, Black and Blue" Radical Paint Sets to Harley-Davidson's dealers. (DPFOF P 91.) Platinum One shipped only 105 "Scarecrow, Black and Blue" Radical Paint Sets to Harley-Davidson dealers. (DPFOF P 92.)

Employees **[\*26]** of H-D, Inc. did not conceive or initiate the design for the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF P 108.) Employees of H-D, Inc. did not participate in communications regarding the commercial development of the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF P 109) Employees of H-D, Inc. did not

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 11 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 10 of 17

draw or create any artwork or designs which were incorporated into the "Scarecrow, Black and Blue" Radical Paint Set. (DPFOF P 110.)

Harley-Davidson had not produced a paint set depicting or referencing a scarecrow for at least ten years before offering the "Scarecrow, Black and Blue" Radical Paint Set in 2005, nor has it produced or offered such a paint since. (PPFOF P 41.) Harley-Davidson has not incorporated barbed wire in a paint set design since production of the "Scarecrow, Black and Blue" Radical Paint Set. (PPFOF P 43.) Harley-Davidson had incorporated barbed wire in the design of a paint set on one occasion in the past ten years, in January 2004. (PPFOF P 44; Def.'s Resp. to PPFOF P 44.) Ciociola first painted barbed wire on a car in the 1980's, and on motorcycles in 1997 or 1998. (PPFOF P 47.)

The 2006 Parts and Accessories Catalog depicting the "Scarecrow, Black **[*27]** and Blue" Radical Paint Set also listed an optional seat which could be purchased to accompany the Scarecrow paint set. The seat was black with a barbed wire outline, and did not contain a scarecrow graphic. The copy adjacent to the picture of the seat provides, in pertinent part:

> **Sidekick Seat for Softail Models - Scarecrow Pattern**
>
> Styled to match the Scarecrow Radical Paint Set, the color matched stitch pattern on the premium cowhide seating surface mirrors the bike's graphics for a true custom look.

(PPFOF P 45; Hartmann Aff., Ex. D, H0O22.)

Prospective names for products developed by Harley-Davidson's Color Shop (including paint sets) are submitted to HD Michigan, Inc., a wholly owned subsidiary of Harley-Davidson, for product name clearance. (PPFOF P 49.) HD Michigan, Inc. owns all Harley-Davidson trademarks. (PPFOF P 50.) HD Michigan, Inc.'s four employees and two contractors are licensed attorneys. (PPFOF PP 51-52.) The employees of HD Michigan, Inc. conduct clearance searches for new product names. (PPFOF P 54.) No written or formal protocol exists at HD Michigan, Inc. which its attorneys are required to follow in conducting new product name clearance searches. (PPFOF P 55; Def.'s **[*28]** Resp. to PPFOF P 55.)

HD Michigan, Inc. does not maintain a data base of Harley-Davidson vendors' names or vendors' product names to use when conducting new product name clearance searches. (PPFOF P 57; Def.'s Resp. to PPFOF P 57.) Following a product name clearance search the attorney will prepare a report which contains legal opinions and advice concerning the use of a proposed product name. (PPFOF P 58; Def.'s Resp. to PPFOF P 58.) Attorney Jennifer Anderson ("Anderson") conducted the clearance search for the "Scarecrow, Black and Blue" Radical Paint Set. (PPFOF P 59.) Harley-Davidson has refused to produce Anderson's clearance search report or related documents, invoking the attorney-client privilege. (PPFOF P 60.)

## II. SUMMARY JUDGMENT STANDARD

*HN1* A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) **[*29]** (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

*HN2* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of his adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment **[*30]** only when they present definite, competent evidence to rebut the motion.'" EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000) (quoting Smith v. Severn, 129 F.3d 419, 427 (7th Cir. 1997)).

*HN3* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (quoting Anderson, 477 U.S. at 255). "In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" Draghi v. County of Cook, 184 F.3d 689, 691 (7th Cir. 1999) (quoting Smith, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 12 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 11 of 17

Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson, 477 U.S. at 252*).

Thus, *HN4*"the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate **[*31]** time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*.

## III. DISCUSSION

In his complaint, Clociola asserts that the defendants' use of his unregistered "Scarecrow" service marks violates §43(a) of the Lanham Act. *HN5*The infringement of an unregistered mark is actionable under § 43(a) of the Lanham Act:

> *HN6*(a) Civil action.

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

> . . .

> shall be liable in a civil action by any person who believes that he or she is or is likely **[*32]** to be damaged by such act.

15 U.S.C. §1125(a); *see also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 435 (7th Cir. 1999)*.

*HN7*In order to prevail on a Lanham Act claim, "a plaintiff must establish that (1) [his] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001)* (citing *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461 (7th Cir. 2000)*). Plaintiffs must establish these two elements for both trademark infringement and unfair competition claims. *Packman, 267 F.3d at 638; see also International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir. 1988)* (outlining the same two prong test for a § 43(a) claim).

*HN8*In addition to contesting the validity of the mark, the defendant may invoke the "fair use" defense by showing that the alleged infringement "'is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . .'" *Id.* (quoting 15 U.S.C. § 1115(b)(4)). "This defense 'is based on the principle that no one should be able to **[*33]** appropriate descriptive language through trademark registration.'" *Id.* (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 951 (7th Cir. 1992)*).

*HN9*"In a trademark infringement case, . . . the determination that a defendant's use was a non-trademark use in good faith, and the finding that consumers are not likely to be confused about the origin of a defendant's products are questions of fact." *Packman, 267 F.3d at 637*. However, "these issues may be resolved on summary judgment 'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Id.* (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 171 (7th Cir. 1996)*.

Here, the defendants concede that there are issues of fact as to whether Clociola has a valid design mark, and as to what comprises Clociola's mark. However, the defendants argue that the evidence supporting their fair use defense, as well as the lack of evidence as to likelihood of confusion, are so overwhelmingly one sided that summary judgment is appropriate.

## A. Fair Use

*HN10*In order to prevail on a fair use defense, the defendants must show that: "(1) they used [the term "Scarecrow" and the scarecrow image] **[*34]** in a non-trademark use; (2) the phrase [or image] is descriptive of their goods or services; and (3) they used the phrase [or image] 'fairly and in good faith' only to describe their goods or services." *Packman, 267 F.3d at 639* (citing 15 U.S.C. § 1115(b)(4)).

## a. Non-Trademark Use

*HN11*In determining whether a term was used in a trademark use, the key question is whether the term was used

Case 1:08-cv-03280   Document 14-2   Filed 07/18/2008   Page 13 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 12 of 17

to identify the source of the products. *See Packman*, 267 F.3d at 640 (the phrase "The joy of six" did not identify the source of any of the defendants' memorabilia so defendants' use was "otherwise than as a trademark"); *M. B. H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980) (radio station's call letters and frequency, not the slogan, identified the source of advertising); *Platinum Home Mortg. Corp. v. Platinum Fin. Group*, 149 F.3d 722, 728 (7th Cir. 1998) ("platinum" described quality of mortgage services and did not identify particular source or designate specific origin of services).

The defendants argue that the prominent use of Harley-Davidson's well-recognized trademarks in the paint set design and the ad copy describing the product eliminate any argument that the scarecrow image **[*35]** or the word "Scarecrow" would be understood by consumers as source identifiers. Specifically, the defendants note that the words "Harley-Davidson" are emblazoned above the figure of the scarecrow in the "Scarecrow, Black and Blue" Radical Paint Set, which is the mark under which Harley-Davidson has sold its motorcycles and accessories for over 100 years. Moreover, the defendants note that Harley-Davidson places its "Bar & Shield" logo in the corner of the gas tank nearest where the rider sits.

In support of their contention that they are using the term "Scarecrow" or scarecrow image in a non-trademark sense, the defendants cite *Packman*, in which the Seventh Circuit found that the Chicago Tribune ("Tribune") used the plaintiff's registered trademark in a non-trademark sense. 267 F.3d at 640. In *Packman*, the plaintiff held federal and Illinois trademarks for the phrase "the joy of six," for use in relation to basketball and football games. *Id. at 633*. The plaintiff alleged that the Tribune infringed on this trademark when it reproduced its front page, which included the headline "The joy of six," onto promotional memorabilia. *Id. at 635*.

In concluding that the Tribune's use of "The joy **[*36]** of six" was a non-trademark use, the court noted that the Tribune's distinctive masthead, which appeared prominently on the front page, on all of the memorabilia containing the phrase, and on one side of the products' tags, plainly identified that the Tribune was the source of the products. *Id. at 639*. The court also noted that the Tribune's use of its well-known masthead identified the phrase as a newspaper headline, and not as a Tribune trademark. *Id.*

The court in *Packman* also cited *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1060 (7th Cir. 1995) in support. In *Sunmark*, the court held that Ocean Spray did not infringe upon the plaintiff's registered trademark "SweeTARTS" by using the phrase "sweet-tart" to describe its juice drinks. The court in *Sunmark* noted that Ocean Spray had not claimed exclusive use of the phrase "sweet-tart" and thus could not object if other makers of juice used it. *Id. at 1059*.

The court in *Packman* contrasted the situation in that case to that found in *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992). In *Sands*, the court found that the fair use defense was inapplicable because the defendant's slogan, "Gatorade is **[*37]** Thirst-Aid," used the plaintiff's "Thirst-Aid" mark as a trademark. *Id. at 954*. In reaching this conclusion, the court noted that the slogan "Thirst-Aid" appeared more prominently than "Gatorade" in the advertisements, and that the rhyming of "Gatorade" and "Thirst-Aid" created a "memorable slogan . . . uniquely associated" with the defendant's "Gatorade" product. *Id.*

In response, Ciociola argues that the facts in *Packman* are distinguishable from the facts in the case at hand. Specifically, the plaintiff argues that *Packman* involved a "straight-up trademark infringement case," and that in contrast this case presents a § 43(a) claim. [7] (Pl.'s Resp. Br. at 31.) Ciociola contends that the plaintiff in *Packman* did not argue that the public was confused as to the plaintiff's affiliation with or endorsement of the Tribune's t-shirts that contained the reproduction of the newspaper's front page. Moreover, according to Ciociola, in contrast to the case at hand, the plaintiff in *Packman* did not present evidence of actual confusion or secondary meaning. (Pl.'s Resp. Br. at 31-32.)

### FOOTNOTES

7 However, the plaintiff in *Packman* did not only bring a claim under § 1114, but also brought a claim under § 43 (a).

As **[*38]** an initial matter, *HN12* regardless of whether a suit is brought under 15 U.S.C. § 1114 for trademark infringement, or under § 43(a) for unfair competition, the analysis of the applicability of the fair use defense is identical. The defendant must meet the same three prongs in both types of cases in order to prevail on a fair use defense. [8] Indeed, it would seem nonsensical if a defendant invoking the fair use defense was under a greater burden in cases involving unregistered trademarks rather than registered trademarks, given that registered trademarks are afforded presumptions of validity under the Lanham Act.

### FOOTNOTES

8 As noted above, in order to prevail on a Lanham Act claim under either § 1114 or § 43(a), "a plaintiff must establish that (1) [his] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman*, 267 F.3d at 638; *see also International Kennel Club*, 846 F.2d at 1084.

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 14 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 13 of 17

HN13 Moreover, the defendants need not negate confusion in order to prevail on a fair use defense. As held by the Supreme Court, "the fair use defendant has no free-standing need to show confusion unlikely." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004). **[*39]** In reaching this conclusion, the Supreme Court noted that "[t]he common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *Id. at 122*. Moreover, the Supreme Court noted that placing a burden on the defendant to show nonconfusion would be incoherent because "it is only when a plaintiff has shown likely confusion by a preponderance of the evidence that a defendant could have any need" for the fair use defense. *Id. at 120*. [9] Such being the case, even if the plaintiff has evidence of actual confusion, a showing of actual confusion is not dispositive on the issue of whether the defendant has used the term "Scarecrow" or the scarecrow image in a non-trademark sense.

### FOOTNOTES

9 As noted by the plaintiff, the court in *Sunmark* stated that,

> HN14 When the products involved are similar, 'likelihood of confusion' may amount to using a word in a 'misleading' way, violating 15 U.S.C. § 1125(a)(1)--not because the likelihood of confusion **[*40]** makes the use nondescriptive, but because the confusion about the product's source shows that the words are being used, de facto, as a mark. And the defense is available only to one who uses the words of description 'otherwise than as a mark.'

64 F.3d at 1059.

However, the court also noted that the "'use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin of the product'" *Id.* (quoting *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528, 44 S. Ct. 615, 68 L. Ed. 1161, 1925 Dec. Comm'r Pat. 420 (1924); *see also KP Permanent Make-Up, 543 U.S. at 119* ("these cases are consistent with taking account of the likelihood of consumer confusion as one consideration in deciding whether a use is fair . . . [but] they do not stand for the proposition that an assessment of confusion alone may be dispositive.").

The plaintiff also argues that the defendants are using "Scarecrow" as a trademark because this word is identical to the plaintiff's word mark. However, HN15 the similarity of the marks is not dispositive on the issue of whether the defendants were using a term in a trademark sense. The fair use defense can still be applicable **[*41]** when the defendants use a term identical to the plaintiff's mark. *See Sunmark, 64 F.3d at 1059* (use of the phrase "sweet-tart" did not infringe upon the plaintiff's registered trademark "SweeTARTS").

As noted above, the key question is whether the term "Scarecrow," or the image of a scarecrow, was used to identify the source of the products. Although the similarity of the marks or the potential for consumers to be confused as to the source of the paint set are potential considerations, these factors are not dispositive on this question. After considering all the evidence in the light most favorable to the plaintiff, I conclude that the defendants did not use the scarecrow image or the term "Scarecrow" to identify the source of the products.

To begin with, the plaintiff has conceded that "[t]he scarecrow figure employed by Harley on the side of the gas tank of the paint set is distinguishable from Cioclola's scarecrow design mark." (Pl.'s Resp. Br. at 21.) Moreover, the plaintiff has admitted that he cannot identify a single instance in which he has painted a scarecrow as the primary image on a gas tank. (DPFOF P 128.) The plaintiff cannot sustain his argument that, essentially, any paint **[*42]** set featuring an image of a scarecrow indicates that the plaintiff was the source of the work, especially when he has never painted a scarecrow as a central figure. Simply stated, the evidence establishes that the defendants did not use the scarecrow image to identify the source of the products.

Moreover, given the prominence of Harley-Davidson's trademarks in the paint set design and the ad copy, as well as the defendants' use of the word "Scarecrow" in a descriptive sense, I conclude that the term "Scarecrow" was not used to identify the source of the products. The term "Scarecrow" was not used in a trademark sense, but rather in a descriptive sense to describe a particular product featuring a scarecrow originating from Harley-Davidson.

As noted above, the words "Harley-Davidson" are emblazoned above the figure of the scarecrow in the "Scarecrow, Black and Blue" Radical Paint Set. Harley-Davidson has sold its motorcycles and accessories under this mark for over 100 years. Moreover, Harley-Davidson places its "Bar & Shield" logo in the corner of the gas tank nearest where the rider sits. The plaintiff concedes that this "Bar & Shield" logo is a recognizable trademark which identifies **[*43]** Harley-Davidson products. As the plaintiff testified:

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 15 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                 Page 14 of 17

A. [Ciociola] You need to understand Harley-Davidson, Albert. People know what their Radical Paint Sets look like. They're identified by a trademark in the corner. It's not hard.

Q. You mean the bar and shield?

A. That's a trademark, correct.

(Hartmann Aff. Ex. I, Ciociola Dep. II 36:4-20.)

In addition to being featured prominently on the gas tanks on which was painted the "Scarecrow, Black and Blue" design, these Harley-Davidson trademarks are also featured on the front of the catalog, and in the ad copy describing the paint set. Specifically, the ad copy states that "The miniature chrome 'Bar & Shield' logo authenticates the special design, and only 150 hand-numbered sets are available. (DPFOF P 9; Hartmann Aff., Ex. D, H0022.) The prominent use of Harley-Davidson's trademarks in the catalog clearly indicates that the products listed originate from Harley-Davidson.

Moreover, the word "Scarecrow" was not found on the gas tank, and was only used in the ad copy and hang tag in combination with Harley-Davidson trademarks. The term "Scarecrow" was not featured prominently in the ad copy or hang tag, and merely was used to identify one particular  [*44] paint set. Indeed, the 2006 P & A Catalog contained 20 other paint sets, each with a different name. The name "Scarecrow, Black and Blue" was not featured any more prominently than any of the other names for the 20 paint sets. The plaintiff does not argue that it was unclear whether Harley-Davidson was the source for these other 20 paint sets.

Furthermore, the plaintiff's scarecrow design was not found on the gas tank, ad copy, or hang tag for the "Scarecrow, Black and Blue" paint set. As noted by the plaintiff, he places a version of his scarecrow design on every motorcycle he paints. (PPFOF P 26.) Ciociola also attends every Harley-Davidson, H.O.G., and dealer event using the scarecrow design, and his booth for such events has always incorporated signs using both the scarecrow word and design. (PPFOF P 18.) The complete absence of the plaintiff's scarecrow design, which he uses to identify that he is the source of the work, provides further support for a finding that Harley-Davidson identified itself, rather than the plaintiff, as the source of the product.

As with the prominent use of the Tribune's distinctive masthead in *Packman*, Harley-Davidson's prominent use of its distinctive  [*45] trademarks identifies Harley-Davidson as the source of the products. The prominent use of these trademarks, along with the less prominent use of the term "Scarecrow," indicates that the term "Scarecrow" is only being used to identify one particular paint set. [10] As will be discussed below, rather than using the term "Scarecrow" in a trademark sense, the defendants are using the term "Scarecrow" to describe a paint set that features the image of a scarecrow.

#### FOOTNOTES

10 The plaintiff argues that "if one considers the totality of Harley's catalog advertisement concerning the Scarecrow, Black and Blue Paint Set, it is clear Harley used the term "Scarecrow" as a trademark, and not in a descriptive sense." (Pl.'s Resp. Br. at 33.) However, the plaintiff does not provide any explanation for this conclusion. Moreover, the plaintiff argues that the defendants' use of the term "Scarecrow" was misleading because it "did not refer to its product as 'black and blue scarecrow' but as "Scarecrow, Black and Blue." (Pl.'s Resp. Br. at 33.) Again, the plaintiff does not explain how this is misleading as to the source of the product.

#### b. Descriptiveness of the Term "Scarecrow"

HN16 A descriptive term imparts information  [*46] directly or is "necessary to the description of the goods or services in question." *M. B. H. Enter., 633 F.2d at 54*. This is in contrast to "fanciful or coined devices, which are utterly undescriptive, and from 'suggestive' devices, which combine elements of descriptiveness and of fancy." *Id.* If a mark "stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Platinum Home Mortg. Corp., 149 F.3d at 727* (quoting *Sands, Taylor & Wood Co., 978 F.2d at 947*). "A person 'cannot appropriate the English language' and thereby render others inarticulate." *Packman, 267 F.3d at 641* (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986)*); *see also M. B. H. Enter., 633 F.2d at 55* (an owner of a registered mark "may not appropriate to itself common English slang terms and thus prevent others from using such phrases in their descriptive sense").

The plaintiff argues that the word "Scarecrow" is not a descriptive term because it is not an adjective, and "is not descriptive of a set of fenders and a gas tank." (Pl.'s Resp. Br. at 32.) Moreover, the plaintiff argues that even considering the design of the "Scarecrow,  [*47] Black and Blue" paint set, descriptive terms would include "shiny," "metallic," black," "blue," blue," "cheerful," "willowy," "a black and blue scarecrow," or "an outline of a scarecrow." (Pl.'s Resp. Br. at 32, 34.)

In my opinion, however, the term "Scarecrow" is descriptive of a paint set which features an image of a scarecrow. Indeed, it is difficult to understand how the term "Scarecrow" could not be considered descriptive of an image of a

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 16 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 15 of 17

scarecrow. The scarecrow image is the dominant image in the "Scarecrow, Black and Blue" paint set, and describing it as "shiny" or "metallic" would provide a much less clear description of this image then simply describing it as a "Scarecrow." It is also unclear how "a black and blue scarecrow" would be more descriptive than "Scarecrow, Black and Blue."

Moreover, the catalog is selling paint designs for fenders and gas tanks. A description of the paint design would involve describing the actual paint design, not the shape and color of the fenders and gas tank. Indeed, the plaintiff himself states, in his brief in response, that "a customer looking at Harley's gas tank would most likely refer to it as the "Scarecrow" tank, given the scarecrow graphic [*48] on the side." (Pl. Resp. Br. at 21.) The plaintiff further states in his brief that "[a] picture of a scarecrow is called or referred to as '"scarecrow.'" Id.

The plaintiff also argues that "Scarecrow" is not descriptive because the term is used in the ad copy for a "Sidekick Seat" that goes along with the "Scarecrow, Black and Blue" paint set, and the "Sidekick Seat" does not contain an image of a scarecrow. However, the ad copy states that the Scarecrow Pattern is "styled to match the Scarecrow Radical Paint Set, the color matched stitch pattern on the premium cowhide seating surface mirrors the bike's graphics for a true custom look. (PPFOF P 45; Hartmann Aff., Ex. D, H0022.) The term "Scarecrow" is still referring to the "Scarecrow, Black and Blue" Radical Paint Set that contains an image of a scarecrow. The seat is designed to match the paint set that contains an image of a scarecrow, and the ad copy for the seat is simply referring back to that particular paint set.

The plaintiff also notes that Harley-Davidson has a propensity for assigning fanciful names to its paint sets. In particular, the plaintiff notes that in the 2006 P & A catalog, at least 12 of the paint sets were named [*49] using whimsical or arbitrary terms, including "Gambler, Gold and Black," "Sneaky, Red on Blue," and "Villain, Black and Red." (Pl.'s Resp. to DPFOF P 69.) "Villain, Black and Red" contains an image of skulls and bones, and "Sneaky, Red on Blue" contains an image of flames. However, the existence of some arbitrary names for certain designs does not impact whether other names in the catalog are, in fact, descriptive. The 2006 catalog also contains names such as "Alien Spider, Candy Blue," "Electric, Red and Black Flames and Lightning Bolt," and "3-D Flame, Metallic Blue with Blue Pinstripe." DPFOF P 97.) These names describe the dominant image found in the paint set (i.e., an alien spider, red and black flames, and a 3-D flame), and are not arbitrary. Likewise, the name "Scarecrow, Black and Blue" is descriptive of a black and blue scarecrow.

The plaintiff further argues that, unlike the plaintiff in *Packman*, he has presented evidence that his "Scarecrow" mark has acquired secondary meaning. *See* 267 F.3d at 641 (finding that the phrase was descriptive in part because the record lacked any evidence that phrase had acquired a secondary meaning as used by the plaintiff). HN17 ⊤"Secondary meaning [*50] exists 'only if most consumers have come to think of the word not as descriptive at all but as the name of the product.'" *Packman*, 267 F. 3d at 639 (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986). "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark." *Id. at 641* (citing 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 15:5, at 15-9 (4th ed. 2001)).

Here, it is conceivable that some consumers might think of the plaintiff's "Scarecrow" mark as representing the plaintiff's pinstriping, detailing, and painting services. However, HN18 ⊤the owner of a mark that has acquired secondary meaning does not acquire an exclusive right "in the original, descriptive sense, but only in the secondary one associated with the markholder's goods." *KP Permanent Make-Up*, 543 U.S. at 122. As noted above, the word "Scarecrow" is not being used by the defendants to identify the plaintiff as the source of the paint design. Rather, the defendants are using the term in its original, descriptive [*51] sense; namely, to describe an image of a scarecrow.

Simply stated, the term "Scarecrow" is a term commonly used to describe an image of a scarecrow. 11 The defendants used the term to describe an image of a scarecrow, which was distinguishable from the plaintiff's scarecrow design. The plaintiff cannot appropriate the term to himself and thereby prevent others from using the term in a descriptive sense, as the defendants did in this case. *See Packman, 267 F.3d at 641.*

**FOOTNOTES**

11 It is unnecessary to discuss whether the image of the scarecrow in the paint set meets the second prong of the fair use defense, as the image of the scarecrow is the product itself (and, in essence, descriptive of itself).

**c. Good Faith**

The plaintiff argues that his long and pervasive association with Harley-Davidson dealers, Harley-Davidson owners, Harley-Davidson executives, and Harley-Davidson rallies and events; the strength of his mark among Harley-Davidson enthusiasts; Harley-Davidson's awareness of a pinstriper named "Scarecrow" during the design approval process for the "Scarecrow, Black and Blue" Radical Paint Set; the use of "Scarecrow" in a non-descriptive manner; and Harley-Davidson's refusal to produce a trademark [*52] clearance report for the "Scarecrow" design are all evidence of the defendants' bad faith.

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 17 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 16 of 17

HN19 "Mere knowledge of [plaintiff's] trademark on the phrase is insufficient to establish that the [defendant] acted in bad faith and to preclude summary judgment." *Packman, 267 F.3d at 642* (citing *M. B. H. Enter., 633 F.2d at 54*). Rather, good faith "can be judged only by inquiry into [the defendant's] subjective purpose in using the [term]." *M. B. H. Enter., 633 F.2d at 54.*

In *M.B.H. Enter.,* the plaintiff had a registered trademark for the phrase "I LOVE YOU" for services related to radio programs. *633 F.2d at 51.* The plaintiff had licensed a promotion using the phrase "I LOVE YOU MILWAUKEE" to the radio station WISN in Milwaukee. *Id.* The defendant radio station WOKY began its own campaign, and used the phrases "WOKY LOVES MILWAUKEE" and "I LOVE MILWAUKEE." *Id. at 52.* In holding that WOKY did not act in bad faith, the court found that WOKY's use of its call letters and radio frequency to identify WOKY as the source in each of the ads suggested that WOKY did not intend to use the phrases as trademarks. *Id. at 54-56; see also Packman, 267 F.3d at 642* (the presence of the Tribune's distinctive masthead **[*53]** above "The joy of six" headline and on every piece of memorabilia would not support an inference that the Tribune acted in bad faith).

Like the situations in *M.B.H. Enter.* and *Packman,* the defendants' prominent use of its distinctive Harley-Davidson trademarks on the paint design set, the ad copy, and catalog to indicate the source suggests a lack of intent to use the term "Scarecrow" as a trademark. Moreover, as discussed above, the term "Scarecrow" was only used in the ad copy and hang tags, and was not displayed any more prominently than the names of the other paint designs found in the catalog. Furthermore, as discussed above, the term "Scarecrow" was descriptive of the scarecrow image found in the paint design. Finally, as discussed above, the image of the scarecrow was distinguishable from the plaintiff's design mark, and the plaintiff had never painted an image of a scarecrow as the central image. All of these factors support an inference that the defendants did not act in bad faith.

It is true that the plaintiff has provided some evidence that certain individuals at Harley-Davidson were aware of a pinstriper known as "Scarecrow." However, the plaintiff has not presented evidence **[*54]** that the two individuals who conceived and designed the "Scarecrow, Black and Blue" Radical Paint Set internally at Harley-Davidson, David Braun and Donnie Cunningham, were aware of the plaintiff. Braun was ultimately responsible for approving the name for the "Scarecrow, Black and Blue" Radical Paint Set, and testified that the his team came up with the name. (DPFOF P 70; PPFOF P 48). The only evidence the plaintiff offers that indicates that individuals from the design team were aware of "Scarecrow" is a conversation which occurred after the "Scarecrow, Black and Blue" paint set was created. (DPFOF P 78, 81.) The other individuals identified by the plaintiff as being aware of his "Scarecrow" mark, such as Gene Ostrum, were not involved in the design process. (DPFOF P 86-89.)

Moreover, even assuming that members of the Harley-Davidson design team were aware of "Scarecrow" and his work, this alone fails to establish that the defendants acted in bad faith. The plaintiff has not provided any additional evidence indicating that the defendants acted with bad faith or with the intent to confuse the public as to the origin of the "Scarecrow, Black and Blue" Radical Paint Set. Indeed, the **[*55]** plaintiff concedes that "[n]o Harley employee testified that the company named the Scarecrow paint set in a deliberate attempt to rip-off Ed Ciociola." (Pl.'s Resp. Br. at 27.) As noted above, mere knowledge of the plaintiff's mark is insufficient to establish that the defendants acted in bad faith and to preclude summary judgment.

Harley-Davidson's refusal to produce a "trademark" clearance report for the "Scarecrow" design due to attorney-client privilege is also not evidence of the defendants' bad faith. The plaintiff is merely speculating as to the content of an attorney-client communication, and the reason for the refusal to produce the report. At most, this may indicate that the defendants were aware of the "Scarecrow" mark when designing the paint set. Once again, however, this is insufficient to establish that the defendants acted in bad faith.

Moreover, the defendants have produced evidence that product names, including paint set names, are not treated as trademarks that will be used by Harley as a source identifier. Attorney Jennifer Anderson ("Anderson"), who conducted the clearance search for the "Scarecrow, Black and Blue" Radical Paint Set, testified that

    A. If it's a trademark **[*56]** and it's going to be used by the company as a brand name, as a source identifier, and we're planning to seek protection and exclusivity . . . we will do a Thomson & Thomson search.

    Q. . . . When don't you use Thomson?

    A. When we have product names. And that might be from color shop, wheels, and paint set names.

(Hartmann Aff., Ex. HH, Ziegler Dep. 16:3-22.)

The plaintiff has not produced any evidence that would support an inference that the defendants acted in bad faith. Rather, the evidence indicates that the defendants used the name "Scarecrow, Black and Blue" to describe a paint set that featured the image of a scarecrow.

In sum, the evidence is so one-sided that there can be no doubt about whether the defendants' use of the term "Scarecrow" and the scarecrow image was fair use. The defendants' use of the term "Scarecrow" was a non-trademark use, in good faith, to describe a paint set featuring an image of a scarecrow. The plaintiff has failed to

Case 1:08-cv-03280     Document 14-2     Filed 07/18/2008     Page 18 of 30

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 33815                    Page 17 of 17

produce evidence creating a genuine issue of fact as to any of the three elements of the fair use defense. Thus, the defendants' motion for summary judgment will be granted.

### B. Likelihood of Confusion

Given that the defendants have established **[*57]** that their use of the term "Scarecrow" and the scarecrow image was fair use, it is unnecessary to discuss the issue of likelihood of confusion. *HN20*The possible existence of confusion does not negate the establishment of the fair use defense. Indeed, if the defendants' fair use of the term "Scarecrow" resulted in any confusion, "that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *KP Permanent Make-Up, 543 U.S. at 122* (quoting *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30 (2nd Cir. 1997))*.

### IV. CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendants' motion for summary judgment will be granted because the plaintiff has failed to establish a genuine issue of material fact as to any of the three elements of the fair use defense.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment be and hereby is **GRANTED;**

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED;**

**SO ORDERED** this 24th day of April 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.

WILLIAM E. CALLAHAN, JR.

United States Magistrate Judge

[SEE **[*58]** APPENDIX 1 IN ORIGINAL]

[SEE APPENDIX 2 IN ORIGINAL]

Service: Get by LEXSEE®
Citation: 2008 U.S. Dist. LEXIS 33815
View: Full
Date/Time: Friday, June 13, 2008 - 11:45 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓧ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.



Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

**LexisNexis®**   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 19 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 1 of 12

LexisNexis® *Total Research System*                    Switch Client | Preferences | Sign Off | ? Help

Search  Research Tasks  Get a Document  Shepard's®  Alerts  Total Litigator  Transactional Advisor  Counsel Selector    History  ⌨

Service:  Get by LEXSEE®
Citation:  2005 U.S. Dist. LEXIS 23420

*2005 U.S. Dist. LEXIS 23420, \**

TY, INC., Plaintiff, v. PUBLICATIONS INTERNATIONAL, LTD., Defendant.

No. 99 C 5565

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2005 U.S. Dist. LEXIS 23420

February 25, 2005, Decided
February 25, 2005, Filed

**PRIOR HISTORY:** Ty, Inc. v. Publ'ns Int'l, LTD., 2004 U.S. Dist. LEXIS 21765 (N.D. Ill., Oct. 21, 2004)

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff manufacturer filed an action against defendant publisher, alleging copyright and trademark infringement. In prior proceedings, the court addressed the claim of copyright infringement. The publisher filed a motion for summary judgment on the manufacturer's claims alleging trademark infringement.

**OVERVIEW:** The manufacturer claimed that the publisher committed trademark infringement when it sold books about stuffed animals the manufacturer produced and used pictures of those animals in its books. The publisher denied the claim, arguing, inter alia, that the manufacturer's claim alleging common law infringement, which was based on 15 U.S.C.S. § 1125(a), unnecessarily duplicated its claims based on 15 U.S.C.S. § 1114(1) because both claims related to the manufacturer's registered trademarks rather than to any unregistered trademarks. The court held that (1) in order to avoid summary judgment on its common law claims, the manufacturer had to point to facts demonstrating endorsement, sponsorship, or affiliation between it and its licensees in the mind of consumers, and the evidence it offered was not sufficient to meet that burden; but (2) the publisher did not show that its use of the manufacturer's animals in books it published was nominative fair use, i.e., use solely to name the manufacturer's product so that it could identify and market its own product, and the publisher was not entitled to summary judgment on the manufacturer's claim alleging infringement of registered marks.

**OUTCOME:** The court granted the publisher's motion for summary judgment on the manufacturer's claim alleging common law trademark infringement, but denied the publisher's motion for summary judgment on the manufacturer's claim alleging infringement of registered trademarks.

**CORE TERMS:** fair use, nominative, trademark, licensee, summary judgment, logo, trademark infringement, common law, consumer's, sponsorship, licensed, endorsement, toy, registered, magazine, tag, affiliation, reasonably necessary, infringement, collector's, licensor, prong, licensing, license, matter of law, customer, law claims, issues of fact, plush, disclaimer

**LEXISNEXIS® HEADNOTES**                                                        ⊟ **Hide**

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview 🔍
Civil Procedure > Summary Judgment > Standards > General Overview 🔍
*HN1* ⬦ Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to the plaintiff. Once the moving party presents a prima facie case showing that it is entitled to judgment as a matter of law, the nonmoving party may not rest upon the mere allegations or denials in its pleading but must set forth specific facts showing that a genuine issue for trial exists. More Like This Headnote

Trademark Law > Conveyances > Licenses 🔍
*HN2* ⬦ Generally speaking, licensors can acquire protectable interests in a trademark by use of a controlled license. More Like This Headnote

Case 1:08-cv-03280   Document 14-2   Filed 07/18/2008   Page 20 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 2 of 12

Trademark Law > Conveyances > Licenses
HN3⬇Ownership rights in a trademark or service mark can be acquired and maintained through the use of the
mark by a controlled licensee even when the first and only use of the mark was made, and is being
made, by the licensee. This is because use of a designation as a mark by a qualified licensee inures to the
benefit of the licensor, who as a result becomes owner of the trademark or service mark rights in the
designation.   More Like This Headnote

Trademark Law > Infringement Actions > General Overview
Trademark Law > Protection of Rights > Conveyances > General Overview
HN4⬇An association of endorsement, sponsorship, or affiliation in the mind of consumers is a necessary
predicate to a claim of common law rights, which exist to protect such an association after it is
established. The keystone of trademark infringement is the likelihood of confusion as to source,
affiliation, connection, or sponsorship of goods or services among the relevant class of customers and
potential customers.   More Like This Headnote

Trademark Law > Conveyances > Licenses
Trademark Law > Infringement Actions > Summary Judgment > Standards
HN5⬇Common law rights in marks stem from endorsement, sponsorship, or affiliation, or the appearance
thereof; alone, the existence of licensing agreements and the revenue generated under those
agreements are neither compelling evidence of such an association nor even minimally sufficient to
withstand summary judgment.   More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
HN6⬇The United States Court of Appeals for the Ninth Circuit has recognized and upheld the nominative fair
use defense in circumstances where a defendant can satisfy a three-part test. The defendant must show
that its product was not reasonably identifiable without the plaintiff's mark, that it used no more of the
plaintiff's mark than was reasonably necessary, and that it did not use the mark in a manner likely to
suggest sponsorship or endorsement of its product by the plaintiff.   More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
HN7⬇The nominative fair use defense arises in cases when it is conceded or obvious that a defendant has used
the plaintiff's mark to describe the plaintiff's product. Such nominative use of a mark, where the only
word reasonably available to describe a particular thing is pressed into service, lies outside the strictures
of trademark law. The United States Court of Appeals for the Ninth Circuit has explained that the type of
fair use recognized in its New Kids on the Block decision extends to situations in which a defendant uses
a plaintiff's mark to describe the plaintiff's product even if the defendant's ultimate goal is to describe his
own product. The court observed that this is in fact the standard case of nominative fair use. Only rarely,
if ever, will a defendant choose to refer to the plaintiff's product unless that reference ultimately helps to
describe the defendant's own product.   More Like This Headnote | Shepardize: Restrict By Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Classic Fair Use
Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 7th Circuit Court
HN8⬇The United States Court of Appeals for the Seventh Circuit has not ruled on the applicability of the
nominative fair use defense, nor the standards by which a claim of nominative fair use should be
evaluated. However, the court of appeals has ruled that a finding of a likelihood of confusion does not
preclude consideration of the classic descriptive fair use defense. That reasoning was recently approved
by the United States Supreme Court. Focusing on the text of 15 U.S.C.S. § 1114, establishing the
likelihood of confusion as the benchmark for determining trademark infringement, and 15 U.S.C.S. §
1115(b)(4), establishing the fair use defense, and employing traditional canons of statutory
interpretation, the Court noted that Congress placed upon the party claiming infringement the burden of
proving the likelihood of confusion in 15 U.S.C.S. § 1114, but said nothing about likelihood of confusion
in setting out the elements of the fair use defense in 15 U.S.C.S. § 1115(b)(4). Both the statute and the
common law of unfair competition support the premise that fair use can occur along with some degree of
confusion.   More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Classic Fair Use
Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
HN9⬇While the United States Supreme Court specifically declined to address the nominative fair use defense in
its KP Permanent Make-Up decision, the United States District Court for the District of Illinois, Eastern
Division, is persuaded that the Court's logic applies with similar force to defendants pursuing the defense
of nominative fair use despite the almost certain likelihood of confusion regarding the source of a
trademark. While this does not mean that consumer confusion is not relevant to the issue of fair use, it
does suggest that the district court should not disregard a defense of nominative fair use simply because
a likelihood of confusion exists. The test which the United States Court of Appeals for the Ninth Circuit

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 21 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 3 of 12

articulated in its New Kids on the Block decision provides sound criteria for assessing when nominative use is fair or unfair, despite a likelihood of confusion among consumers.  More Like This Headnote |
*Shepardize: Restrict By Headnote*

Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
HN10± A likelihood of confusion should not bar the door to a nominative fair use defense; if the use is necessary, then other, more refined criteria are needed to determine if the use might still be fair. The criteria which the United States Court of Appeals for the Ninth Circuit articulated in its New Kids on the Block decision are far better suited to that task.  More Like This Headnote

Trademark Law > Infringement Actions > Summary Judgment > Standards
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
HN11± In cases of trademark infringement subject to the likelihood of confusion analysis, the standard for gaining summary judgment is high.  More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
Trademark Law > Infringement Actions > Determinations
HN12± While the number of times an image appears is not dispositive, it is relevant to the factual issue of whether a party who is accused of trademark infringement used more of the logo than reasonably necessary for its product.  More Like This Headnote

Trademark Law > Infringement Actions > Defenses > Fair Use > Nominative Fair Use
Trademark Law > Infringement Actions > Determinations
HN13± What is reasonably necessary to identify a plaintiff's product differs from case to case.  More Like This Headnote

COUNSEL: [*1] For Ty Inc, Plaintiff: Avrum Sidney Katz, John Aron Carnahan, Joseph Eben Cwik, Welsh & Katz, Ltd., Chicago, IL.

For Publications International Inc, Defendant: William F Patry, Thelen, Reid & Priest LLP, New York, NY; E. Leonard Rubin, John L. Hines, Jr., Sachnoff & Weaver, Ltd., Chicago, IL.

JUDGES: James B. Zagel, United States District Judge.

OPINION BY: James B. Zagel

OPINION

MEMORANDUM OPINION AND ORDER

This is the second motion for summary judgment (in effect a delayed cross-motion) that I have entertained from the parties to this litigation: Ty, Inc. ▾ ("Ty"), the maker of the famed Beanie Babies plush toys, and Publications International, Ltd. ▾ ("PIL"), the publisher of a series of books and magazines designed as collectors' guides to Ty's products. PIL has moved for summary judgment of Ty's claim of trademark infringement, presenting two arguments in support of its motion. [1] First, PIL argues that Ty has no claim of common law trademark infringement because: a) Ty has not used the mark in connection with collectors' guides; b) the actions of Ty's licensees are not sufficient to form a legal basis for liability; and c) even if Ty has asserted a legal claim of common law trademark [*2] infringement, PIL has a nominative fair use defense. Second, PIL argues that Ty's claim for infringement of a registered trademark must fail because PIL has a nominative fair use defense for all of the alleged infringing uses; or alternatively, because Ty failed to offer facts demonstrating a likelihood of confusion. [2] I review each of PIL's arguments in turn.

FOOTNOTES

1 Ty also asserted a claim for trademark dilution but withdrew this count in response to PIL's assertion that it had no intention to resume publication of the accused books and magazines.

2 Count IV of Ty's Complaint appears to raise state law claims based on the allegations made within the rest of the Complaint. PIL moved for summary judgment of this count, arguing that the claims were duplicative of Ty's federal claims in Count I (trademark infringement) and would be governed by my decision on the issue of trademark infringement. See McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1174 n.9 (7th Cir. 1986) (holding Lanham Act analysis dispositive of claim under Illinois Deceptive Trade Practices Act, which in turn is dispositive of unfair competition claim under Illinois common law). Ty failed to respond to PIL's arguments,

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 22 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 4 of 12

waiving any argument that the Count was not governed by the resolution of its trademark infringement claims. Therefore, the claims embedded in Count IV remain only to the extent that Ty's federal claim of trademark infringement survives this motion for summary judgment.

[*3] *HN1* Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." _Fed. R. Civ. P. 56(c)_. See also _Celotex Corp. v. Catrett, 477 U.S. 317, 322-33, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)_. A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the plaintiff's favor, allowing for all reasonable inferences drawn in a light most favorable to the plaintiff. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)_. Once the moving party presents a prima facie case showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleading but must set forth specific facts showing that a genuine issue for trial exists. _Id. at 256-57_.

## I. Ty's Claim of Common Law Trademark Infringement

### A. The Scope of Ty's Common Law Claim

The parties vigorously dispute the scope of Ty's [*4] common law claim. PIL insists that Ty's claim of common law infringement, based on _15 U.S.C. § 1125(a)_, unnecessarily duplicates its claims based on _15 U.S.C. § 1114(1)_, because both claims relate to Ty's registered marks ("Beanie Babies" and the Ty Heart Logo) rather than to any unregistered trademarks. Ty naturally disagrees, stating that it alleged "infringement of its registered trademarks as well as violation of _Section 43(a)_ because PIL has infringed Ty's registered trademarks as well as its unregistered trademark rights that Ty owns through its licensees' use of the Beanie Babies and TY HEART LOGO trademarks." _Pl. Resp. Mem._ at 6. Ty narrows the scope of its common law claim when it states that "Ty's _Section 43(a)_ claim stems, ~~in part, from the common law trademark rights that Ty has obtained by virtue of its licensees' use of Ty's~~ trademarks." _Id._ (emphasis added). However, Ty never offers another basis for its common law _§ 43(a)_ claim. Therefore, I find that its claim is limited to any common law trademark rights Ty obtained through its licensees' use of its trademarks.

### B. Ty's Licensees and Its Common Law Trademark [*5] Infringement Claim

At issue is whether Ty can claim common law rights in two marks ("Beanie Babies" and the Ty Heart Logo) as they are used in books and magazines. Whether Ty can establish common law rights in these marks depends on the conduct of Ty and the parties to whom it licensed use of the marks. *HN2* Generally speaking, licensors can acquire protectable interests in a trademark by use of a controlled license.

> *HN3* Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee. This is because use of a designation as a mark by a qualified licensee inures to the benefit of the licensor, who as a result becomes owner of the trademark or service mark rights in the designation.

J. Thomas McCarthy, 4 _McCarthy on Trademarks and Unfair Competition_ § 18:46 (2004). In this case, Ty issued licenses to several publishers, which used Ty's marks in connection with the publication of books, magazines and even websites about Ty's plush toy products.

In order to avoid summary judgment of its common law claims, Ty must point [*6] to facts demonstrating endorsement, sponsorship or affiliation between Ty and its licensees in the mind of consumers. *HN4* An association of endorsement, sponsorship or affiliation in the mind of consumers is a necessary predicate to a claim of common law rights, which exist to protect such an association after it is established. See _Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 436 (7th Cir. 1999)_ ("The keystone' of trademark infringement is likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers") (quoting _Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960, 964 (6th Cir. 1987)_).

Ty appears to assert that its licenses, in and of themselves, are "compelling evidence" that it established common law rights in its trademarks as used in connection with books and magazines. _Pl. Resp. Mem._ at 6-7. These licenses (and settlement agreements that in some cases preceded the licenses) generated over $ 2.6 million in royalties for Ty. However, as noted above, *HN5* common law rights in marks stem from endorsement, sponsorship [*7] or affiliation (or the appearance thereof); alone, the existence of licensing agreements and the revenue generated under those agreements are neither compelling evidence of such an association nor even minimally sufficient to withstand PIL's motion for summary judgment.

Both parties direct my attention to the language of the actual licensing agreements as evidence that Ty did (or, as PIL argues, did not) establish common law trademark rights by virtue of its licensees' use of the marks. PIL makes the better argument, however, when it suggests that the language of these agreements clearly required licensees to

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 23 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 5 of 12

hold out their licensed products in a way that prevented consumers from forming any association of sponsorship or endorsement by, or any other affiliation with Ty. A typical licensing agreement between Ty and a licensee reads, in relevant part, as follows:

**8. COPYRIGHT AND TRADEMARK NOTICES AND LICENSING STATEMENT.**

a) The Licensee shall cause to be printed, on the copyright page of each Licensed Product published under this Agreement and on the initial screen of their web sites, for copyrighted material and trademarks owned by Licensor (i) the appropriate **[*8]** copyright notice as set forth in subparagraph b) hereof; (ii) the appropriate trademark notice as set forth in subparagraph c) hereof; and (iii) an appropriate licensing statement as directed in subparagraph d) hereof, as may be amended from time to time by Licensor. The Licensee shall further cause to be printed immediately adjacent to each photograph of each BEANIE BABIES Design and each reproduction of the BEANIE BABIES Poems, the designation "©19   , Ty Inc. ▾"

The Licensee shall further cause to be printed on the first page preceding the Buyer's Guide section of the Licensed Products containing any TY INC. ▾Designs published under this Agreement, the appropriate copyright notice as set forth in paragraph b) hereof, as may be amended from time to time by Licensor. Any permitted usage by Licensor of Ty's trademarks in the headlines or headers of the publications, and the individual names of the Ty Inc. ▾plush products contained in the Price Guide section of the Licensed Products, shall be followed by (R) if registered, or (tm) if not registered, provided, however, that the "(tm)" designation shall not be placed next to the words "Garcia," "Sparky," "Tabasco," "Doodle," **[*9]** "Seamore," or "Lizz." In this regard, Licensor will provide Licensee a list of all existing registered and non-registered trademarks and will notify Licensee if any common-law trademarks used by Licensor in connection with the TY INC. ▾Designs become registered with the United States Trademark Office, within thirty (30) days of the issuance of such registration by the United States Trademark Office.

[. . .]

c) The appropriate trademark statement is as follows:

BEANIE BABIES(R), Ty(R), and the Ty Heart Logo are registered trademarks of Ty Inc. ▾
BEANIE(tm), BEANIES(tm), and the individual names of most of the Ty Inc. ▾plush animals depicted in this publication are also trademarks of Ty Inc. ▾

d) The appropriate licensing statement is as follows:

This publication (web site) is not sponsored or endorsed by, or otherwise affiliated with Ty Inc. ▾All Copyrights and Trademarks of Ty Inc. ▾are used by permission. All rights reserved.

**9. SPECIFIC UNDERTAKINGS OF LICENSEE.** During the term and any renewal period herein provided for and thereafter, Licensee agrees that:

a) other than the notices set forth in Paragraph 8 above, it will not indicate, **[*10]** on the Licensed Products, or any advertising or marketing materials for the Licensed Products, that the Licensed Products are "Official" Ty Inc. ▾products, or that the Licensed Products are otherwise licensed by, affiliated with or sponsored by Ty Inc. ▾ provided, however, that Licensee may indicate, in its advertising and marketing materials to its customers (i.e. the trade, and not the ultimate consumer) that Licensee has obtained a license from Ty Inc. ▾in connection with the Licensed Products, so long as such licensing statement is not the focal point, predominant aspect, or in the headline of the advertising and marketing materials . . .

*Def. Decl. in Support of Rule 56.1(a) (3) Statement of Fact*, Exh. 8.

PIL contends that § 8(d) and § 9(a) of the sample agreement are express disclaimers that the licensed books and magazines were not sponsored or endorsed by, or otherwise affiliated with, Ty. PIL also notes that the licensed products were published under the respective brands of the individual (licensee) publishers. Thus, concludes PIL, "the books were held out to the public specifically as being independent of Ty . . . such use of the marks could not possibly create **[*11]** the consumer perception of source, sponsorship, affiliation or endorsement required to establish ownership of common law trademark rights." *Def. Rep. Mem.* at 2-3.

In response, Ty claims that its licensees' use of its "well-known" trademarks conveyed to consumers the message that Ty had licensed the publications in question and was controlling the quality of the publications sold under Ty's

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 24 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 6 of 12

marks. *See McCarthy*, § 18:48 (warning against uncontrolled licensing of a mark and stating that a "trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark"). ³ Ty, however, failed to offer any evidence to support this claim. The $ 2.6 million in royalties that Ty collected from its licensees is not evidence that consumers purchased the licensed products because they believed Ty was controlling the publications, particularly in light of the disclaimers Ty's licensees were required to publish.

**FOOTNOTES**

₃ Ty also references two cases holding that a licensee's use of a trademark did not strip the licensor of trademark rights. *See General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986) (licensees do not misrepresent source of product; the licensee whose name appears on the product is the source of the product); *Financial Matters, Inc. v. Pepsico, Inc.*, 806 F. Supp. 480, 482 n.2 (S.D.N.Y. 1992) ("the public need not know the name of the trademark owner for their (sic) to be goodwill in a mark"). I do not find these cases particularly instructive, as the issue is not whether Ty's licensees stripped Ty of its trademark rights but whether Ty can assert common law rights in the mark based on the manner in which the licensees used the mark.

**[*12]** Ty attempts to raise an issue of material fact by pointing to the language of the licensing agreements, which requires licensees to indicate "all Copyrights and Trademarks of Ty Inc. ⌐are used *by permission.*" *Def. Decl.*, Exh. § 8(d) (emphasis added). Ty suggests that this is evidence consumers knew Ty had licensed the use of its marks. Whether or not it constitutes evidence of consumer's knowledge of Ty's decision to license its mark, it is not evidence of consumer perceptions of sponsorship, affiliation or endorsement necessary to confer common law trademark rights on Ty. Viewed in concert with the other, explicit disclaimers demanded by Ty, the words "used by permission" do not allow Ty to avoid summary judgment.

In a final effort to offer facts that would allow it to assert common law rights in its marks, Ty notes that in two instances, licensees were explicitly permitted to inform customers that they had obtained a license from Ty. H&S Media, Inc. received permission to inform readers that it had entered into a license with Ty in one issue of its magazine and for two weeks on its website. Tuff Stuff Publications was permitted to send a letter to customers indicating that **[*13]** its products are licensed by Ty. This is not, however, "compelling evidence that Ty has establish [ed] common law rights" in its trademarks by virtue of its licensees' use of the marks. *Pl. Resp. Br.* at 6. Absent other evidence, these limited disclosures are not sufficient to raise questions of material fact regarding consumer perceptions of Ty's affiliation with, or sponsorship or endorsement of the licensed publications. PIL's motion for summary judgment of Ty's common law trademark infringement claims is granted. ⁴

**FOOTNOTES**

₄ Because Ty is unable to claim common law rights in its trademarks based on its licensees' use of the marks, there is no need for me to address PIL's argument that if such rights existed, PIL's use of the marks was nominative fair use and therefore non-infringing.

## II. Ty's Claim of Infringement of its Registered Marks

### A. The Nominative Fair Use Defense

As a defense to Ty's allegation of infringement of its registered marks, PIL asserts that its use of Ty's two marks **[*14]** (the Beanie Babies mark and the Ty Heart Logo) were merely nominative: i.e., used solely to name Ty's product so that PIL might identify and market its own product. *HN6⌐*The Ninth Circuit Court of Appeals has recognized and upheld this defense in circumstances where the defendant can satisfy a three-part test. *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (holding that the defendant must show that its product was not reasonably identifiable without the plaintiff's mark; that it used no more of the plaintiff's mark than was reasonably necessary; and that it did not use the mark in a manner likely to suggest sponsorship or endorsement of its product by the plaintiff). PIL claims that it easily satisfies this test, and that having successfully alleged nominative fair use, the "likelihood of confusion" element normally essential in trademark infringement cases becomes irrelevant. Another way of putting it is to say that "confusion" in this type of use of a mark is tolerated.

*HN7⌐*The nominative fair use defense arises in cases when it is conceded -- or obvious -- that the defendant has used the plaintiff's mark to describe the plaintiff's product. **[*15]** *New Kids*, 971 F.2d at 308. As Judge Kozinski first noted, "such *nominative use* of a mark -- where the only word reasonably available to describe a particular thing is pressed into service -- lies outside the strictures of trademark law." ⁵ *Id.* (emphasis in original). Ten years later, the Ninth Circuit explained that the type of fair use recognized in *New Kids* naturally extends to situations in which the defendant uses the plaintiff's mark to describe the plaintiff's product "*even if the defendant's ultimate goal is to describe his own product.*" *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis in original). The Court observed that "this is in fact the standard case of nominative fair use: Only rarely, if ever, will a defendant choose to refer to the plaintiff's product unless that reference ultimately helps to describe the defendant's

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 25 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 7 of 12

own product." *Id. at 1151, n. 8.*

**FOOTNOTES**

5 The term "nominative fair use" might just as easily have been labeled "denominative fair use," "proper name fair use," "reference fair use," "signifying fair use," or, *apropos* of the parties in this case, "tag fair use." (I suppose Judge Kozinksi would call this exercise synonymatic analysis.)

[*16] Much of the parties' present disagreement centers around the relationship between the nominative fair use defense and the existence of a likelihood of confusion (the standard for demonstrating infringement). One treatise refers to nominative fair use as a type of "non-confusing" fair use. *McCarthy*, § 23:11 ("this has been dubbed a non-confusing nominative use' because it names' the real owner of the mark"). It is possible, I suppose, that a defendant's (or junior user's) use of a plaintiff's (or senior user's) mark to identify the plaintiff's product may not always be confusing. *See, e.g., New Kids, 971 F.2d at 307-08* (finding that the newspapers' use of a band's mark did not constitute unfair competition; the dispute belonged to a "class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one). However, the *Cairns* version of the defense (i.e., when the defendant uses the plaintiff's mark with the ultimate purpose of describing its own product) extends the doctrine beyond McCarthy's presumptively non-confusing nominative use to a use that, while nominative, [*17] is *presumptively confusing.* Consider the facts of the present case. Defendant PIL includes Ty's mark within the title of its own book, *For the Love of Beanie Babies.* Absent other information, PIL's use of Ty's mark is inherently, almost inescapably confusing: standing alone, a consumer cannot tell whether PIL's product is sponsored by, endorsed by or affiliated with Ty.

Judge Kozinski's opinion for the Court recognized this dilemma and abandoned the likelihood of confusion test in cases of nominative use. *Id. at 308.* In its place, the Court established a test better suited to the distinctive situation in which a defendant uses the plaintiff's mark in order to identify (name) the plaintiff's product. *Id.* This is not a simple augmentation of the likelihood of confusion test. Rather, the test assumes a likelihood of confusion, and notwithstanding that confusion, provides an opportunity to determine whether the defendant's use of the mark infringes or can be defended as "fair use." 6

**FOOTNOTES**

6 *Cf. Restatement (Third) of Unfair Competition § 28* (1995). The Restatement notes a "substantial uncertainty regarding the nature of the fair use doctrine" and its relationship to the likelihood of confusion analysis. RST (3rd) *§ 28 cmt. b.* However, the Restatement excludes from "fair use" the type of nominative use identified by the Ninth Circuit in *New Kids* and *Cairns.*

The term "fair use" is also occasionally applied to the use of another's trademark for the purpose of referring to the owner of the mark or to the owner's goods or services [citing *New Kids*]. However, such a use does not implicate the private and public interest in preserving access to the original lexicographic meaning of the descriptive terms and is not within the scope of this Section ["Descriptive Use"].

*Id.* at Rep. Notes cmt. a. The nominative fair use defense finds no clear home in the Restatement; likewise, its relationship to the likelihood of confusion test is uncertain.

[*18] *HN8* The Court of Appeals for the Seventh Circuit has not ruled on the applicability of the nominative fair use defense, nor the standards by which a claim of nominative fair use should be evaluated. 7 There is also no guiding precedent within this Circuit on the relationship between a nominative fair use defense and the likelihood of confusion test for infringement. However, the Seventh Circuit has ruled that a finding of a likelihood of confusion does not preclude consideration of the classic (descriptive) fair use defense. *Sunmark, Inc. v. Ocean Spray Cranberries, Inc., 64 F.3d 1055, 1059 (7th Cir. 1995)* (finding that confusion is not inconsistent with a fair use defense). That reasoning was recently approved by the Supreme Court in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 160 L. Ed. 2d 440, 125 S. Ct. 542, 550 (2004)* (finding that a party raising the defense of descriptive fair use is not required to negate the likelihood that its use of the mark will confuse customers about the origin of the goods or services).

**FOOTNOTES**

7 *Cf. August Storck K.G. v. Nabisco, Inc., 59 F.3d 616 (7th Cir. 1995)* (considering a defendant's use of the plaintiff's mark for purposes of comparison rather than identification).

[*19] Focusing on the text of *15 U.S.C. § 1114* (establishing the likelihood of confusion as the benchmark for

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 26 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 8 of 12

determining trademark infringement) and 15 U.S.C. § 1115 (b)(4) (establishing the fair use defense) and employing traditional canons of statutory interpretation, the Court noted that Congress placed upon the party claiming infringement the burden of proving the likelihood of confusion in § 1114, but "said nothing about likelihood of confusion in setting out the elements of the fair use defense in § 1115(b)(4)." *Id.* at 548. Moreover, both the statute and the common law of unfair competition support the premise that fair use can occur along with some degree of confusion. *Id.* at 548-550. [HN5]While the Supreme Court specifically declined to address the nominative fair use defense, I am persuaded that its logic applies with similar force to defendants pursuing the defense of nominative fair use despite the almost certain likelihood of confusion regarding the source of the mark. While this does not mean that consumer confusion is not relevant to the issue of fair use (*Id.* at 551), it does suggest that I should not disregard a defense [*20] of nominative fair use simply because a likelihood of confusion exists. The *New Kids* test provides sound criteria for assessing when nominative use is fair or unfair, despite a likelihood of confusion among consumers.

Within the Northern District of Illinois, two Judges have recognized the potential for a nominative fair use defense and applied *New Kids* test. In an unpublished opinion, Judge Kocoras considered a plaintiff's motion to strike a defendant's affirmative defense of nominative fair use. *R. J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.,* 2001 U.S. Dist. LEXIS 8896 at *18 (N.D. Ill. June 28, 2001).* Applying a truncated version of the defense, my colleague found the defendant's claim of nominative fair use legally insufficient, because the defendant failed to show that its use of the mark was unlikely to suggest the plaintiff's sponsorship, endorsement of or affiliation with the defendant's product. *Id.* In 2002, Judge Lindberg issued an opinion endorsing the *New Kids* test; but like Judge Kocoras, he found the defendant's use of the plaintiff's mark more than merely nominative. *World Impressions, Inc. v. McDonald's Corp.,* 235 F. Supp. 2d 831, 843 (N.D. Ill. 2002). [*21] Judge Lindberg then proceeded to apply the traditional likelihood of confusion test for trademark infringement, a step of the analysis that is unnecessary. *Id.*

The Court of Appeals for the Sixth Circuit has explicitly declined to adopt the nominative fair use defense, finding that its traditional likelihood of confusion test sufficiently captures the potential for trademark misuse. *PACAAR Inc. v. Telescan Techs., L.L.C.,* 319 F.3d 243, 256 (6th Cir. 2003), overruled in part, *K. P. Permanent Make-Up,* 125 S. Ct. at 547. In dicta, the Court observed that even if the defense applied, the defendant in that particular case could not satisfy the elements of the *New Kids* test. *Id.* (finding that defendant's use of the marks "go beyond using the marks as is reasonably necessary to identify" the plaintiff's products). However, the Court also conflated the *New Kids* analysis with the likelihood of confusion analysis, noting that the defendant's use of the plaintiff's marks in its domain names created a "likelihood of confusion as to whether its web sites are affiliated with [the plaintiff]." *Id.*

In contrast, the Court of Appeals for the [*22] Fifth Circuit has adopted the nominative fair use defense and at least part of the *New Kids* analysis; but in so doing, it also blended the *New Kids* and likelihood of confusion analyses. *Pebble Beach Co. v. Tour 18 I,* 155 F.3d 526, 545 (5th Cir. 1998) ("while a claim that the use was to identify the markholder's goods or services is analogous to the statutory fair-use defense, it is in actuality a claim that the use is noninfringing and thus creates no likelihood of confusion"). Ultimately, the Fifth Circuit concludes that the test for nominative fair use must be synonymous with the likelihood of confusion analysis. See *Pebble Beach* at 546 ("where a nominative use of a mark occurs without any implication of affiliation, sponsorship, or endorsement -- i.e., a likelihood of confusion -- the use lies outside the strictures of trademark law'") (quoting *New Kids*) (emphasis added). I respectfully disagree. [HN10]A likelihood of confusion should not bar the door to a nominative use defense; if the use is necessary, as *Cairns* suggests, then other, more refined criteria are needed to determine if the use might still be fair. The *New Kids* criteria are far better [*23] suited to that task.

The *New Kids* analysis finds nominative use to be fair only after an analysis of both the nature and extent of the defendant's use of the mark, and a determination that the defendant did not do anything in conjunction with use of the mark to suggest sponsorship or endorsement. *New Kids,* 971 F.2d at 308. This test captures the difference between confusing use and misleading use -- a distinction that is critical in cases alleging nominative fair use. *Cf. Sunmark,* 64 F.3d at 1059 ("when the products involved are similar, 'likelihood of confusion *may* amount to using a word in a misleading' way, violating 15 U.S.C. § 1125(a)(1) -- not because the likelihood of confusion makes the use nondescriptive, but because the confusion about the product's source shows that the words are being used, de facto, as a mark") (emphasis added). [8]

## FOOTNOTES

[8] While *Sunmark* involved a case of descriptive fair use, which is available only when the words of description are used "otherwise than as a mark" (15 U.S.C. § 1125(a)), its recognition of the line between confusion and misleading use is just as compelling in cases of nominative fair use, in which use of the mark may be necessary for purposes of identification.

[*24] Applied to the facts of this case, the *New Kids* nominative fair use test would require PIL to prove: 1) Ty's Beanie Baby toys, the subject of its books and magazines, are not readily identifiable without use of the marks; 2) PIL only used as much of the marks as was reasonably necessary to identify the toys; and 3) PIL did nothing in conjunction with its use of the mark to suggest sponsorship or endorsement of its product by Ty. 971 F.2d at 308. Ty does not contest that PIL satisfies the first element of the test. Instead, it suggests that issues of fact exist with respect to the latter two factors such that summary judgment on the grounds of nominative fair use must be denied.

Case 1:08-cv-03280     Document 14-2     Filed 07/18/2008     Page 27 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                     Page 9 of 12

Because issues of fact exist with respect to the second prong of the test (as explained below), I cannot determine on summary judgment whether PIL's nominative use was fair. Summary judgment on the basis of the defense is inappropriate. However, as this case involves nominative use, I do not consider the traditional likelihood of confusion analysis as a ground for granting or denying PIL's motion for summary judgment.

**B. PIL's Claim of Nominative Fair Use**

*I. PIL's Use of the Beanie* **[*25]** *Babies Mark*

PIL claims that as a matter of law, its use of the "Beanie Babies" mark in the title of its publications is nominative fair use, in that it is not used to differentiate PIL's books from those of other publishers, but to identify Ty's plush toys as the subject of its books. Applying *New Kid's* three-part nominative fair use test to PIL's use of the mark, I find sufficient issues of fact to prevent PIL from relying on the defense to win summary judgment. Under the second prong of the test, PIL contends that it used no more of the Beanie Babies mark in the titles of its publications than was reasonably necessary to describe the subject of the books. Ty contends that it was unreasonable for PIL to highlight or offset the mark in the manner it did; for example, by using different colors, font sizes and styles for the words Beanie Babies than for other words in the titles. ⁹ PIL defends these decisions by claiming that "such use is necessary to efficiently inform shoppers, who often spend mere seconds viewing a book cover before making a purchase decision, what the book is about." *Def. Mem.* at 14.

. . . . . . . .              . . . . .

**FOOTNOTES**

9 In the title of *For the Love of Beanie Babies*, the mark "Beanie Babies" appears in bright letters, outlined in gold, with a black background that creates a shadowing effect; other words appear in solid black print. In the smaller paperback version of the *Beanie Babies Collector's Guide*, the mark "Beanie Babies" appears in bright, multi-colored letters while other words appear in predominantly black lettering; the letters of the mark are also twice as high and wide as the lettering in the other words. Finally, in the magazine format of the collector's guide, the mark "Beanie Babies" appears in blue or red print, while other words appear in solid black. The mark is printed with capital letters, again with greater height and width than other words in the title.

**[*26]** In this case, whether the extent of PIL's use of Ty's mark to describe its products was reasonable is a question of fact. *Cf. Cairns, 292 F.3d at 1154* (holding that defendant's prominent reference to Princess Diana in the title of its product -- "Diana, Princess of Wales Porcelain Portrait Doll" -- was fair use). This case, involving the style and placement of the plaintiff's mark, rather than its mere use, is more appropriately compared to *World Impressions*, in which Judge Lindberg held that the plaintiff's stylized use of the mark "Disneyland" on its map of California tourist attractions negated the fair use defense. *235 F. Supp. 2d at 843.* The plaintiff's reliance on distinctive lettering, rather than plain lettering, went "beyond mere nominative use." *Id.*

I recognize that in *Cairns* the Second Circuit held that "where, as in the present case, the description of the defendant's product depends on the description of the plaintiff's product, more use of the plaintiff's trademark is reasonably necessary to identify the plaintiff's product' than in cases where the description of the defendant's product does *not* depend on the description **[*27]** of the plaintiff's product." *Cairns, 292 F.3d at 1154.* However, that language followed a discussion of two other cases in which the number of times a mark was used, rather than the style in which the mark was presented or highlighted, was central to a court's decision. While instructive, the holding of *Cairns* does not compel the result PIL now seeks. While PIL may have been entitled to use "more" of Ty's mark in order to successfully describe its own product, the manner in which it did so arguably exceeds the limits of nominative fair use. I cannot conclude that no reasonable fact finder would agree with Ty. Therefore, PIL cannot rely on the nominative fair use defense to win summary judgment on Ty's claim of trademark infringement. ¹⁰

**FOOTNOTES**

10 *HN11* In cases of trademark infringement subject to the likelihood of confusion analysis, the standard for gaining summary judgment is high. See *AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th Cir. 1993)* (reversing grant of summary judgment for defendant where issues of fact existed regarding likelihood of consumer confusion); *see also CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 677 (7th Cir. 2001)* (holding that the question of whether likelihood of confusion exists may only be resolved on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered") (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 173 (7th Cir. 1996)*). While I firmly believe that the likelihood of confusion and nominative fair use analyses are conceptually distinct, I also believe that the standard for granting summary judgment would likely be the same under both analyses, should the Seventh Circuit recognize the latter. The questions of fact present in this case, while not overwhelming, are sufficient for a denial of summary judgment under the Seventh Circuit's standard in trademark infringement cases not involving nominative use.

**[*28]** As for the third prong of the *New Kids* test, Judge Lindberg's decision in *World Impressions* suggests that

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 28 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                    Page 10 of 12

PIL is not entitled to the defense of nominative fair use because its use of the mark, admittedly highlighted in order to attract consumer's attention (*Def. Mem.* at 14), goes beyond identification and implies sponsorship or endorsement by Ty.

> Although the Disney marks may not be larger than the other identifiers on plaintiff's maps, plaintiff uses the stylized form of the word "Disneyland" as "attention-getting symbols" [quoting *Sands, Taylor and Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992)] . . . By using the stylized form of [the mark] and the distinctive castle design, rather than a plain rendition of the word "Disneyland," plaintiff does more than simply identify Disneyland's location on a map. Instead, it implies that Disney sponsored or endorsed its maps."

*World Impressions*, 235 F. Supp. 2d at 843. PIL, however, asserts that its statement explicitly disclaiming sponsorship or affiliation with Ty satisfies the third prong of the *New Kids* nominative fair use test.

Neither **[*29]** party has pointed to (nor can I find) any binding cases that address the impact of a disclaimer upon the third prong of the *New Kids* test. *Cf. Cairns*, 292 F.3d at 1154-55 (upholding summary judgment on the basis of nominative fair use for a defendant who failed to expressly claim sponsorship or endorsement). In my earlier decision denying summary judgment to Ty, I found PIL's use of its own marks, as well as its disclaimer, to be points in PIL's favor (albeit within the likelihood of confusion analysis). *Ty, Inc. v. Publications Int'l, Ltd.*, 2000 U.S. Dist. LEXIS 15382, 99 C 5565, at *35 (N.D. Ill. Oct. 4, 2000). In this case, PIL's disclaimer appears on the front cover of every book; on one publication, it also appeared in bold letters. In light of these facts, Ty must respond with evidence raising an issue of fact that suggests PIL's use of the mark suggested sponsorship or endorsement by Ty. Ty has failed to do so. Therefore, PIL has satisfied the third prong of the nominative fair use defense. However, given PIL's failure to satisfy the second prong of the defense, it is not entitled to summary judgment on Ty's claim of trademark infringement for **[*30]** use of the "Beanie Babies" mark on its covers. [11]

FOOTNOTES

[11] PIL also moves for summary judgment on the ground that its use of Ty's mark in the titles of its books and magazines is presumptively non-infringing. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989). I considered the *Rogers* defense in ruling on Ty's earlier motion for summary judgment of its trademark infringement claims. *Ty, Inc.*, 2000 U.S. Dist. LEXIS 15382 at *33-35. In that decision, I found that PIL had not displayed Ty's trademarks in its book and magazine titles in a manner that "conjures up a visual image prominently associated" with Ty's works. *Id.* (quoting *Twin Peaks Productions, Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1380 (2d Cir. 1993)). However, I have now held that there are issues of fact surrounding the reasonableness of the extent to which PIL used the mark in its titles. Therefore, I will not grant summary judgment in PIL's favor on the basis of *Rogers*.

In its opening memorandum PIL also relied heavily on *Mattel Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) to argue that its use of the contested mark in its titles cannot constitute trademark infringement as a matter of law. In *Mattel*, the Ninth Circuit upheld a grant of summary judgment for the defendants when it found that their use of "Barbie" in a song title did not explicitly suggest that the song was produced or otherwise associated with the plaintiff toy manufacturer. That decision does not compel a grant of summary judgment in PIL's favor in this case. There is a sufficient difference between pop songs that use a protected mark and collectors' guides that use the mark of the product featured in the guide, that it is not inconsistent for the former to support a holding of non-infringement as a matter of law while the latter cannot.

**[*31]** *II. PIL's Use of the Ty Heart Logo*

PIL also contends that it is entitled to the defense of nominative fair use with respect to its depiction of the Ty Heart Logo ("the logo") in its publications. The logo appears on the front cover of all of the contested publications, and on the back cover of several. The logo also appears on most of the pages of the collector's guides. [12] HN12 While the number of times the image appears is not dispositive, it is relevant to the factual issue of whether PIL used more of the logo than reasonably necessary for its product.

FOOTNOTES

[12] The logo appears on 77% of the pages in the first version of *For the Love of Beanie Babies*; on 82% of the pages of the second version of the same book; and on 64% of the pages in the third version. The logo appears 106 times, or on 43% of the pages in the paperback version of the *Beanie Babies Collector's Guide*, while the three "magazine" versions of the guide have a total of 109, 98 and 104 photographs of the logos (comprising 57%, 61% and 65% of the pages, respectively).

**[*32]** Ty argues that PIL could have avoided using the "hangtags" that depict Ty's logo by detaching the cardboard tags before photographing the toys; by photographing the toys from an angle that did not include the

Case 1:08-cv-03280    Document 14-2    Filed 07/18/2008    Page 29 of 30

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 23420                         Page 11 of 12

tags bearing the logo; or by editing the photographs. PIL responds that the tags bearing the logos are "very important to collectors," and that "eliminating the tags entirely or replacing them with bogus tags would defeat the purpose of the photographs, which is to show what the products should look like as released in the marketplace by Ty." *Def. Rep. Br.* at 11. PIL, however, fails to point to any evidence suggesting that consumers would not purchase its product had the publisher used fewer images of the tags affixed to the toys. The hangtags do not appear on every page of each of PIL's publications or on every photograph of a Ty product; the fact that some of the toys are shown without the tag suggests that the use of the tag was not always necessary. While this issue may ultimately be resolved in PIL's favor, I find that a genuine issue of fact exists on the issue of whether PIL used more of Ty's tags than necessary for its publications.

Furthermore, the cases on which [*33] PIL relies do not support its position that its use of Ty's logo was reasonable as a matter of law. PIL relies heavily on a case from the Northern District of California, in which the defendant film distributors' use of the plaintiff's "Slip N Slide" mark in a movie was held to be nominative use. *Wham-O, Inc. v. Paramount Pictures Corp., 286 F. Supp. 2d 1254 (N.D. Cal. 2003)*. Considering the second prong of the *New Kids* test, the court noted that "to identify the slide as a toy, it was at once sensible and necessary to refer to the slide by its popular name." *Id. at 1263*. In this case, whether PIL's depiction of the tag bearing Ty's logo was similarly sensible and necessary is an issue of fact. A trier of fact might reasonably find that PIL's depiction of Ty's logo was unnecessary or even abusive. *Id. at 1264*. As the *Cairns* court noted, "what is reasonably necessary *HN13* to identify the plaintiff's product' differs from case to case." *Cairns, 292 F.3d at 1154* (comparing *Playboy Enters. v. Welles, 279 F.3d 796, 804 (9th Cir. 2002)* in which defendant's repeated use of plaintiff Playboy Enterprises' [*34] mark was not necessary to describe her status as a former Playmate on her website, with *Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1142 (C.D. Cal. 1998)* in which repeated use of "Barbie" and "Ken" was reasonably necessary "for the purposes of parody").

In *Cairns*, the court considered it doubtful that every Franklin Mint customer could recognize Princess Diana's features on the doll without reference to her name. *Id.* However, one might reasonably expect that most collectors of Beanie Babies could recognize the plush toys without seeing the Ty handtag displaying the Heart Logo. On the other hand, display of the logos might be reasonably necessary to assure customers that the pictured products were, in fact, Ty's products and not copycat products. As I noted in an earlier decision in this case, consumers of PIL's collectors' books are likely to know something about Beanie Babies, and to be concerned with the authenticity of Ty's plush toys and identifying tags. *Ty, Inc., 2000 U.S. Dist. LEXIS 15382 at *39*. This issue, however, is one of fact, and I am unwilling to decide the question as a matter of law on a motion for summary judgment when a reasonable [*35] fact finder might agree with Ty.

For the same reasons noted in the previous section, I find that under the third prong of the *New Kids* test, Ty can point to no issues of material fact suggesting that PIL did anything in connection with its use of the logo to imply sponsorship or endorsement. However, PIL's motion for summary judgment with respect to Ty's claim of trademark infringement based on PIL's use of the Ty Heart Logo is denied. As noted above, PIL has failed to establish as a matter of law that it used no more of the logo than reasonably necessary for its publications.

For all of these reasons, PIL's motion for summary judgment is GRANTED IN PART and DENIED IN PART. PIL's motion for summary judgment of Ty's common law claim of infringement is granted; PIL's motion for summary judgment of Ty's claim of infringement of registered trademarks is denied.

ENTER:

James B. Zagel

United States District Judge

DATE: February 25, 2005

Service:  Get by LEXSEE®
Citation:  2005 U.S. Dist. LEXIS 23420
View:  Full
Date/Time:  Friday, June 13, 2008 - 11:48 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

LexisNexis®  About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.