**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DEVRY INC., and | ) | |
| GLOBAL EDUCATION | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 08 CV 3280 |
| | ) | |
| UNIVERSITY OF MEDICINE AND | ) | Judge Coar |
| HEALTH SCIENCES - ST. KITTS, | ) | |
| | ) | Magistrate Judge Keys |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT**

The Defendant's fair use defense turns on facts for which it has the burden of proof. Its applicability is a question of fact, not law, making the present motion to dismiss totally unsuitable. Defendant asks this Court to rule, before any discovery occurs, that Plaintiffs' notice-pleading factual allegations are incorrect, and that Defendant will inevitably prevail in proving that all of its uses of Plaintiffs' marks - even those not yet uncovered - constitute fair use. The exhibits attached to the complaint are only examples supporting the complaint's general allegations, and <u>all</u> other such uses need to be considered factually by the Court to rule on a fair use defense. Those other uses are not presently before the Court.

1

## ARGUMENT

I.  **Plaintiffs' Complaint Properly States Claims for Trademark Infringement, Unfair Competition, and Related State Law Claims.**

   A.  **Defendant's Motion Fails to Address Plaintiffs' Unfair Competition and State Law Claims.**

Although Defendant requests that Plaintiffs' entire complaint be dismissed for failure to state a claim upon which relief can be granted, all of its arguments focus upon an alleged fair use defense to Plaintiffs' claim of trademark infringement.  Defendant's brief does not even mention that Plaintiffs have actually alleged four additional claims - for Lanham Act unfair competition, common law unfair competition, violation of the Illinois Uniform Deceptive Trade Practices Act, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.  Defendant makes no argument as to why those claims should be dismissed along with the trademark infringement one.  As a result, those four claims should remain valid regardless of whether Plaintiffs' arguments concerning the trademark infringement claim succeed or fail.

   B.  **Defendant's Alleged Fair Use Affirmative Defense Does Not Require Dismissal of Plaintiffs' Claims.**

Defendant's arguments boil down to one point - the supposed existence of a fair use affirmative defense that Defendant alleges to be indisputably proven on the face of the complaint and its exhibits.

When considering a motion to dismiss, a court must accept the factual allegations in the complaint as true, and draw all possible inferences in favor of the plaintiff.  *Heisner v. Genzyme Corp.*, 2008 WL 2940811, *2 (N.D. Ill., July 25, 2008).  In general, a complaint properly states a claim as long as it provides a "short and plain statement of the claim showing that the pleader is

entitled to relief" and gives the defendant fair notice of the claim and the factual basis for it. *Id.*;
Fed. R. Civ. P. 8(a)(2).

There are at least two completely separate ways for a complaint to fail to state a claim.
The complaint can either fail to plead enough facts, thereby failing to give fair notice of the
claim or plausibly suggest a right to relief, or it can plead too many facts, thereby pleading the
plaintiff right out of court by establishing a complete defense to its claims. *Tamayo v.
Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Here, Defendant's arguments fall solely under
the "too many" facts theory. Defendant makes absolutely no argument that Plaintiffs failed to
plead enough facts to give Defendant fair notice of the nature of the claims against it.

Only the clear and incontestable existence of certain types of "impenetrable" affirmative
defenses can defeat a complaint at the motion to dismiss stage. In part, this is because "plaintiffs
need not anticipate and attempt to plead around all potential defenses. Complaints need not
contain *any* information about defenses and may not be dismissed for that omission. Only when
the plaintiff pleads itself out of court - that is, admits all the ingredients of an impenetrable
defense - may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."
*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (citations omitted;
emphasis in original). In this context, a defense is impenetrable when the plaintiff would need to
"contradict the complaint in order to prevail on the merits." *Tamayo*, 526 F.3d at 1086.
Conversely, a defense is not impenetrable where the plaintiff's recovery is still plausible even
under the facts taken from the face of the complaint and its exhibits. *Id.*

Fair use is not the type of impenetrable defense that can defeat a complaint at the motion
to dismiss stage. First, the fair use defense is not impenetrable because it is not even applicable
to Defendant's actions, as explained more fully below in Section C. Even if this Court were to

make the factual determination that all of the specific examples discussed in Defendant's brief constituted fair use, Plaintiff could still prevail on the merits. This is because Defendant has attacked only certain specific factual instances mentioned in the complaint. Plaintiffs' actual allegations are broader, and the described instances are only <u>examples</u> of Defendant's infringing actions. *See, for example*, Complaint ¶¶ 46, 49 and 50. Plaintiffs could prevail on the merits by proving entirely different examples of the behavior described by, and completely consistent with, those broader allegations. Therefore, the fair use defense Defendant attempts to prove is not an impenetrable one which would allow success on a motion to dismiss.

**C.    Defendant Has Failed to Prove That it Would Prevail on a Fair Use Defense.**

Even the limited evidence available on the face of the complaint and its exhibits demonstrates that Defendant cannot establish a fair use affirmative defense. Defendant bears the burden of proving that the fair use defense should apply. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001). Defendant has not met that burden here, much less proven it should prevail as a matter of law, because the available facts contradict one or more of the elements of each type of fair use Defendant alleges.

**1.    Defendant's use of the phrase "Founded By Dr. Robert Ross" is not a classic fair use.**

Plaintiffs have alleged that Defendant is using the word "Ross" in a trademark sense to identify the source of its educational services, such as in the phrase or tagline "Founded By Dr. Robert Ross." *See* Complaint ¶¶ 46-48. Defendant claims that the examples attached to the complaint demonstrate, as matter of law, that its use of the "Founded By Dr. Robert Ross" phrase is completely protected under the fair use defense. Even setting aside the issue that the attached exhibits highlight only two examples of a wider problem, Defendant is incorrect. Those

4

two examples of Defendant's use of the phrase "Founded By Dr. Robert Ross" do not even come close to meeting the requirements for a successful defense of fair use.

The classic trademark fair use defense stems from the language of the Lanham Act itself, which gives the owner of a registered mark the exclusive use of that mark, unless:

> the use of the name, term, or device charged to be an infringement is a use, *otherwise than as a mark*, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4) (emphasis added).  Regardless of whether a use involves the personal name of someone connected with the defendant, or is claimed to be descriptive of the defendant's goods or services, the use in question must be "otherwise than as a mark" to qualify as a fair use. Whether a specific use is "otherwise than as a mark" is a question of fact. *Sunmark, Inc. v. Ocean Spray Cranberries, Inc*., 64 F.3d 1055, 1058 (7th Cir. 1995); *Packman*, 267 F.3d at 637.  As such, it is particularly unsuited for determination on a motion to dismiss.  Significantly, none of the cases Defendant cites concerning the fair use defense are at the motion to dismiss stage.[1]

In *Packman,* the defendant Chicago Tribune prevailed at the summary judgment stage on a fair use defense, in part because the court agreed that it did not use the disputed words in a trademark manner.  267 F.3d at 639-40.  The day after the Bulls won their sixth NBA championship, the Tribune's front-page headline was "The joy of six."  The owner of a trademark in the phrase "The joy of six" sued the Tribune, not over the newspaper headline

---

[1] The issue in *Segal v. Geisha NYC LLC*, 517 F.3d 505 (7th Cir. 2008), is whether the trademark use was authorized by contract, not whether it was a trademark use in the first place.  *Local 15, Intern. Broth. of Elec. Workers, AFL-CIO v. Exelon Corp*, 495 F.3d 779 (7th Cir. 2007), addresses no trademark law issues at all.

itself, but when the Tribune later sold t-shirts and other memorabilia displaying the newspaper's front page from that historic day. The court held that "The joy of six" was not used as a mark because it did not in any way identify the source of the memorabilia, but rather was a specific newspaper headline reporting a memorable event. *Id*.

In contrast to *Packman*, Defendant here uses the phrase "Founded By Dr. Robert Ross" to identify the source of its educational services. Even the two examples of this use attached to the Complaint show this to be the case. Defendant's letterhead (Complaint Exhibit G) includes a logo in the prominent upper-left hand corner, consisting of the large letters "UMHS," with "Founded By Dr. Robert Ross" directly beneath them. This is not merely a way to describe Defendant's educational services. It is a way to identify them, and the school that provides them, to everyone who receives correspondence from Defendant. The placement of that exact same phrase on the large outdoor sign on Defendant's campus (Complaint Exhibit H) shows that its placement on the letterhead was not an isolated incident. Instead, it appears to be part of a coordinated campaign to use this short, isolated phrase - not even a complete sentence - as a source-identifier of Defendant's educational services. This is the essence of use as a trademark, and certainly not use "otherwise than as a mark."

Other courts have held that similar phrases used in similar ways constituted use as a mark which precluded a fair use defense. In *JA Apparel Corp. v. Abboud*, 2008 WL 2329533 (S.D.N.Y., June 5, 2008), the famous clothing designer Joseph Abboud designed and promoted a new 'jaz' line of clothing after he sold the trademark rights in his own name to his previous company. The previous company objected to Abboud's use of phrases like "by the award-winning designer Joseph Abboud." Abboud claimed a fair use defense, making virtually the same argument as the present Defendant that the phrase was merely descriptive. *Compare* 2008

WL 2329533 at *18 *with* Defendant's Brief at 7-8.  The court flatly rejected Abboud's claim that use of that phrase was other than as a trademark:

> Abboud is seeking to use his name to identify and distinguish his goods and to indicate that he is the source of the goods.  The fact that the proposed use of his name might also carry with it a descriptive component, in that it describes an aspect of the 'jaz' line, does not render it a fair use.

2008 WL 2329533 at *19.  The present Court should reach the same conclusion.  The exhibits to the Complaint show that Defendant uses the phrase "Founded By Dr. Robert Ross" to identify itself as the specific source of the educational services it provides, thereby precluding a fair use defense.  *See also Madrigal Audio Laboratories, Inc. v. Cello, Ltd.*, 799 F.2d 814, 818 (2nd Cir. 1986) (Mark Levinson, after selling trademark rights to his name, did not appeal injunction barring him from using "Cello by Mark Levinson" on his new company's products).

Plaintiffs have also alleged the existence of actual confusion between Defendant and Plaintiffs' Ross University (Complaint ¶ 56), and have described an example of such confusion (Complaint ¶ 57; Exhibit M).  There have been many other examples.  While the Supreme Court has recently clarified that a defendant claiming fair use need not completely negate the existence of a likelihood of confusion, this "does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 543 U.S. 111, 123, 125 S.Ct. 542, 550 (2004).  Here, the actual confusion Plaintiffs allege demonstrates that Defendant's use of the word "Ross" is not fair use.  As such, it raises a fact question and provides an additional reason why Defendant should not prevail on a fair use defense as a matter of law.

Defendant uses the standalone phrase or tagline "Founded By Dr. Robert Ross" in a manner that is inconsistent with its alleged classic fair use defense.  At a minimum, Defendant

has failed to show that it should prevail on this defense as a matter of law, at the present motion to dismiss stage where all reasonable inferences must be made in Plaintiffs' favor.

> ### 2. Defendant's repeated references to Ross University do not qualify as nominative fair use.

Defendant claims that its references to Ross University in Defendant's advertising brochure (Complaint Exhibit I) and in a letter to potential students (Complaint Exhibit L) amount to protected "nominative" fair uses of Plaintiffs' marks. Defendant's brief fails to acknowledge the additional attached examples of its references to Ross University (Complaint Exhibits J and K), much less Plaintiffs' allegations (Complaint ¶¶ 49-50) that these are merely examples of a wider problem. To ultimately prevail at trial, Defendant will have to prove that all of its uses of Plaintiffs' marks (even those not attached as Complaint exhibits) are fair uses. Even focusing on just the two Exhibits Defendant discusses, however, Defendant's claimed nominative fair use defense fails.

The nominative fair use defense applies when the defendant uses the plaintiff's trademarks to refer to the *plaintiff's* own goods or services in a non-confusing manner. *New Kids On the Block v. News America Publishing, Inc*., 971 F.2d 302, 308 (9th Cir. 1992).[2]  Such use is only "fair," however, where it does not trade on the plaintiff's goodwill or imply a connection to the plaintiff. "Because [such use] does not implicate the source-identification function that is the purpose of [a] trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *Id*.

---

[2]  Defendant's brief incorrectly describes the first prong of the nominative fair use test as applying to where the *defendant's* product is not reasonably identifiable without use of the plaintiff's mark. Defendant's Brief at pg. 11. Instead, this prong should focus on whether the *plaintiff's* product or service is reasonably identifiable without use of the plaintiff's mark. *See New Kids*, 971 F.2d at 308 (stating that it was not reasonably possible to refer to the plaintiff singing group New Kids as an entity without use of their mark).

Courts have developed a three-part test for determining when the nominative fair use defense applies:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.* This test has been applied by courts in the Northern District of Illinois. *See World Impressions Corp. v. McDonald's Corp.*, 235 F.Supp.2d 831, 844 (N.D. Ill. 2002).

Here, Defendant's use of the Ross University marks fails to satisfy at least the second and third prongs of the nominative fair use test. Regarding the second prong, the exhibits attached to the complaint demonstrate that Defendant uses the Ross University name and mark much more than reasonably necessary in order to identify that institution. Defendant's brochure includes a page which refers to Ross University *four* times within two short paragraphs. *See* Complaint Exhibit I at pg. 3. In Defendant's letter to a prospective student, the paragraph following the heading "Introduction" contains the same density of references to Ross University. *See* Complaint Exhibit L. These uses go beyond what is merely needed to identify Ross University. Instead, the repetition of the Ross University name amounts to associating Defendant's new medical school with the reputation of the established Ross University.

Defendant also fails the third prong of the nominative fair use test, because it suggests a connection to Ross University and seeks to trade on Ross University's established reputation and goodwill. The same paragraphs that repeat the Ross University mark and name four times in a row do so in the context of claiming that the success of Ross University should convince students to come to the new medical school founded by the same person. *See* Complaint Exhibits I and L. The nominative fair use defense is supposed to apply to situations where "use

of the trademark does not attempt to capitalize on consumer confusion or appropriate the cachet of one product for a different one." *New Kids*, 971 F.2d at 308. Here, Defendant is attempting to benefit from the established reputation, goodwill, and even cachet of Ross University in order to draw students to its fledgling school. This is not nominative fair use, and Defendant will not prevail in asserting such a defense at trial, much less now when all reasonable inferences must be in Plaintiffs' favor.

<u>**CONCLUSION**</u>

Defendant's attempts to argue the merits of its fair use affirmative defenses in a motion to dismiss have failed. Plaintiffs have successfully pled all of their claims, and this Court should deny Defendant's Motion to Dismiss.

Respectfully submitted,

DEVRY INC. and GLOBAL EDUCATION
INTERNATIONAL, INC.


Date:    August 12, 2008                    By:___s/  Mark R. Bagley_____
Arne M. Olson
Kathryn E. Garipay
Mark R. Bagley
OLSON & CEPURITIS, LTD.
20 North Wacker Drive
36th Floor
Chicago, Illinois 60606
(312) 580-1180

Attorneys for Plaintiffs
DEVRY INC. and GLOBAL EDUCATION
INTERNATIONAL, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT** was served via the Northern District of Illinois electronic filing system, to:

> Patricia S. Smart
> SMART & BOSTJANCICH
> 19 South LaSalle Street, Suite 1300
> Chicago, Illinois 60603

and by First Class U.S. mail, postage prepaid, to:

> J. Christopher Jensen
> COWAN, LIEBOWITZ & LATMAN, P.C.
> 1133 Avenue of the Americas
> New York, NY 10036-6799

on this 12th day of August, 2008.


                                        s/  Mark R. Bagley
                                        Mark R. Bagley

Exhibit A

Westlaw.

Heisner ex rel. Heisner v. Genzyme Corp.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Elmer HEISNER, individually and on behalf of Jayne
HEISNER, Plaintiff,
v.
GENZYME CORPORATION, a Massachusetts
corporation, Defendant.
**No. 08-C-593.**

July 25, 2008.

Kurt D. Hyzy, The Law Group, Ltd., Chicago, IL, for
Plaintiff.

Stephanie Ann Scharf, David W. Austin, Schoeman
Updike Kaufman & Scharf, Chicago, IL, for
Defendant.

***MEMORANDUM OPINION AND ORDER***

DAVID H. **COAR** , District Judge.
**\*1** Plaintiff Elmer Heisner ("Plaintiff" or "Heisner")
brought this action against Defendant Genzyme
Corporation ("Genzyme" or "Defendant") for
violations of state law surrounding the death of his
wife, Jayne Heisner ("Decedent"). Now before this
Court is Defendant's **motion** to **dismiss** pursuant to
Federal Rule of Civil Procedure 12(b)(6) (Docket No.
8). For the reasons stated below, Defendant's motion
is GRANTED.

**1. FACTS**[FN1]

> FN1. These facts are derived from Plaintiffs'
> complaint and, for the purposes of this
> motion, are assumed to be true. *See Davis
> Companies v. Emerald Casino, Inc., 268
> F.3d 477, 479 (7th Cir.2001).*

As an initial matter, Defendant requests that this
Court take judicial notice of the fact that "Seprafilm
is a Class III device approved through the PMA
[premarket approval] process."(Def.'s Reply at 2-4.)
The Complaint references Seprafilm's approval by
the FDA on December 20, 2000, but does not make

clear what approval process or category was applied
to the device.

It is certainly possible to "take judicial notice of
matters of public record without converting the
12(b)(6) motion into a motion for summary
judgment."*Anderson v. Simon, 217 F.3d 472, 474-75
(7th Cir.2000)* (citing *Henson v. CSC Credit Servs.,
29 F.3d 280, 284 (7th Cir.1994)*). However, this can
be done only where "an undisputed fact in the public
record establishes that the plaintiff cannot satisfy the
12(b)(6) standard."*Gen. Elec. Capital Corp. v. Lease
Resolution Corp., 128 F.3d 1074, 1081 (7th
Cir.1997)*.

Plaintiff argues against taking judicial notice of facts
surrounding the FDA's approval, stating that
"disputable findings exist concerning the Defendant's
compliance with the FDA's Medical Device
Amendments (MDA) and Premarket approval
process in the manufacturing of their product,
Seprafilm."(Pl.'s Resp. at 3.) However, this does not
contradict the putative fact in question, which is only
that the FDA approved Seprafilm as a Class III
device pursuant to the PMA process. Whether that
process was properly followed by the FDA, or
whether Defendant fulfilled its obligations over the
course of that process, are disputed issues that cannot
be resolved at this early stage. However, neither of
these questions contradict the clear, undisputed, and
publicly available fact put forward by Defendant; that
the FDA approved Seprafilm as a Class III device. As
a matter of law, this approval is granted only upon
completion of the PMA process. *See*21 U.S.C. §
360c(a)(1)(C). Therefore, this Court takes judicial
notice of the fact that "Seprafilm is a Class III device
approved by the FDA pursuant to the PMA process,"
and leaves open any additional questions regarding
the adequacy of that process as applied in this case.

Plaintiff's wife underwent surgery to remove an
ovarian cyst on January 19, 2006. A Seprafilm
adhesion barrier manufactured and sold by the
Defendant was inserted into her body to prevent post-
surgical adhesions from forming between her internal
organs and tissue. Plaintiff alleges that Jayne Heisner
died on February 22, 2006 as a proximate result of
the insertion of Seprafilm into her body. (Compl.¶ 2.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Plaintiff's Complaint contains seven counts, generally alleging that Genzyme was negligent in the design, manufacture, and labeling of Seprafilm and that Seprafilm was not fit for its intended use. Defendant has moved to dismiss all seven counts of the Complaint. In his Response to the Defendant's **Motion** to **Dismiss**, Plaintiff has asked this Court to dismiss without prejudice Count II, which claimed a failure to disclose under Massachusetts General Law Ch. 93A § 2(a). (Pl.'s Resp. to Def.'s **Mot.** to **Dismiss** 14-15.) Dismissal of Count II is GRANTED without prejudice. The remaining counts are:

> I. Breach of Implied Warranty of Merchantability under Massachusetts General Law § 2-314.

> III. Strict Liability under Illinois tort law, as product was unreasonably dangerous for normal use.

> IV. Negligence under Illinois tort law in testing, inspection, design, manufacture, warning, and/or labeling.

> V. Negligence *per se* under Illinois tort law due to adulteration and/or misbranding in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, the Sherman Food, Drug and Cosmetic Law, and "other applicable laws, statutes, and regulations," including standards for care and labeling set by 21 C .F.R. §§ 201.56 and 201.57.

> VI. Breach of Express Warranty under Illinois tort law

> VII. Breach of Implied Warranty under Illinois tort law

## 2. STANDARD OF REVIEW FOR MOTION TO DISMISS

When considering a **motion** to **dismiss** for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), courts take the allegations in the complaint as true, drawing all possible inferences in favor of the plaintiff.*Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007).

To state a claim under federal pleading standards, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to provide the defendant with "fair notice" of the claim and its basis. Fed.R.Civ.P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). In *Twombly,* however, the Supreme Court seemingly raised the level of factual development required to state a claim, requiring a complaint to contain more than "labels and conclusions," *id.* at 1964-65, and "enough facts to state a claim to relief that is plausible on its face,"*id.* at 1974.

The Seventh Circuit has emphasized that *Twombly*"did not ... supplant the basic notice pleading standard."*Tamayo v. Blagojevich,* No. 07-2975, 2008 WL 2168638, at \*8 (7th Cir. May 27, 2008). The essential requirement of a complaint remains, that it "give the defendant sufficient notice to enable him to begin to investigate and prepare a defense."*Id.* But after *Twombly,* the Seventh Circuit has also recognized that "the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8."*Airborne Beepers & Video, Inc. v. AT & T Mobility, L.L.C.,* 499 F.3d 663, 667 (7th Cir.2007); *Killingsworth,* 507 F.3d at 619.

## 3. ANALYSIS

**\*3** Defendant has filed a **motion** to **dismiss** pursuant to Federal Rule of Civil Procedure 12(b)(6) that advances several arguments for judgment as a matter of law, including: (1) federal preemption of state law claims pursuant to § 360k (seeking dismissal of all counts); (2) failure to state a claim for negligence per se (Count V); (3) failure to identify an express warranty (Count VI); (4) lack of duty to warn (all counts); (5) improper use of conclusions rather than facts (all counts); and (6) terminal failure to satisfy requirements of the Illinois Wrongful Death Act (multiple counts).

a. *Preemption*

i. *Law of the FDCA*

The primary issue now before this Court is whether any of Plaintiff's claims are preempted under the

Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act (FDCA).21 U.S.C. § 360c et seq. The MDA established a regulatory structure pursuant to which the Food and Drug Administration (FDA) regulates medical devices. Under the MDA, devices are categorized into three classes, based on the level of risk that they pose. Devices used "in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" are classified as Class III devices.Id. § 360c(a)(1)(C). A Class III device is required to undergo a premarket approval (PMA) process "to provide reasonable assurance of its safety and effectiveness" before being marketed. Id. During the PMA process, manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA thoroughly reviews. Medtronic, Inc. v. Lohr, 518 U.S. 470, 477, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The FDA must approve the product's design, testing, intended use, manufacturing methods, performance standards, and labeling. Mitchell v. Collagen Corp., 126 F.3d 902, 913 (7th Cir.1997). The device in question in this case, Seprafilm, received PMA as a Class III device on December 20, 2000. (See Compl. ¶ 12; discussion supra p. 1.)

The MDA contains a preemption clause meant to displace state regulations that conflict with requirements imposed by the FDA. The clause states that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement

> (1) which is different from, or in addition to, any requirement applicable under this chapter to this device, and

> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The initial interpretive questions raised by the preemption clause involve the meaning of the word "requirement": (1) whether the federal process or action constitutes a "requirement" imposed by the FDA; and (2) whether state statutes

and state tort law impose different and additional "requirements" on manufacturers. If the FDA and state statutory and tort duties both constitute "requirements," then § 360k may dictate that the state requirements be preempted by those imposed by the FDA. Lohr, 518 U.S. at 477. If the state requirement creates obligations that are "different from, or in addition to" the relevant federal requirements, then § 360k necessitates preemption. McMullen v. Medtronic, Inc., 421 F.3d 482, 488 (7th Cir.2005). However, tension between FDA requirements and those created by state law is avoided where the state requirements parallel the federal ones.Riegel, 128 S.Ct. at 1011 (declining to address, in the first instance, whether plaintiffs' claims were "parallel" to federal requirements); Lohr, 518 U.S. at 496-497 (holding that state requirements that are "substantially identical to" those imposed by the MDA are not preempted).

**\*4** The Supreme Court recently applied the preemption analysis to the PMA process in Riegel v. Medtronic, holding that the specific approval of a device's design and implementation amounts to the imposition of federal requirements, and that both state statutes and state tort duties may be requirements within the meaning of § 360k(a).--- U.S. ----, ---- - ----, 128 S.Ct. 999, 1007-8, 169 L.Ed.2d 892 (2008).Riegel involved a number of New York statutory and tort law claims brought against the manufacturer of a balloon catheter that had received PMA. Given the potentially conflicting requirements of the state laws and the PMA process, the Court held that the latter preempted the plaintiff's claims of implied warranty of merchantability, strict liability, and negligence. Id. at 1008-9.

*ii. Party positions*

Defendant argues that all six of the remaining counts of the Complaint are preempted pursuant to § 360k(a). (Def.'s Dismiss Mem. at 4-7.) In response, Plaintiff attempts to find loopholes in the holding of Riegel.(See Pl.'s Resp. to Def.'s **Mot**. to **Dismiss** 4-8.) Plaintiff first notes that manufacturers are required to inform the FDA, under 21 U.S.C. § 360(i), of any new clinical studies or of incidents of death or serious injury related to medical devices that have received PMA. (Id. at 5-6.)Plaintiff seems to suggest that, because Genzyme may have failed to meet these reporting requirements, this Court should not accept

Genzyme's contention that Seprafilm is an approved Class III device that has met the requirements of the MDA.

Plaintiff also contends that his claims "parallel" the PMA requirements and Good Manufacturing Practice requirements that specify regulations in regard to the manufacturing, design, packaging, labeling, marketing and distribution of medical devices. 21 U.S.C. §§ 360(e, j, contract); 21 C.F.R. § 820.1. Therefore, Plaintiff argues, his claims should not be preempted for imposing different or additional requirements. (Pl.'s Resp. to Def.'s **Mot**. to **Dismiss** 6-8.)

### iii. Discussion

Defendant overstates the holding of *Riegel* in arguing that it settles all questions of preemption in this case. It is true that Plaintiff's claims in this case are similar to those that were found, in *Riegel,* to constitute different and additional requirements. The plaintiffs in *Riegel* alleged that a balloon catheter "was designed, labeled, and manufactured in a manner that violated New York common law."128 S.Ct. at 1001. They made claims of strict liability, breach of implied warranty, and negligence in the design, testing, inspection, distribution, labeling, marketing, and sale of the catheter. *Id.* In the instant case, Plaintiff similarly alleges that Seprafilm was negligently designed, manufactured, and labeled. (Compl.¶¶ 20, 34, 39.) Like the plaintiffs in *Riegel,* he makes claims of strict liability, breach of implied warranty, and negligence. (*Id.* ¶¶ 20, 34, 39.)However, the *Riegel* court expressly declined to address the question of whether the claims were sufficiently "parallel" as to avoid preemption, because the plaintiff had failed to raise this issue before the court of appeals or in their petition for certiorari. 128 S.Ct. at 1011. In addition, *Riegel* does not delve into the compatibility of FDCA preemption and state law claims based on the post-approval reporting requirements of 21 U.S.C. § 360i.

**\*5** Here, there is at least some possibility that Seprafilm's failure might be attributed to Defendant's negligence in a way that does not conflict with the FDA's requirements. *See, e.g., Mitchell,* 126 F.3d at 907 ("[T]o the extent that the Mitchells' claims for mislabeling, misbranding and adulteration alleged that Collagen had not followed the FDA requirements, the claims were not preempted

because, in permitting a cause of action for non-conformity with federal requirements, state law did not impose a requirement 'different from, or in addition to,' the federal requirements.") (summarizing a previous ruling); *Riegel,* 128 S.Ct. at 1001. As Defendant acknowledges, to the extent that Plaintiff's allegations are concerned not with the nature of Seprafilm as approved by the FDA, but rather with Defendant's action or inaction in its efforts to take part in the PMA process or implement its results, he may be able to satisfy the parallel exception to preemption. (*See* Def.'s Reply at 5 ("An exception [to preemption] is when claims are premised on violations of the federal requirements embodied in the PMA process specific to the challenged device.") (citing *Riegel,* 128 S.Ct. at 1011).)

Whatever merit there may be to Plaintiff's argument regarding parallel requirements, however, the Complaint cannot be saved as it is now formulated. This Court cannot possibly determine whether Plaintiff's claims are based on requirements that are "substantially identical" to those of the FDA without a more precise statement of his claims. *See Lohr,* 518 U.S. at 496-497. As currently pled, each and every count brought by Plaintiff relies either directly or indirectly on the existence of a "defect" in Seprafilm. (*See* Compl. ¶¶ 19-20, 34, 39, 46, 50, 55.) However, if the referenced defect was in fact intrinsic to the product as approved in the PMA, then it is likely if not certain that any finding of liability based on that defect would place additional and/or different burdens on Defendant's product, necessitating preemption pursuant to *Lohr* and § 360k. *See McMullen,* 421 F.3d at 489 (finding that state and federal requirements are not equivalent if a manufacturer could be held liable under state law while complying with federal requirements). Out of practical necessity and the cold calculus of nationwide regulation, the FDA may be aware of a certain failure rate associated with a medical product and yet approve it. A single instance of such failure, while tragic, does not necessarily amount to a "defect" for purposes of establishing liability that survives preemption. *See Mitchell,* 126 F.3d at 913-15 (upholding summary judgment against plaintiff due to the fact that any judgment premised on product failure which nonetheless complied with the PMA "would necessarily conflict with the determination of the FDA that its requirements rendered the product safe and effective").

Similarly, it may be premature to conclude that Plaintiff cannot succeed in establishing Defendant's liability by means of the reporting requirements created by the FDCA. Though not entirely clear, Plaintiff seems to suggest that some portion of his claims should survive on a distinct basis by way of these requirements. Plaintiff is correct that after receiving PMA, Class III devices are subject to annual reporting requirements. 21 U.S.C. § 360i. These "post-approval reports" must identify all changes made to the device, 21 C.F.R. § 814.84(b)(1), and summarize unpublished data from any clinical investigations or laboratory studies or reports in scientific literature involving the device "that reasonably should be known to the applicant,"*id.* § 814.84(b) (2) (i-ii). A manufacturer must also report to the FDA any problems in labeling, malfunctions of devices, and incidents in which a device may have caused death or serious injury. *Id.* § 803.50. At this stage it cannot be said that any liability for failing to meet these requirements is precluded. Nonetheless, Plaintiff's vague suggestion that Defendant violated these reporting requirements does not help Plaintiff avoid dismissal of his claims; Plaintiff has not alleged anything in his Complaint that would put Defendant on notice that the basis of Plaintiff's claim was Genzyme's failure to meet the FDA's reporting requirements. SeeFed.R.Civ.P. 8(a)(2); *Twombly,* 127 S.Ct. at 1964.

**\*6** The burden is on Defendant to show "a conflict between the state and federal regulations of the medical devices which threatens to interfere with a specific federal interest."*Mitchell,* 126 F.3d at 913 (quoting *Hernandez v. Coopervision, Inc.,* 691 So.2d 641 (Fla.Dist.Ct.App.1997)). However, Defendant cannot adequately argue this defense where the Complaint fails to provide the proper level of specificity in its claims. *Brokaw v. Mercer County,* 235 F.3d 1000, 1014 (7th Cir.2000) ("while the federal rules of notice pleading do not require the plaintiff to allege all of the relevant facts, '[f]or fair notice to be given, a complaint must at least include the operative facts upon which a plaintiff bases his claim.'") (quoted cite omitted). To the extent that Plaintiff may eventually succeed in a claim that rests outside those that are preempted by § 360k, it is unclear from the Complaint as it now stands how such a claim would appear. It is not the responsibility

of this Court to restructure Plaintiff's suit so that it alleges claims with some potential for success under the FDCA. *See James Cape & Sons Co. v. PCC Const. Co.,* 453 F.3d 396 (7th Cir.2006) ("District judges are not mind readers, and should not be required to explain to parties whether or how their complaints could be drafted to survive a **motion** to **dismiss**."). At this stage, we find only that every aspect of the Complaint in its current form is either preempted pursuant to § 360k, or lacks sufficient clarity to place Defendant on notice of the claims levied against it. Plaintiff has therefore failed to state a claim upon which relief can be granted, and the Complaint must be dismissed in its entirety. Fed.R.Civ.P. 12(b)(6).

Plaintiff has requested the opportunity to amend his complaint in light of some of the issues addressed in the **motion** to **dismiss** filings. It is clear that the defense of preemption has highlighted a lack of clarity in the structure of several of Plaintiff's claims that may be redeemable through amendment. At the very least, Plaintiff must provide some allegations regarding the nature of the alleged Seprafilm defect as it relates to the FDA approval process. In the interest of justice, Plaintiff will therefore be permitted the opportunity to amend those counts of the Complaint whose failings have only been made clear as a result of the defense of preemption. SeeFed.R.Civ.P. 15. Therefore, Counts I, III, IV, and VII-related to implied warranties, strict liability, or negligence-are DISMISSED. The remaining Counts V and VI suffer from additional failings that warrant additional discussion.

b. *Negligence per se Claim*

Count V of Plaintiff's Complaint alleges that Defendant has violated a statute establishing a standard of care, making Defendant negligent *per se.*(Compl.¶¶ 43, 45, 46.) Under Illinois law, the violation of a statute intended to protect human life or property may establish a prima facie case of negligence.*Kalata v. Anheuser-Busch Cos.,* 144 Ill.2d 425, 434, 163 Ill.Dec. 502, 581 N.E.2d 656 (1991). To prevail on a claim of negligence based on the violation of a statute, a plaintiff must establish that (1) he was a member of the class of persons the statute was designed to protect, (2) his was the type of injury the statute was intended to protect against, and (3) the defendant's violation of the statute was the

proximate cause of his injury. *Id.*

**\*7** Plaintiff alleges that Defendant violated the standards of care for labeling and provision of information set by 21 C.F.R. §§ 201.56 and 201.57 and that Defendant violated §§ 301 and 331 of the FDCA. (Compl. ¶¶ 43-46.) Plaintiff also alleges that he, "as a purchaser and consumer of Seprafilm, is within the class of persons the statutes and regulations ... are designed to protect and [his] injury is of the type of harm these statutes are designed to prevent."(*Id.* at ¶ 44, 163 Ill.Dec. 502, 581 N.E.2d 656.) Plaintiff further alleges that his injuries resulted from the violation of the statutes. (*Id.* at ¶ 47, 163 Ill.Dec. 502, 581 N.E.2d 656.)

In response to the Complaint, Defendant contends that the regulations in 21 C.F.R. §§ 201.56 and 201.57 do not apply to medical devices such as Seprafilm. (Def.'s Memo. in Supp. of **Mot.** to **Dismiss** 7.) Defendant is correct that these regulations apply to "human prescription drug and biological products," not medical devices. 21 C.F.R. §§ 201.56; 201.57. The statutory regulations for Class III medical devices are defined in § 360 of the FDCA, as Plaintiff now acknowledges. (Pl.'s Resp. to Def.'s **Mot.** to **Dismiss** 10-11.) So far as Plaintiff alleges that Defendant has violated 21 C.F.R. §§ 201.56 and 201.57, Count V of Plaintiff's Complaint must be dismissed for failing to place Defendant on notice of the underlying standard of care, an essential element of a negligence *per se* claim. *See Kalata,* 144 Ill.2d at 434, 163 Ill.Dec. 502, 581 N.E.2d 656.

Plaintiff argues in his Response that, because he also alleged that Defendant violated §§ 301 *et seq* and 331, he has pleaded the applicable statutory regulations for medical devices. (*Id.* at 9-10, 163 Ill.Dec. 502, 581 N.E.2d 656.) Plaintiff suggests that he could amend his Complaint to more specifically allege that Defendant violated the regulations for medical device warnings in 21 C.F.R. 801.1 and 801.6 and the requirements for PMA laid out in 21 U.S.C. § 360(e).(*Id.* at 10, 163 Ill.Dec. 502, 581 N.E.2d 656 .) Such amendment may save this count of Plaintiff's Complaint, but must refer specifically to one or more federal requirements to place Defendant on proper notice of the negligence *per se* claim; if Plaintiff merely reiterates FDCA duties within the context of the PMA, its post-approval implementation, or general reporting requirements,

the amended Count V will simply duplicate the claims of Count IV, brought on the basis of overall negligence, and will likely be stricken. *See* Fed.R.Civ.P. 12(f) (enabling a court to strike from a pleading any redundant matter). Therefore, Count V is DISMISSED.

c. *Breach of Express Warranty*

Count VI of Plaintiff's Complaint alleges that Defendant has breached an express warranty made to Plaintiff, on which Plaintiff relied in using Seprafilm. (Compl.¶¶ 49-50.)

According to Section 2-313 of the UCC, express warranties are created by:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

**\*8** (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

810 ILCS 5/2-313(1)(a)-(c) (West 2006). An express warranty creates an obligation on the part of the seller to deliver goods that conform to the promise, description, or model offered by the seller. *Mydlach v. DaimlerChrysler Corp.,* 226 Ill.2d 307, 320, 314 Ill.Dec. 760, 875 N.E.2d 1047 (2007). The warranty is breached if the goods do not conform. *Id .* at 321, 314 Ill.Dec. 760, 875 N.E.2d 1047.[FN2]

> FN2. Illinois courts have not been consistent in interpreting the "basis of the bargain" language in § 2-313 to require proof that a plaintiff actually relied on the warranty. *Compare Hasek,* 319 Ill.App.3d at 538 ("The burden is on the seller to establish ... that the affirmations did not become part of the basis of the bargain.), *with Regopoulous*

*v. Waukegan P'ship,* 240 Ill.App.3d 668, 674, 181 Ill.Dec. 384, 608 N.E.2d 457 (1992) (requiring purchaser to prove he "actually relied on the warranty"). In this case, however, the issue is irrelevant because Plaintiff alleges that he relied on the warranty.

Under an express warranty, the language of the warranty itself dictates the obligations of the parties. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 379 F.Supp.2d 968, 983-84 (N.D.Ill.2005); *Hasek v. DaimlerChrysler Corp.,* 319 Ill.App.3d 780, 788, 253 Ill.Dec. 504, 745 N.E.2d 627 (2001). Express warranty claims are not preempted by § 360k, as they arise from representations made by parties as the basis of the bargain between them rather than requirements imposed under state law. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 525, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Were a court to hold that, under state law, a defendant had breached an express representation made to a plaintiff, such a holding would not interfere with the operation of the PMA process. *Mitchell,* 126 F.3d at 915.

Defendant contends, however, that Plaintiff's Complaint must be dismissed because it does not contain sufficient factual allegations about the nature of the express warranty to state a claim. (Def.'s Mem. in Supp. of **Mot**. to **Dismiss** 8-9.) Defendant is correct that Count VI of Plaintiff's Complaint essentially repeats the elements required to prevail on a claim for breach of express warranty-that a warranty forming part of the basis of the bargain between the parties was breached by the defendant. *See Hasek,* 253 Ill.Dec. 504, 745 N.E.2d at 634. Plaintiff alleges that "Genzyme expressly warranted to Plaintiff by and through statements made ... orally and in publications, package inserts, and other written materials ... that Seprafilm was safe, effective, fit and proper for its intended use."(Compl.¶ 49.) Plaintiff then alleges that he relied on the warranty in using the device and that the warranty was false.(*Id.* at ¶ 50, 253 Ill.Dec. 504, 745 N.E.2d 627.)

The Seventh Circuit has not addressed what is required to state a claim based on breach of express warranty. Even before *Twombly,* however, some courts required that plaintiffs at least mention the particular promise or description that allegedly gave rise to an express warranty. For example, in *Johnson*

*v. Brown & Williamson Tobacco Corp.,* a complaint was insufficient when it stated only that the defendant extended an express warranty through its "advertising, marketing and other efforts." 122 F.Supp.2d 194, 206 (D.Mass.2000). Plaintiff has not pointed this Court to any case suggesting that its allegation that Defendant made "statements ... orally and in publications" is sufficient to state a claim for breach of express warranty. The single case Plaintiff's Response cites in defense of Count VI of his Complaint, *Gelormino v. J.C. Penney Co., Inc.,* actually states that "[s]ince J.C. Penney's allegation of a breach of an express warranty is not supported by any facts, such a mere conclusion of law is legally insufficient."No. CV 960067840, 1997 WL 297601, at *3 (Conn.Super.Ct. May 22, 1997). This unpublished case, moreover, is in no way binding on this Court and has only limited persuasive value.

**\*9** Post-*Twombly,* the federal pleading standard requires more than "a formulaic recitation of the elements of a cause of action."*Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). The Seventh Circuit has indicated that the factual content of a claim may be too "sketchy" to put a defendant on notice. *Killingsworth,* 507 F.3d at 619. In this case, Plaintiff has offered nothing more than a formulaic recitation of the elements required to prevail on a claim and has alleged no facts at all that suggest an express warranty existed. Plaintiff has not specified any particular affirmation, promise, description, or sample that formed part of the basis of his bargain with Defendant. He thus fails to put the Defendant on notice as to the substance of his claim. This seems to be precisely the type of claim that is too indefinite to meet the *Twombly* standard. Count VI of Plaintiff's Complaint is therefore DISMISSED.

### CONCLUSION

In any other instance, a claim of a purported defect related to negligence would likely place Defendant on sufficient notice as to survive dismissal. Within the context of § 360k of the FDCA, however, the word "defect" carries much less meaning, as any such "defect" falling within the scope of the PMA essentially carries no weight for purposes of showing liability under state law. Therefore, the ability of Plaintiff to adequately state a claim according to such allegations is limited, and at present it is not clear that any of his claims might survive those limitations.

Slip Copy
Slip Copy, 2008 WL 2940811 (N.D.Ill.)
**2008 WL 2940811 (N.D.Ill.)**

During the pendency of a decision on the instant **motion** to **dismiss**, Plaintiff amended his complaint. (Docket No. 23.)However, Plaintiff's voluntary amendments as reflected in that document are relatively limited, consisting of: the exclusion of the strict liability count already withdrawn voluntarily; expansion of the general negligence claim to include Defendant's design and manufacture of Seprafilm, as well as its failure to adequately and properly warn "Plaintiff's health care provider purchasing Seprafilm"; changes in the negligence *per se* count to shift its statutory basis; and removal of Count VI for breach of implied warranty. (*See generally id.*)Of these, the only significant change impacting this Court's rationale for granting dismissal involves the new basis for Plaintiff's claim of negligence *per se.*However, this claim is still dependent on the purported "defect" that this Court has already found to be lacking in clarity. In the interest of efficiency this Court will not ask the parties to re-argue a **motion** to **dismiss** on this one count before Plaintiff has had the opportunity to resolve the failings identified in this opinion. Therefore, the Amended Complaint does not save Plaintiff's claims, and it is similarly dismissed without prejudice.

For the reasons stated above, Defendant's **motion** to **dismiss** is GRANTED. Counts I, II, III, IV, V, VI, and VII of the Complaint are DISMISSED WITHOUT PREJUDICE. Plaintiff's Amended Complaint is also DISMISSED WITHOUT PREJUDICE. Plaintiff will be granted leave to amend his Complaint on or before August 18, 2008 in light of this Opinion.

N.D.Ill.,2008.
Heisner ex rel. Heisner v. Genzyme Corp.
Slip Copy, 2008 WL 2940811 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

H JA Apparel Corp. v. Abboud
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
JA APPAREL CORP., Plaintiff,
v.
Joseph ABBOUD, Houndstooth Corp., and
Herringbone Creative Services, Inc., Defendants.
Joseph Abboud, Houndstooth Corp., and
Herringbone Creative Services, Inc., Counterclaim-
Plaintiffs,
v.
JA Apparel Corp. and Martin Staff, Counterclaim-
Defendants.
**No. 07 Civ. 7787(THK).**

June 5, 2008.

**MEMORANDUM OPINION AND ORDER**

THEODORE H. KATZ, United States Magistrate
Judge.
**\*1** In this action, Plaintiff JA Apparel Corp.
("Plaintiff" or "JA Apparel") sues Defendants Joseph
Abboud ("Abboud"), Houndstooth Corp.
("Houndstooth"), and Herringbone Creative Services,
Inc. ("Herringbone") (at times, collectively
"Abboud") for (1) breach of contract, (2) trademark
infringement, false designation of origin, unfair
competition, trademark dilution, false and deceptive
trade practices, and (3) a declaratory judgment
regarding the nature of its rights, stemming from a
June 16, 2000 Purchase and Sale Agreement, and a
related July 13, 2000 Side Letter Agreement,
between, on the one hand, JA Apparel, and, on the
other, Abboud and Houndstooth.

Defendants assert counterclaims against JA Apparel
and one of its principals, Martin Staff ("Staff"), for
false endorsement, false advertising, violation of
New York civil rights and general business laws, and
common law unfair competition, stemming from
activities in which JA Apparel and Staff allegedly
engaged subsequent to the expiration of the Side
Letter Agreement.

The Court's jurisdiction over the federal trademark

and related claims arises under 28 U.S.C. §§ 1331
and 1388(a) and (b) and 15 U.S .C. § 1121, and its
supplemental jurisdiction over the state law claims
arises under 28 U.S.C. § 1367.

On September 4, 2007, Plaintiff filed its Complaint
seeking, among other things, preliminary and
permanent injunctive relief against Defendants. By
agreement of the parties, JA's motion for a
preliminary injunction was consolidated with a trial
on the merits. After engaging in intensive
documentary and deposition discovery, on December
5, 2007, the parties consented to trial before this
Court, pursuant to 28 U.S.C. § 636(c) and
Fed.R.Civ.P. 73. The Court presided over a bench
trial on February 20-22 and March 10-12, 2008, and
closing arguments were heard on April 3, 2008. What
follows are the Court's Findings of Fact and
Conclusions of Law.

**FACTUAL BACKGROUND**FN1

FN1. The following citation formats will be
used herein: trial testimony will be cited as
(TT at ___); April 3, 2008 closing argument
will be cited as (CA at ___); deposition
testimony will be cited as ( [Last name] Tr.,
at ___); Plaintiff's trial exhibits will be cited
as (PX ___); Defendants' trial exhibits will
be cited as (DX ___); Plaintiff's Post-Trial
Proposed Findings of Fact and Conclusions
of Law will be cited as (Pl.'s Post-Trial
Mem., at ___); and Defendants' Post-Trial
Proposed Findings of Fact and Conclusions
of Law will be cited as (Defs.' Post-Trial
Mem., at ___).

Joseph Abboud began his career in the fashion
industry in Boston, in the late 1960s, with the
menswear retailer, Louis Boston. He worked there for
twelve years, serving as a buyer, designer,
merchandiser, and coordinator of promotion and
advertising. In 1980, Abboud left Louis Boston and
went to work for a company called Southwick, where
he was responsible for designing tailored clothing.
About a year later, in 1981, Abboud left Southwick
and began working for Polo Ralph Lauren as a
menswear designer. In 1985, Abboud was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



approached by Barry Bricken, an individual in the menswear business, who asked Abboud to join him in creating an entire menswear collection. Abboud accepted Bricken's offer and, during this time, established what he refers to as his designer "DNA"- a style that rests between traditional American "preppie" clothes and "faster" European clothes.

In 1987, Abboud launched his first menswear line under the "Joseph Abboud" label, while working for the Milton Freeberg Company. It was at this time that Abboud also registered his personal name, "Joseph Abboud," as a trademark with the United States Patent and Trademark Office. Thereafter, in March 1988, Abboud, through his new wholly-owned corporation, Houndstooth, entered into a joint venture with GFT International B.V. ("GFT") to manufacture, market, and sell various products under the Joseph Abboud brand name.[FN2] The joint venture was named JA Apparel-which is the Plaintiff in this case. During the joint venture, pursuant to a March 1, 1988 License Agreement, Abboud licensed the "Joseph Abboud" trademarks to JA Apparel, which used the "Joseph Abboud" trademarks in the manufacture, marketing, and sale of its products. Abboud remained responsible for the design of JA Apparel's men's clothing and accessory lines.

> [FN2.] The Complaint alleges that the joint venture was with GFT USA, Inc.-as opposed to GFT International B.V. (*See* Complaint ¶ 19.) The discrepancy is of no moment to the Court's decision.

**2** The joint venture continued in this form until 1996, when GFT, which had recently been acquired by new Italian owners, bought out Abboud's interest in the joint venture and JA Apparel became a wholly-owned subsidiary of GFT. In connection with this transaction, GFT canceled the 1988 License Agreement in exchange for Abboud issuing two new licenses to JA Apparel for the use of the "Joseph Abboud" trademark in the manufacture, marketing and sale of men's tailored clothing and sportswear, that was to be approved by Abboud. Throughout the new license period, through the year 2000, JA Apparel, then wholly-owned by GFT, continued to sell its products under the "Joseph Abboud" trademarks. Sales of products under the Joseph Abboud trademarks grew substantially in the period from 1988 through 2000, and Abboud became a well-

known and highly respected figure in the fashion industry.

*The Purchase And Sale Agreement*

On June 16, 2000, JA Apparel entered into the Purchase and Sale Agreement with Abboud and Houndstooth (the "Agreement"). Abboud was represented by counsel during the negotiation and execution of the Agreement, read the Agreement before signing it, and initialed each page on behalf of himself and Houndstooth. The Agreement is the genesis of the current litigation.

In exchange for a payment of $65.5 million, which was to be "allocated 100% to Abboud," Abboud agreed to "sell, convey, transfer, assign and deliver" to JA Apparel "all of [his] right, title and interest in and to" the following:

> (A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks") ... and all other Intellectual Property (as hereinafter defined).

> (B) All licenses to use the Trademarks granted by Houndstooth or Abboud ... (collectively, the "License Agreements").

> (C) All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar to or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products and services.

> (D) All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

> (E) The goodwill of or pertaining to the Trademarks. (The items referred to in clauses (A)



Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

through (E) of this Section 1.1(a) are collectively referred to as the "Assets").

(*See* PX 1 at ¶ 1.1(a)(A)-(E).)

The Agreement also has an "Interpretation" provision, which provides, in pertinent part:

> 9.8.    *Interpretation*.... The parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any provisions of this Agreement ....

**\*3** (*Id.* ¶ 9.8.)It also has an integration clause, which states:

> 9.9.    *Entire Agreement.*This Agreement, including the Exhibits and Schedules hereto and the documents, certificates and instruments referred to herein, embody (*sic* ) the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions.

(*Id.* ¶ 9.9.)

\* \* \*

*The Side Agreement*

Approximately one month later, on July 13, 2000, the same parties entered into another agreement, alternately referred to by the parties as the Side Letter Agreement or Personal Services Agreement (referred to herein as the "Side Agreement"). Abboud was represented by counsel during the negotiation and execution of the Side Agreement, pursuant to which Abboud agreed to serve as "Chairman Emeritus" of JA Apparel, and, for a period of five years, provide JA Apparel with, among other things, consulting

services relating to fashion design and brand promotion of products sold under the Abboud marks.

The Side Agreement, therefore, was to expire on July 13, 2005, but the terms provided that upon expiration, Abboud would not compete with JA Apparel for a period of two years-until July 13, 2007 (the "Restricted Period"). Specifically, the non-competition provision provides as follows:

> 2. *Prohibition of Competing Activities by Abboud*
>
> (a) For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period"), Abboud agrees that he will not, directly or indirectly, through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise, or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of the Buyer as then conducted or as such business may reasonably be expected to be conducted in the future anywhere in the world.

(*See* PX 2 at ¶ 2(a).)

In language that further strengthened the non-compete provision, during the Restricted Period Abboud also agreed to obtain written permission from JA Apparel-which JA Apparel could grant, withhold, or condition solely in its discretion-"before becoming associated in *any capacity* with any person, group, business enterprise or other entity," that competed with, or could be expected to compete with, JA Apparel in the future. (*Id.* ¶ 2(b)) (emphasis added). The Side Agreement further provided that the $65.5 million Abboud received in connection with the Agreement provided him with full and fair consideration for his non-competition obligations. (*Id.* ¶ 2(c).) In that regard, Abboud acknowledged in the Side Agreement that his non-competition obligations were specifically bargained for in connection with the Agreement, and that if he breached such obligations JA Apparel would be entitled to injunctive relief to "enforce such agreements." (*Id.* ¶ 2(d).)



*The First Dispute And Sale Of JA Apparel*

**\*4** Shortly after entering into the Agreement and Side Agreement, Abboud and the then-owners of JA Apparel became embroiled in a dispute regarding Abboud's role in the creative process, and Abboud instituted litigation against JA Apparel, GFT, and the President/CEO of GFT. While that case was pending, in a transaction that closed in March, 2004, JA Apparel was sold to affiliates of an entity named J.W. Childs for $73 million and the assumption of certain debt. Thereafter, Abboud dismissed his case against JA Apparel, its former owners, and its then President/CEO, and entered into a June 29, 2004 Letter Agreement ("Letter Agreement"), pursuant to which Abboud was given new responsibilities at JA Apparel, including a role in designing JA Apparel's tailored clothing line, for which he was assigned assistant designers. JA Apparel also agreed to provide Abboud with access to its merchandising, marketing, publicity, and advertising services.

In the Letter Agreement, Abboud and JA Apparel also expressly reaffirmed their commitment to the terms of the Side Agreement and specifically reiterated that JA Apparel had bought the "Joseph Abboud" marks. The Letter Agreement also granted Abboud the right, which he subsequently exercised, to make a $1 million dollar investment in JA Holding, Inc.-the company J.W. Childs formed to acquire JA Apparel.

In the Spring of 2005, Abboud informed JA Apparel that he was not going to continue in his position with JA Apparel, and, pursuant to the terms of the Letter Agreement, Abboud's $1 million dollar investment was returned to him. The Personal Services period terminated on July 13, 2005, thereby triggering the Restricted Period that was to run until on July 13, 2007.

*Abboud's Activities During The Restricted Period*

Abboud was determined to reenter the men's fashion world and conceived a high-end line of men's clothing that would be sold under the trademark "jaz." In the time period between July 13, 2005 and July 13, 2007, Abboud engaged in certain activities, which are described in greater detail below, that would enable him to launch his new "jaz" menswear

line after the expiration of the Restricted Period. For example, through Herringbone, of which Abboud remained an officer, director, and sole shareholder, Abboud and/or his attorney, Theodore Dinsmoor ("Dinsmoor"), conducted meetings in which he presented his new "jaz" line and negotiated licensing agreements, which were executed after the expiration of the Restricted Period, with Jack Victor, a well-known menswear manufacturer, Cardinal of Canada ("Cardinal"), and J.S. Blank & Co. ("J.S.Blank"), a prominent tie design company.

In addition, Abboud, either personally or through Herringbone and/or Dinsmoor, engaged in certain activities with respect to the Fall River Shirt Company ("Fall River") in Fall River, Massachusetts. Although the parties dispute the legal import of these activities, the factual circumstances surrounding the activities are largely undisputed. A thorough description of the facts is set forth in Section V.B., *infra.*

*JA Apparel Becomes Aware Of Abboud's Plans For The Jaz Line*

**\*5** On August 6, 2007, approximately three weeks after the expiration of the Restricted Period, the leading magazine of the men's fashion industry, DNR, published an article indicating that, in connection with a new Fall 2008 menswear collection called "jaz," Abboud had (a) lined up licensing agreements with Jack Victor, Cardinal, and J.S. Blank, and (b) negotiated agreements with Alden Street Shirt Company ("Alden"), to acquire Alden for production of his new shirt line, and Merrill-Sharpe, Ltd. ("Merrill"), to acquire Merrill for production of his new sportswear line. (*See* PX 8.) The article also had pictures of models wearing clothing identified as being from the "Fall '08 JAZ collection." (*Id.*)

The DNR article initially stated that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials."(*Id.*) Thereafter, however, JA Apparel was notified by the article's author, David Lipke, that Defendants had asked him to issue a correction because, in Defendants' words, they "are free to use [Abboud's] name in marketing materials, not on clothing."(*See* PX 9.) Based on Abboud's request, DNR ran a "Clarification," which stated "according to Abboud and his attorney, Theodore Dinsmoor, the designer ...

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 5
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

is, in fact, allowed to use his name on marketing and advertising materials for Jaz."(PX 10.) During his deposition, Abboud testified that he told Lipke that he believes he "has the right to use [his] name in advertising and marketing as long as it was used in an informational way to inform the public that [he] was the designer of JAZ."(Abboud Tr., at 140.) Similarly, at trial, Abboud testified that he has "the right to inform the public of who is designing a new collection."(TT 609, 617.)

Plaintiffs also learned of Abboud's intentions with respect to his new "jaz" line by way of an August 6, 2007 article in the Wall Street Journal, which stated that Abboud "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.' " (See PX 11.) At trial, Abboud acknowledged that he provided the Wall Street Journal with a press release that had the words "A New Concept From Designer Joseph Abboud." (See TT 568.) During trial, Defendants also provided a "mock-up" of a proposed advertisement for "jaz" that they do not believe will violate the Agreement, which uses the words "by the award-winning designer Joseph Abboud."

Plaintiff maintains that while Abboud is free to compete in the menswear market, he sold all rights to use his name in connection with goods and services, and that his proposed uses of his name in connection with the "jaz" line violate the Agreement because they are plainly "similar" to or "derivative" of the names, trademarks, and designations he expressly sold, namely "Joseph Abboud," "designed by Joseph Abboud," and "by Joseph Abboud." Plaintiff also contends that Abboud's use of his name in connection with the "jaz" line of clothing would result in trademark infringement and other forms of unfair competition.

**\*6** Defendants, conversely, maintain that Abboud did not sell the exclusive right to use his name for all commercial purposes, and, in furtherance of that position, assert Counterclaims against JA Apparel and Staff for improperly using the Joseph Abboud name in ways that, among other things, deceive consumers, trade on Abboud's personal reputation [FN3], and constitute unfair competition.

> FN3. From 1987 through the present, Abboud has been the recipient of numerous

awards and honors based on his work as a fashion designer and philanthropist. For purposes of this decision, Abboud's well-respected reputation-at least within the fashion industry-is assumed.

### DISCUSSION

"A good name, like good will, is got by many actions and lost by one."-Lord Jeffery

\* \* \*

This case presents the interesting and somewhat vexing issue of whether and how an individual, whose name and reputation have become clearly identified with a business and line of products, and which serve as its trademarks, can continue to use his name after he sells the business, its trademarks, and his name, for a considerable amount of money.

Notwithstanding the torrent of claims, counterclaims, motions, briefs, testimony, exhibits, and letters that have been submitted in and to this Court over the past six months, the central and overriding issue in this case is a simple one, which can be stated as follows: by way of the Agreement, did Abboud sell to JA Apparel the exclusive right to use his name in connection with goods and services? If this question is answered in the affirmative, JA Apparel is entitled to a permanent injunction preventing Abboud from using his name in connection with his new "jaz" line, or, in the future, in connection with any other goods and services.[FN4]

> FN4. Although the injunction Plaintiff seeks is broad, for purposes of this case Defendants have conceded that they are not seeking to use the Joseph Abboud name on clothes, labels, or hang-tags for the "jaz" line (TT at 4-5), and Plaintiff has conceded that it is not seeking to prevent Abboud from being in business and competing, or personally presenting his new "jaz" line to prospective purchasers, such as Bloomingdale's. (Id. at 8, 12.)Thus, the specific dispute presented to the Court, which was left open by these concessions, is whether Abboud can use his name in advertising or marketing materials to promote his "jaz" line. (See id. at 3 (Counsel

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



for Defendants: "All [Abboud] is asking to do in this case is to be able to use his name in advertising materials ... to be able to identify himself in text as the designer of the ... jaz products that are at issue."); at 11 (Counsel for Plaintiff: "We're not trying to stop him from competing against us.... But once he starts advertising, then he's trading on the same reputation that is, in fact, merged into the goodwill of the brand that he sold to us.").)

Plaintiff asserts claims for breach of the Agreement, violations of the Lanham Act and the New York General Business Law, and breaches of the Side Agreement's non-competition provision. Plaintiff seeks (a) a declaratory judgment, (b) a permanent injunction "enjoining Defendants from breaching the ... Agreement and enjoining Defendants' infringing and other wrongful conduct," (*see* Pl.'s Post-Trial Mem., at 88), and (c) an injunction enjoining "[D]efendants from competing with JA Apparel for no less than the amount of time that Mr. Abboud breached his non-compete obligations in the Side [ ] Agreement prior to July 13, 2007, i.e., until 90 days from the date of entry of the Court's injunction."(*Id.*)

### I. *Breach Of Contract*

#### A. *Legal Standard*

In order to "prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir.2000)* (internal quotations omitted); *see also Clalit Health Servs. v. Isr. Humanitarian Found., 385 F.Supp.2d 392, 397 (S.D.N.Y.2005)* (same).[FN5]

> **FN5.** The parties agree that New York law governs this case.

Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accordance with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing."*Innophos, Inc. v. Rhodia, S.A., 882 N.E.2d 389, 391-92, 10 N.Y.3d 25, 29 (2008)* (internal

citations omitted). Moreover, where, as here, a contract is negotiated by sophisticated parties negotiating at arm's length:

> **\*7** [C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.

*Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 768 (2004)* (internal citations omitted); *see also Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 580 (2d Cir.2006)* ("Under New York law, ... [c]ourt[s] must enforce contract provisions clearly expressing parties' intent."); *Terwilliger, 206 F.3d at 245* ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."); *Belle Harbor Wash. Hotel, Inc. v. Jefferson Omega Corp., 17 A.D.3d 612, 612, 795 N.Y.S.2d 597, 598 (2d Dep't.2005)* ("A written agreement that is complete, clear, and unambiguous on its face must be enforced in accordance with the plain meaning of its terms.").[FN6]

> **FN6.** As stated above, this rule applies with particular force here because the contract was negotiated by sophisticated business people who were represented by counsel.

The determination of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts."*W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990)*. If a court makes a determination that the contract is unambiguous, extrinsic evidence regarding the intent of the parties is inadmissible and cannot be considered. *See id.; see also Terwilliger, 206 F.3d at 245* ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.").

#### B. *Application*



1. *The Parties' Interpretations*

Both parties agree that the Agreement is unambiguous. Defendants maintain that "the Purchase and Sale Agreement is not ambiguous as to what Abboud agreed to convey[.]" (*See* Defs.' Post-Trial Mem ., at 74.) Plaintiff also maintains that "[t]here is nothing ambiguous about the Purchase and Sale Agreement."(*See* Pl.'s Post-Trial Mem., at 90.)

Not surprisingly, however, each party argues that the Agreement unambiguously supports its rather than its adversary's conflicting position. Defendants argue that the Agreement obligated Abboud to convey or assign only "trademarks and service marks and the good will pertaining thereto, as well as license agreements."(*See* Defs.' Post-Trial Mem., at 66.) Plaintiff, conversely, argues that "Mr. Abboud agreed to and did sell to JA Apparel-for $65.5 million-'all of the Sellers' right, title and interest in ... [t]he names, trademarks, trade names, service marks, logos, insignias, and designations' that include the words 'Joseph Abboud,' 'all trademark registrations and applications therefor, and the goodwill related thereto.'" (*See* Pl.'s Post-Trial Mem., at 89-90.) In other words, Defendants argue that the words "names ... trade names ... logos, insignias, and designations" in Sections 1.1(a)(A) and/or (C) of the Agreement are merely descriptive of the trademarks and service marks that Abboud agreed to convey, while Plaintiff argues that each of these words represents a separate category of assets that Abboud agreed to convey.

2. *Plaintiff's Motion In Limine*

**\*8** Trial in this matter was commenced, as scheduled, on February 20, 2008. On February 4, 2008, Plaintiff filed a Motion *In Limine* To Preclude The Admission Of Parol Evidence ("Plaintiff's Mtn."), wherein it argued that the Agreement was unambiguous and that the Court should preclude the admission of all parol evidence.[FN7]Defendants filed their Opposition to Plaintiff's Motion *In Limine* ("Defs.' Resp.") on February 14, 2008, one day after the parties submitted their pre-trial proposed findings of fact and conclusions of law.[FN8]On February 19, 2008-one day before the trial was to commence-Plaintiff filed its reply in support of its Motion. At the start of the trial the next day, the Court stated that it was "reserving decision on the *in limine* motion because I'm going to hear testimony, but it's obviously without prejudice to

my concluding, possibly concluding, that the contract's unambiguous."(TT at 14.)

> FN7. Plaintiff claims that it first became aware of Defendants' intention to rely on extrinsic evidence in late December, 2007, when the parties exchanged witness and exhibit lists. (*See* Pl's Post-Trial Mem., at 102, n. 46.) Plaintiff does not explain why it waited until two weeks before trial-and at least seven weeks after learning of Defendants' intention-to file its Motion *In Limine.*

> FN8. Defendants' opposition is based on the unusual position that, although Defendants believe the Agreement is unambiguous, if the Court were to disagree, it would be required to take into account all of the extrinsic evidence which Defendants believe supports their position. The main argument Defendants advance in support of this argument as to why the Court should hear parol evidence is that, in the context of a bench, as opposed to jury, trial, the risk of prejudice based on the admission of parol evidence is significantly decreased. (*See* Defs.' Resp., at 15-16.)

The Court's ruling on Plaintiff's Motion was largely, if not exclusively, a function of the timing of its completed submission. The Court was disinclined to alter the trial and excise a large portion of the evidence based on a motion, which required the interpretation of a contract, that it had less than twenty-four hours to consider. Accordingly, the Court allowed the parties-over Plaintiff's consistent and repeated objections-to submit extrinsic evidence regarding the parties' intent. However, after having had an appropriate amount of time to adequately review Plaintiff's Motion, the Court now concludes that the Agreement and the Side Agreement are, in fact, unambiguous. Accordingly, the Court is precluded from considering extrinsic evidence regarding the parties' intent, and must construe the language as it is written. The Court will therefore not discuss the fairly extensive extrinsic evidence presented at trial.[FN9]

> FN9. Although legally irrelevant under this ruling, it should be noted that the extrinsic



evidence submitted at trial did not overwhelmingly support either party's position.

3. *Under The Agreement, Abboud Agreed To Convey More Than Trademarks, Service Marks, And Licensing Agreements*

As stated above, pursuant to the key contractual provision in this case, Abboud agreed to "sell, convey, transfer, assign and deliver ... all of [his] right, title and interest in and to: (A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks")."

Despite this language, Defendants' position throughout this case has been that Abboud only sold the rights to use the names, trade names, logos, insignias, and designations listed on Schedule 1.1(a) *as* trademarks and service marks-and not as independent species of assets. In fact, Defendants initially took the position that Abboud only sold the rights to the trademarks listed on Schedule 1.1(a)(A), but they modified their position during trial to include service marks. The overarching, and ultimately fatal, flaw with this position is that it requires the Court to render meaningless or superfluous the words "names ... trade names ... logos, insignias and designations," which would, in turn, require the Court to be unfaithful to a bedrock principle of contract interpretation.[FN10]

> **FN10.** Plaintiff also argues that the Court would be required to ignore the word "collectively" because the use of that word "necessarily means that the defined term 'Trademarks' means each of the seven items specified in the 'collection.' " (*See* Pl.'s Post-Trial Mem., at 96.)

**\*9** Indeed, pursuant to a long-standing and unassailable rule of contract interpretation, the Court is required to give meaning to every term in the Agreement. *See, e.g., God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs. LLP,* 6 N.Y.3d 371, 374, 812 N.Y.S.2d 435, 437 (2006) ("A contract 'should be read to give effect to all its provisions.'") (citing *Mastrobuono v. Shearson*

*Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212 (1995)); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S .2d 1, 3 (1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract without force and effect'.") (citing *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (1956) & *Fleischman v. Furgueson,* 223 N.Y. 235, 239, 119 N.E. 400, 401 (1918).) Alternatively stated, "rules of construction of contracts require a court to adopt an interpretation which gives meaning to every provision of a contract ...." *Muzak,* 1 N.Y.2d at 46, 150 N.Y.S.2d at 174;*see also Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 468 (1984) ("[O]ne of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); *River View Assocs. v. Sheraton Corp. of America,* 306 N.Y.S.2d 153, 156, 33 A.D.2d 187, 190 (1st Dep't 1969) ("[W]ords in a contract are not to be ignored when seeking to arrive at the express intent.").

Moreover, the Court must "accord the words of the contract their fair and reasonable meaning."*Sutton v. East River Sav. Bank,* 450 N.Y.S.2d 460, 463, 435 N.E.2d 1075, 1078 (1982) (internal citations omitted); *see also Crowley v. VisionMaker, LLC,* 512 F.Supp.2d 144, 152 (S.D.N.Y.2007) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use, and thus, the court ordinarily looks only at the wording used by the drafters who presumably understood what they intended.") (internal citations omitted); *Albanese v. Consolidated Rail Corp.,* 666 N.Y .S.2d 680, 682, 245 A.D.2d 475, 476 (2d Dep't 1997) ("The words of a contract must be accorded their 'fair and reasonable meaning,' and its meaning should be based on reasonable interpretations of the literal language.").

Applying these rules, the Court finds Plaintiff's interpretation of the contract to be compelling. A reading of the Agreement that acknowledges each of the words used, in their fair and reasonable meaning, makes plain that Abboud agreed to sell all rights to, among other things, the "names" on Schedule 1.1(a)(A), and the name Joseph Abboud appears repeatedly on that schedule. Alternatively stated, if Abboud only intended to convey trademarks, then the Agreement could have and should have said:



Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

"Abboud agrees to sell ... all of [his] right, title and interest in and to the trademarks identified on Schedule 1.1(a)(A)." But it said more than that, and in order to give the word "names" due meaning and effect, the Court must interpret the Agreement in a manner that provides JA Apparel with that which it expressly purchased-all of Abboud's rights to use his name for commercial purposes.[FN11]

> FN11. As set forth below, Defendants' interpretation would also entail ignoring or negating the term "trade names," which has a commonly understood meaning that is distinct from that of a trademark, and is not capable of being interpreted merely as a description of a trademark.

4. *Defendants' Counter-Arguments Are Unavailing*

**\*10** Defendants have offered a variety of arguments as to why the word "names"-along with the other words such as "trade names ... logos, insignias, and designations"-should not be read to constitute independent species of assets. Each of these arguments will now be discussed.

a. *Intent Must Be Clearly Shown*

Relying heavily on the case of *Madrigal Audio Laboratories, Inc. v. Cello, Ltd.,* 799 F.2d 814 (2d Cir.1986), Defendants argue that the traditional rules of contract interpretation do not apply in a situation where one party to a contract asserts that the other party sold an exclusive right to commercially use his name. In such a situation, according to Defendants, there "is a higher threshold than simply reading the paragraphs and attempting to determine what the language of the contract means-the Agreement must be clear on its face that Abboud intended to sell the exclusive right to use his name in business."(Defs.' Post-Trial Mem., at 57) (citing *Madrigal,* 799 F.2d at 822-23 ("intention to convey an exclusive right to the use of [his] own name" must be "clearly shown") (internal citations omitted)). Thus, Defendants contend that:

> [T]he failure of the Agreement to clearly indicate that it was Abboud's intent to sell to JA Apparel the exclusive right to the use of his personal name in business such as a statement to the affect (*sic*) that 'For the avoidance of doubt, as part of

> the Assets to be conveyed by Seller, Seller shall assign, transfer and convey at the Closing the exclusive right to use the name 'Joseph Abboud' for commercial benefit in any and all media in perpetuity', constitutes a failure to meet this higher threshold.

(*Id.*) (citing *Madrigal,* 799 F.2d at 822-23.) In the Court's view, simply because the Agreement could have been clearer, does not render it ambiguous.[FN12] Due to Defendants' heavy reliance on *Madrigal,* a brief recitation of the facts and holding of that case is warranted.

> FN12. Indeed, Defendants argue that the contract is unambiguous, even though, without doubt, it could have been more clearly worded to convey their claimed intent.

In *Madrigal,* the plaintiff purchased from defendant Mark Levinson, an established designer of audio-equipment, the Levinson trade name and trademark. Thereafter, a district court enjoined Levinson and a new company he founded to produce audio equipment, Cello, Ltd., from, among other things, publicizing the fact that Levinson worked for Cello. *See Madrigal,* 799 F.2d at 816. On appeal, the Second Circuit narrowed the injunction, and stated:

> When an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products, and not from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name, or from advertising in a not overly intrusive manner, that he is affiliated with a new company.

*Id.* at 823 (citations omitted). Thus, even though Levinson had sold the right to use his name as a trade name, he was not precluded from engaging in business through another company or publicizing his connection to the new company. *Id.* at 825.The court held, therefore, that the plaintiff did not acquire the exclusive right to use Levinson's personal name as a symbol of his individual reputation. *Id.* at 823.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                           Page 10
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

*\*11* But, in language that dramatically reduces the utility of *Madrigal* to Defendants' argument here, the court went on to state that "[w]hether a person who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale."*Id.* Here, as stated above, in a transaction in which Abboud personally received $65.5 million, Abboud expressly sold (a) all rights to use his name, in addition to trademarks and trade names incorporating his name (*see* PX 1 at ¶ 1.1(a)(A)), and (b) all rights to the designations "Joseph Abboud," "by Joseph Abboud," and "designed by Joseph Abboud," or "anything similar to or derivative thereof,""for any and all products and services."(*See id.* at ¶ 1.1(a)(C).) In light of these "terms of the sale"-and the statement in *Madrigal* that one's ability to use his name after such a sale is contingent on the terms of the sale-*Madrigal* does not lend the support to Defendants' position that they would like the Court to give it.

Further distinguishing *Madrigal* from the instant case are: (1) in *Madrigal,* unlike here, the agreement was expressly limited to the sale of the Mark Levinson name as a trade name or trademark, and other than alleging trademark infringement, the plaintiff did not contend that a contract for sale of a personal name was breached; (2) Levinson did not appeal the district court's holding that he could not use the phrase "Cello by Levinson" because that phrase may have been misleading to the public; (3) the stereo equipment Levinson intended to sell through his new company was "distinct" from the plaintiff's goods; and (4) the transfer of Levinson's name as a trademark occurred through a bankruptcy proceeding, and Levinson only received a token amount as a result of the transfer. *Id.* at 816, 822, 825.

It is also worth noting that, aside from cursory parenthetical references, Defendants do not squarely address the two main cases upon which Plaintiff relies in support of its position-*Levitt Corp. v. Levitt,* 593 F.2d 463 (2d Cir.1979) & *In re The Leslie Fay Cos., Inc. ("Nipon"),* 216 B.R. 117 (Bankr.S.D.N.Y.1997).*Levitt* and *Nipon* both (a) wrestle with the issue of the extent to which an individual can use his name in connection with a new venture following the sale of his name as a trademark or trade name to the entity with which he was previously involved, and (b) issue injunctive relief

precluding individuals' use of their names in certain ways. Defendants, however, categorically reject the relevancy of these cases because the defendants therein were attempting to use their names "as a trademark, service mark or trade name" and not, as Defendants claim Abboud is attempting to do here, as "other than a trademark, in business."(*See* Defs.' Post-Trial Mem., at 81, 91.)

*Levitt* and *Nipon* cannot be dismissed so quickly. In *Levitt,* defendant Levitt, a prominent builder, agreed to merge his business into a new company, which succeeded to all rights of Levitt's former company, "including the goodwill, trademarks, trade names, service marks, and service names associated with the corporation."*Levitt,* 593 F.2d at 465. Levitt later acknowledged in writing that he did not have any right to use the name "Levitt" as a "corporate title, trademark or trade name in the construction business," but he also specifically retained the right to use his name publicly as a corporate officer or director of a business enterprise, to the extent that such use did not cause confusion with the trademarks or trade names of his former company. 593 F.2d at 465-66. The parties became involved in a dispute when Levitt began advertising that he was the founder of a company that had built "Levittowns" in various cities.

*\*12* The district court subsequently entered two injunctions against Levitt. The first forbade the defendants from issuing "any press releases or advertising, or generating any publicity" concerning Levitt's connection to a new project for a period of two years. *Id.* at 467.The second permanently enjoined Levitt from publicizing his prior involvement with Levitt and Sons, his former corporation. In rejecting Levitt's challenge to these two broad injunctions, the Second Circuit made the following statement: "Where, as here ... the infringing party has previously sold his business, including the use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable."*Levitt,* 593 F.2d at 468. The court also instructed that,

> [t]o protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it'.... And if the district court

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



finds that the seller has attempted to arrogate to himself the trade reputation for which he received valuable consideration, broad remedies may be effected to restore to the plaintiff the value of his purchase.

*Id.* (citing *Guth v. Guth Chocolate Co.,* 224 F. 932 (4th Cir.1915)).[FN13]

> **FN13.** In *Levitt,* unlike the instant case, there was not even a claim that the defendant had sold his "name," as opposed to a trademark or trade name containing his name. Yet, the court upheld restrictions on how Levitt used his personal name, observing that "[w]hen a name is used as a trademark, it risks becoming a symbol of the corporation and its past accomplishments and losing its individual identity."*Levitt,* 593 F.2d at 468.

In *Nipon,* Albert Nipon, a well-known clothing designer, and his company, Albert Nipon, Inc., sold to Leslie Fay the existing trademarks in Nipon's name and the related goodwill. *See Nipon,* 216 B.R. at 123. Years later, Nipon entered into a license agreement with American Pop for neckties and, beneath the American Pop trademark, the label on the ties read "CREATED BY ALBERT NIPON." *Id.* at 125.Nipon, like Abboud here, argued that this use of his name was a "permissible means to inform the public and industry of his association with American Pop."In rejecting that argument, the court stated:

> The use of the Albert Nipon name on at least one of the registered trademarks, "Executive Dress by Albert Nipon," is remarkably similar to the mark and legend of American Pop created by Albert Nipon. This phrasing is commonly used by established trademarks in the apparel and accessory industry. Thus, potential purchasers could easily be confused by such similar and usual phrasing encompassing Nipon's full name on a label, hangtag, advertising or promotional material.

*Id.* at 127-28.

The court ultimately found the defendants' conduct to constitute trademark infringement and dilution and citing the language from *Levitt* and *Guth,* that courts should be "especially alert to foreclose attempts by

the seller to keep for himself the essential thing he sold, and also keep the price that he got for it"-enjoined Nipon from using his name on any merchandise labels for American Pop. *Id.* at 124-26, 136 (internal quotations omitted).

Accordingly, even accepting Defendants' general distinction of *Levitt* and *Nipon,* on the grounds that they involved attempts to use a personal name as trademarks or trade names, as opposed to non-trademark business use, the Court gleans useful guidance in these cases that can aptly be applied to a similar context here.[FN14]The key principle from all three cases-*Levitt, Madrigal,* and *Nipon*-is that a court must first determine, based on the language of the contract, exactly what the seller (an individual in whose name there is value) sold to the purchaser (the company with which he was formerly associated, who for valuable consideration purchased the rights to use his name in some form or another). If the court determines, based on the facts of the particular case, that the seller is subsequently trying to use to his advantage, and to the detriment of the purchaser, that which he previously sold, courts should be prepared to grant "sweeping injunctive relief" if necessary to protect the rights of the purchaser. *Levitt,* 593 F.2d at 468. Here, as previously stated, the Court finds that the Agreement unambiguously provided for the sale of all the rights in the Joseph Abboud name to JA Apparel for commercial purposes.

> **FN14.** Contrary to Defendants' distinction, *Levitt* goes beyond the proposed use of a name as a trademark or trade name. Indeed, the court permanently forbade defendant Levitt from publicizing, in reciting the highlights of his career, his association with his former company in connection with all future residential developments. *Levitt,* 593 F.2d at 467.

b. *Absence Of The Word "Exclusive"*

**\*13** The Court also rejects Defendants' argument, citing *Madrigal,* that Plaintiff could not have obtained the exclusive right to commercially use the Abboud name in the absence of language such as, "Seller conveys and assigns the exclusive right to use the name 'Joseph Abboud' for commercial benefit in any and all media in perpetuity."(*See* Defs.' Post-Trial Mem., at 57.) *Madrigal*'s instruction that an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                          Page 12
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

intent to sell the exclusive right must be "clearly shown" simply does not require that level of clarity. The difference between the words that were used-"all rights"-and the words that Defendants argue should have been used-"exclusive rights"-is a mere semantical variation that does not convey a different concept. Indeed, Defendants do not argue that their sale of "all" rights to their service marks and trademarks conveyed anything but "exclusive" rights to the service marks and trademarks to JA Apparel. In other words, Defendants concede that "all" means "exclusive" with respect to some of the assets sold, but contend that "all" does not mean "exclusive" with respect to other of the assets. The language of the Agreement does not support this parsed reading.

Morever, although the language proposed by Defendants clearly would have obviated the need for this litigation, that is a recursive argument that does not aid the Court's analysis. Indeed, during trial, both parties repeatedly argued that the other party could have insisted on language during the drafting of the Agreement that would have provided better support for its litigation position. But the task presented to this Court is to interpret the contract as it was written, not to speculate as to how it could have been better drafted by either of the parties.

c. *No Assignment For Name And Trade Name*

Defendants also argue that Abboud did not sell the exclusive right to use his name because he did not execute a separate assignment transferring his name or trade names to JA Apparel. (*See* Defs.' Post-Trial Mem., at 68.) In this regard, Defendants argue that, because Abboud only executed assignments for "the Marks, and the registrations and applications associated with them," the Agreement only covered the sale and transfer of trademarks. (*Id.*) But Defendants provide no statutory or legal support for the proposition that, in order for Abboud to have effectively sold the rights to his name, he would have needed to execute a separate assignment in addition to the assignment for his trademarks.

As an initial matter, the Lanham Act neither requires nor contemplates the registration or assignment of a personal name. Moreover, the lack of an assignment agreement for Abboud's personal name appears entirely logical. In order to police trademark registration and enforce trademark rights vis-a-vis

third parties, the United States Patent and Trademark Office requires formal documentation, including assignments of trademark rights. *See* 15 U.S.C. §§ 1060(a)(1) ("A registered mark or a mark for which an application to register has been filed shall be assignable ....") & (a)(4) ("An assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office ...."); *see also Evercrete Corp. v. H-Cap Ltd.,* 429 F.Supp.2d 612, 621 (S.D.N.Y.2006) (discussing assignment provisions of Lanham Act as they relate to trademarks). There is no concomitant need or right to register personal names.

d. *Schedule 1.1(a)(A) Is A Trademark Report*

**\*14** In further support of their argument that the Agreement only provided for the sale of the trademarks and service marks listed on Schedule 1.1(a)(A), despite the fact that the Agreement states the "names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A)," Defendants argue as follows:

> [T]o find out what, if any, names Abboud agreed to transfer, the Court must look at Schedule 1.1(a)(A), which is a Trademark Report listing only trademark registrations and applications. Simply put, there is no listing of "names" on Schedule 1.1(a)(A), just as there is no listing therein of any trade names, logos, insignias or designations. Rather, the only items listed on the Schedule are trademark registrations, service mark registrations and applications therefor. Thus, when Article 1.1(a)(A) is read together with Schedule 1.1(a)(A), it becomes clear that the words "names, trademarks, trade names, service mark, logos, and designations" must be read collectively as being descriptive of the trademarks on the Schedule, rather than in isolation as independent items.

(Defs.' Resp., at 7.)

The Court views this as an overly strained reading of Schedule 1.1(a)(A) and the Agreement. Defendants are correct that Schedule 1.1(a)(A) is identified as a "Trademark Report by Mark," but the Schedule, on which the names "Joseph Abboud" and "J.O.E." appear repeatedly, does not define the parties'



Slip Copy                                                                                                      Page 13
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

Agreement or the words in the Agreement. Rather, in order to give effect to all provisions in the Agreement, it is appropriate to view the Trademark Report, in conjunction with the Agreement, as having served the function of capturing all of the trademarks, service marks, trade names, names, logos, and designations that Defendants were selling to JA Apparel, including the name Joseph Abboud. Moreover, as stated previously, if the Agreement was only supposed to provide for the sale of trademarks listed on Schedule 1.1(a)(A), it could have and should have simply said "the Trademarks listed on Schedule 1.1(a)(A)." But it did not, and the Court cannot excise the other words, including "names," from the contract provision.

Indeed, Defendants' view that each of the separately identified assets is simply a different way of identifying trademarks is fallacious. A "trade name" is not a "trademark" and is recognized as being a separate form of intellectual property that cannot be registered with the Patent and Trademark office. *See* 15 U.S.C. § 1127 ("The terms 'trade name' and 'commercial name' mean any name used by a person to identify his or her business or vocation"); 4A Callmann on Unfair Comp., Tr. & Mono. § 26:40 (4th Ed.2008) ("Trade names, i.e. corporate and other company names, are not registrable as such"); *see also New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979) ("A trade name is descriptive of the manufacturer or dealer himself and applies to a business and its good will, whereas a trade-mark, in a technical sense, is applicable to the vendible commodities."); *American Optical Corp. v. North American Optical Corp.,* 489 F.Supp. 443, 448 (N.D.N.Y.1979) ("While the understanding of their meanings sometimes overlaps, a 'trade name' is the corporate or business name symbolizing the reputation of a business as a whole, whereas a 'trademark' is a term identifying and distinguishing a business's products."(citing *American Steel Foundries v. Robertson,* 269 U.S. 372, 380, 46 S.Ct. 160, 162 (1926)). Thus, it is not reasonable to construe the itemization of the intellectual property being sold as simply an alternative means of defining trademarks.

e. *Right To Make Media Appearances*

***15** Defendants also argue that in the Side Agreement, Abboud "reserved his personal publicity

rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop a personal reputation, which would imply a right to identify himself."(*See* Defs.' Post-Trial Mem., at 71.) In response, however, Plaintiffs correctly note that (a) this provision terminated on July 13, 2007, and (b) Abboud did not reserve the right to make media appearances, or otherwise use his name, in a way that competed with JA Apparel. (*See* Pl.'s Post-Trial Mem., at 98.) That being said, as set forth in greater detail below, the Court does not believe that Abboud sold away his right to be Joseph Abboud, the individual, and to make media appearances as himself, or as a fashion expert, as opposed to using his name and making media appearances to promote goods and services in competition with Plaintiff.

f. *Placement Of The Words Identified On Schedule 1.1(a)(A)*

Finally, Defendants argue that:

> While JA Apparel contends that the terms used in Article 1.1(a) (A) of the Purchase and Sale Agreement are independent of the trademarks on *Schedule 1.1(a)(A), i.e.,* "names" means "names" and not "trademarks", as a matter of law, this argument is belied by the clear and unambiguous language of Article 1.1(a) (A) of the Purchase and Sale Agreement, namely because the words "identified on Schedule 1.1(a)(A)" are *placed at the end of the terms;* and, because the Schedule is a *"Trademark Report By Mark"* that *only* identifies *trademarks and servicemarks and not any names or trade names,* the Court must, as a matter of law, interpret the terms as being descriptive of the trademarks on Schedule 1.1(a)(A), rather than as being independent of the Schedule.

(*See* Defs.' Post-Trial Mem., at 67.)

To the extent that this argument, or a portion thereof, has not already been rejected, there are two additional reasons to reject it here. First, this argument fails to take into account that, under Article 1.1(a)(C) of the Agreement, Abboud sold to JA Apparel "all rights *to use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Abboud,' or anything similar to or derivative thereof ... for any and all goods and services" (emphasis added)-without reference to Schedule 1.1(a)(A). Thus, JA Apparel purchased the rights to use these words, or combinations thereof, for all commercial purposes, regardless of whether they are used as a trademark or service mark.

Second, to the extent that Defendants are arguing that Plaintiff's interpretation could only withstand scrutiny if the words "identified on Schedule 1.1(a)(A)" immediately modified "trademarks," as Plaintiff aptly points out by demonstration, that argument makes no sense because there would then be no mooring for the other words in the list. In other words, if the provision read "the names, trademarks *identified on Schedule 1.1(a)(A),* trade names, service marks, logos, insignias and designations ... and all the goodwill related thereto (collectively, the "Trademarks"), ..." there would be no basis to identify the other categories of assets that were being transferred. (*See* Pl.'s Mem., at 100-01.) [FN15]

> FN15. Defendants also argue that because another company owned by Abboud, Joseph Abboud Worldwide, Inc., survived the Agreement, Plaintiff must not have bought the Abboud name for all purposes. (*See* Defs.' Post-Trial Mem., at 71.) But Abboud testified at trial that the company is dormant, has not conducted any business since it transferred the license agreements to JA Apparel upon execution of the Agreement, and has not used its name in any kind of advertisement since June, 2000. (TT at 657-58.) Accordingly, this argument does not change the Court's analysis.
>
> * * *

**\*16** In sum, and for all of the reasons stated above, the Court concludes that, pursuant to the Agreement, Abboud sold, conveyed, transferred, assigned, and delivered to JA Apparel all of his right, title and interest to the use of his personal name, in addition to the trademarks, trade names, and designations containing his name, for commercial purposes. Accordingly, the Court concludes that Abboud's proposed use, in connection with his new "jaz" clothing line, of the phrases "a new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud," would constitute a breach

of Sections 1.1(a)(A) and 1.1(a)(C) of the Agreement-irrespective of whether these phrases constitute trademark use. [FN16]

> FN16. As set forth below, Defendants' claim that these phrases, such as "by award-winning designer Joseph Abboud," are merely accurate descriptions that are not trademarks and do not violate the Agreement further undermines Defendants' position. Abboud clearly sold the rights to the trademark or designation "by Joseph Abboud." *See* Agreement § 1.1(a)(C). Defendants fail to adequately explain how their proposed uses would not violate the express terms of the Agreement.

## II. *Plaintiff's Trademark Infringement Claims*

Plaintiff also asserts claims for trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and New York common law. Defendants tender a variety of defenses to Plaintiff's infringement claims, most notably, that Abboud's proposed use of his name in connection with his new "jaz" line constitutes a "fair use" under Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b) (4). (*See* Defs.' Post-Trial Mem., at 91-111.) Defendants also argue that Abboud's proposed use is protected commercial speech under the First Amendment to the United States Constitution, and that JA Apparel is not entitled to equitable relief on its infringement claims because of its own unclean hands. [FN17]

> FN17. In connection with Plaintiff's common law unfair competition claims, common law trademark infringement claims, and dilution claim under N.Y. Gen. Bus. Law § 360-1, Defendants argue, as well, that they must be dismissed because Abboud's proposed use constitutes fair use.

In light of the Court's holding on Plaintiff's breach of contract claim, pursuant to which any attempt by Abboud to use his name to market, sell or otherwise promote, goods, products, or services to the consuming public would constitute a breach of the Agreement, resolution of Plaintiff's infringement claims is, for the most part, unnecessary. [FN18] Plaintiff has already established that it purchased the exclusive right to the Joseph Abboud name for commercial

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



purposes, and, therefore, any proposed use by Abboud of his name commercially is improper. Moreover, in this specific case, it is difficult to analyze the trademark claims in isolation from the Agreement because Abboud not only sold the rights to his name, he also sold the rights to use and apply for the registration of, among other things, new trademarks or designations containing the words "Joseph Abboud," "by Joseph Abboud," "designed by Joseph Abboud," and "JOE," or anything similar to or derivative of those phrases. Thus, what may have constituted a permissible use of Abboud's name under the Lanham Act is largely foreclosed by the express terms of the Agreement.

> FN18.*See* TT at 7 (Court: "I take it, if I were to decide that he's precluded from using his name under the contract there would be no reason to reach the Lanham Act issue, right?"-Defense Counsel: "If you were to decide that he sold the exclusive right to use his name under the contract, then under the *Madrigal* case, you're correct.").

Nevertheless, in the interest of completeness and to the extent possible under the facts of this case, the Court has endeavored to view the trademark claims apart from the Agreement, and concludes that Abboud's proposed use of his name in connection with the "jaz" line would also constitute trademark infringement-in addition to constituting a breach of the Agreement.

A. *Legal Standard*

**\*17** In order to prevail on a claim for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), a plaintiff is required to show that its marks are valid and entitled to protection and that a defendants' use of its marks is likely to cause consumer confusion as to the origin or sponsorship of the defendants' goods. *See, e.g., Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003); *Time, Inc. v. Petersen Publ'g Co.,* 173 F.3d 113, 117 (2d Cir.1999).[FN19]

> FN19."The standard for trademark infringement under the Lanham Act is similar to the standard for analogous state law claims."*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,* 425 F.Supp.2d 402,

410 n. 6 (S.D.N.Y.2006); *see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1048 (2d Cir.1992) (applying same likelihood of confusion analysis to claims under New York law as to claims under Lanham Act).

In evaluating the likelihood of confusion, courts in this Circuit regularly apply what have become known as the *Polaroid* factors: (1) strength of plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the parties' products or services; (4) likelihood that the prior owner will bridge the gap between the parties' products or services; (5) actual confusion; (6) defendants' bad faith in adopting its mark; (7) quality of defendants' products or services; and (8) sophistication of the relevant consumers. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961); *see also Natural Organics, Inc. v. Nutraceutical Corp.,* 426 F.3d 576, 578 (2d Cir.2005).

B. *Application*

Defendants do not dispute that the Abboud marks are registered marks that are entitled to protection; nor do they argue that Abboud should be able to use his name as a trademark because, under the *Polaroid* factors, there would be no likelihood of confusion. Defendants merely assert that "there is no competent or credible evidence that any consumer will be confused by Abboud's proposed use of his personal name, to refer to himself as the designer of the 'jaz' product line."(*See* Defs.' Post-Trial Mem., at 39.) The Court disagrees with this assessment of the evidence. In addition to the fact that a simple side-by-side comparison leads to the conclusion that Abboud's proposed uses are undeniably similar to Plaintiff's trademarks, Plaintiff put on competent evidence at trial demonstrating, among other things: (a) the strength of the Abboud marks (*see* TT at 30-41, 246, 257, 540-41); (b) the close proximity of the goods and services at issue (*see id.* at 72-73, 76, 87-88, 95-96, 610-614; PX 8, 11, 38); and (c) at least some instances of actual confusion within the industry (*see id.,* at 128-29, 276-280, 293-94, 300-03; PX 13, 187, 189), despite the fact that the 'jaz' products have not even hit the market. Based on this evidence, the Court has no difficulty concluding that there exists a substantial likelihood of confusion between Abboud's proposed uses and Plaintiff's trademarks. Defendants'



argument that there is no evidence of actual confusion in the form of a "mistaken purchasing decision" fails to acknowledge that there could be, as of yet, be no such evidence. (*See* Defs.' Post-Trial Mem., at 40, n. 7.)

Thus, instead of arguing that, were Abboud to use his name as a trademark, there would be no likelihood of confusion, Defendants rely heavily on the "fair use" defense, set forth in Section 33(b) (4) of the Lanham Act, 15 U.S.C. § 1115(b)(4). The fair use defense, which allows for some level of confusion, is an absolute defense to claims of trademark infringement, trademark dilution, and false designation of origin. Consistent with this defense, Defendants argue that Abboud is not seeking to use his name as a trademark.[FN20] By the use of such phrases as "by the award-winning designer Joseph Abboud" and "a new composition by designer Joseph Abboud," Abboud argues that he is merely seeking to use his name descriptively to convey information to the public about the products sold under his "jaz" trademark.

> FN20. Defendants argue that because Abboud is not "intending to use his personal name as a trademark, but is intending to use his name other than as a trademark in connection with his business, as a matter of law, a finding of likelihood of confusion is irrelevant."(*See* Defs.' Post-Trial Mem., at 93.) This is an overstatement. While likelihood of confusion is not mutually exclusive with the "fair use" defense, this "does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair."*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 123, 125 S.Ct. 542, 550 (2004).

1. *Fair Use Defense*

**\*18** Section 33(b) (4) of the Lanham Act states "the right to use the registered mark shall be subject to proof of infringement ... and shall be subject to the following defenses or defects:

> (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone

in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin;"

15 U.S.C. § 1115(b)(4). Thus, in order to assess whether the use of a term is "fair" under this defense, courts endeavor to assess whether the term is used (1) descriptively, (2) other than as a mark, and (3) in good faith. *See, e.g., Car-Freshener Corp., v. S .C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir.1995).

Defendants correctly assert that the first step of this analysis must focus on whether a personal name or descriptive term such as "by designer Joseph Abboud," is being used in its primary sense to identify the person or describe his goods, or in its secondary sense to identify the source of the product. (*See* Defs.' Post-Trial Mem., at 106 (citing 15 U.S.C. 1115(b)(4)).) Here, Abboud argues that he is only using his name "descriptively" because he is using it to "refer to himself individually, and *as* a form of commercial speech to describe values, characteristics and attributes of his products in promotional and advertising materials that is placed in newspapers, magazines and other traditional communications media."(Defs.' Post-Trial Mem., at 100.) Abboud goes on to argue that he is not seeking to use his name "as a trademark, that is, to identify and distinguish his goods, or to indicate the source, but rather only to use his personal name in business to convey information about the products being sold under his 'jaz' mark, namely that he is the designer of such products."(*Id.* at 102.)[FN21]

> FN21. To the extent that Abboud argues that he will not be using his name as a trademark because it will be only used with the "jaz" mark, the Court gives this argument little weight because multiple marks can clearly be used together. *See, e.g., Quiksilver Inc. v. Kymsta, Corp.,* 466 F.3d 749, 757 (9th Cir.2006) ("A product mark like 'ROXY,' even if always displayed with a house mark like 'QUIKSILVER,' may acquire independent trademark significance.").

Abboud also argues that his proposed uses of his name are in "good faith" because, based on his "substantial personal goodwill as the result of his



talents, skills and artistic abilities, as well as his own accomplishments in the fashion industry and his widespread reputation and celebrity," he has a "legitimate basis to use his name to identify himself in connection with his business and the 'jaz' line that he has designed."(*See id.* at 111.)

Putting aside for the moment the fact that Abboud sold more than the right to use his name as a trademark, the Court still cannot accept Abboud's fair use defense. Abboud is not simply seeking to use his own name in order to identify himself in his business. First, the definition of a trademark is "any word, name, symbol or device ... use[d] in commerce ... to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the *source* of the goods, even if that source is unknown."15 U.S.C. § 1127 (emphasis added). During trial, when the Court asked Abboud if he wants consumers to know that he is the "source" of the "work," Abboud testified "I want them to know that JAZ is my new brand, yes."(TT at 580.) Thus, by Abboud's own testimony, he is, at least in part, seeking to use his name as a trademark.[FN22]*See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986) (a claim for trademark infringement "is made out by showing that the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product"); *Virgin Enters.,* 335 F.3d at 146 (same).

> [FN22]. Abboud argues that the word "work" in this exchange "refers to Abboud's design work, not his 'jaz' products."(*See* Defs.' Post-Trial Mem., at 103, n. 21.) Not only is this assertion unpersuasive, it also highlights the inherent difficulty and confusion in assessing Abboud's objectives in connection with the proposed uses of his name.

**\*19** Nor is Abboud merely proposing to use "terms or devices" which are descriptive of the goods he intends to sell. Defendants cite numerous cases for the proposition that descriptive, non-trademark use is permissible, but the cases on which they rely find "fair use" of words in situations where the words are clearly being used to describe some aspect of the product itself.[FN23]In other words, the words were used to describe the "ingredients, quality or composition" of a product, not the source of the product. *In Re Colonial Stores Inc.,* 394 F.2d 549, 551

(C.C.P.A.1968). Here, as Abboud testified, and as common sense dictates, in seeking to use such phrases as "by the award-winning designer Joseph Abboud," Abboud is seeking to use his name to identify and distinguish his goods and to indicate that he is the source of the goods. The fact that the proposed use of his name might also carry with it a descriptive component, in that it describes an aspect of the "jaz" line, does not render it a fair use. Further, Abboud's proposal to use his name in advertising, rather than on hang tags or labels for the product, does not make it a non-trademark fair use. Indeed, Abboud's position at trial was that he retains "the perfect right to use his name in the same way that he proposes to use it on advertising on a hang tag or a label as long as it's not the mark and as long as it's used in an informational or descriptive way."(TT at 4.) Thus, the advertising limitation appears to be a mere concession by Abboud that is largely unrelated to what is permissible, or impermissible, under the law.

> [FN23].*See, e.g., Cosmetically Sealed Indus., Inc. v. Chesebrouah-Pond's USA Co.,* 125 F.3d 28, 30 (2d Cir.1997) (descriptive term "Seal with a Kiss" deemed permissible as an "instruction to seal by kissing the complimentary postcard"); *Kiki Undies Corp. v. Alexander's Dep't Stores, Inc.,* 390 F.2d 604, 605 (2d Cir.1968) ("kicky" permissible for ladies apparel); *Eli Lilly & Co. v. Revlon, Inc.,* 577 F.Supp. 477, 485-86 (S.D.N .Y.1983) ("lip repair cream" for lip treatment cream).

As set forth above, the *Madrigal* and *Nipon* courts enjoined individuals who sold their names as trademarks from subsequently advertising their new brands using, respectively, "Cello by Mark Levinson" and "Created by Albert Nipon" because those uses constituted trademark uses of the names and goodwill that the individuals previously sold. *See Madrigal,* 799 F.2d at 818;*Nipon,* 216 B.R. at 125. Relatedly, the United States Patent and Trademark Office frequently grants applications to register trademarks such as "designed by _____." (*See* PX 223; *e.g* .,"Designed by Harvey R. Ball USA 1963," "Logic Bricks Designed by XYLON," & "Designed by Cecile Platovsky.")

Finally, it is very difficult, if not improper, to



completely ignore the Agreement in the context of Abboud's "fair use" defense. In Section 1.1(a)(C), Abboud specifically sold "[a]ll rights to use and apply for the registration of new ... trademarks ... and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' ... or anything similar to or derivative thereof ... for any and all products and services."(*See* PX 1 at 1.1(a)(C).) It cannot seriously be argued that Abboud's proposed uses-"by the award-winning designer Joseph Abboud" and "a new composition by designer Joseph Abboud"-are not similar to or derivative of "designed by Joseph Abboud." Thus, in the context of the good faith analysis under the "fair use" doctrine, it must be noted that Abboud is attempting to use that which he expressly sold to Plaintiff. *See Equibrand Corp. v. Reinsman Equestrian Products, Inc.,* No. 3:07-CV-0536, 2007 WL 1461393, at *13 (N.D.Tex. May 17, 2007) (if an individual sold the exclusive right to use his name in connection with certain products, a subsequent attempt to use his name with different products "is not a 'fair use' ... even if it is an accurate description of the products.").

**\*20** In short, Abboud is attempting to use his name, and the goodwill associated with it, to identify and distinguish goods, and to advise consumers that he is the source of his new "jaz" line. Therefore, although there is a descriptive component to Abboud's proposed uses, the Court concludes that he is also attempting to use his name, at least in part, as a trademark and that the confusion generated by his proposed uses would be far more than incidental. It is patently obvious that consumers seeing JA Apparel's products, marked or advertised as "Joseph Abboud" or "by Joseph Abboud," would be utterly confused as to whether the "jaz" products advertised as "by designer Joseph Abboud," were derived from the same source. *See KP Permanent Make-Up,* 543 U.S. at 123 ("[O]ur holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair ."). For all of the foregoing reasons, the Court concludes that Abboud has not met his burden of establishing the fair use defense. *See id.*(burden rests with party asserting "fair use" defense). Consequently, Abboud's proposed uses of his name constitute trademark infringement, in addition to constituting a breach of the Agreement, as set forth above.

## 2. *First Amendment Defense*

Defendants also argue that Abboud's ability to use his name to convey commercially valuable information to the public is protected commercial speech under the First Amendment to the United States Constitution. (*See* Defs.' Post-Trial Mem., at 112-16.) But Defendants provide no support for the proposition that a party cannot contract away his right to engage in what otherwise might be considered protected commercial speech. Indeed, the opposite may be said. *See, e.g., Snepp v. United States,* 444 U.S. 507, 509, n. 3, 100 S.Ct. 763, 766 (1980) (upholding agreement to limit otherwise protected speech as part of employment with government agency). Consequently, all of the cases upon which Defendants rely to make their First Amendment argument are clearly distinguishable from the instant case, which involves a specific agreement not to commercially use certain words.

## III. *Plaintiff's Remaining Claims: Dilution, False Designation Of Origin, Unfair Competition, And False And Deceptive Trade Practices*

Plaintiff also asserts claims for false designation of origin, unfair competition, and dilution in violation of Sections 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a), 1125(c), New York General Business Law ("N.Y.Gen.Bus.Law") § 360-1, and the common law, as well as false and deceptive trade practices under N.Y. Gen. Bus. Law §§ 349-350, all of which relate to Abboud's proposed uses of his name in connection with his new "jaz" line. The Court, however, has already concluded that Abboud is prohibited under the Agreement from using his name in connection with goods or services, and that his proposed uses of his name would also constitute trademark infringement. Moreover, Plaintiff does not seek different or additional relief in connection with these remaining claims. These conclusions make further discussion of Plaintiff's remaining claims, vis-a-vis Abboud's proposed uses of his name, a purely academic exercise, in which the Court has no need to engage. *See, e.g., Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 143 (2d Cir.1999) ("[w]e need not address the [dilution claim] because Morningside Group-having already succeeded on its infringement claim-has neither requested, nor could it receive, any further



Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

relief based on dilution."); *Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research,* --- F.3d ----, No. 07-4095, 2008 WL 2204387, at *2 (10th Cir. May 29, 2008)* ("trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together").

* * *

**\*21** It would be remiss of this Court not to make a final comment on the inherent risks a seller assumes in this type of transaction. As courts have recognized, when an individual chooses to use his name as a trademark or trade name, he runs the risk that the name will become inextricably entwined with the goodwill of the company and its brand, thereby losing some or all of its personal significance. Thus, in *Levitt,* the court stated "[w]hen a name is used as a trademark, it risks becoming a symbol of the corporation and its past accomplishments and losing its individual identity." *Levitt,* 593 F.2d at 468 (citing 3 R. Callman, Unfair Competition, Trademarks and Monopolies, § 85.2(d)(1), at 1036 (3d ed.1969)). Indeed, as the *Levitt* court pointed out, it is "precisely this goodwill" that would lead a company to spend significant amounts of money to acquire the name of an individual. *Id.* at 469.

The court in *Nipon* also commented on the risks the individual assumes when he allows his personal name to become a trademark, and then sells it:

> [T]he name Albert Nipon is itself a distinctive mark. The Nipons spent considerable time and effort to promote the name as a symbol of quality and style. Leslie Fay bought that name when it paid $1,000,000 to the Albert Nipon, Inc. estate. It then put additional effort and money, including more than $2,000,000 in salary to the Nipons, to further the name. Unlike a logo or a distinctive package, the Nipon name itself, in any form, is part of the mark.

216 B.R. at 128.

Thus, although this Court has endeavored to construe the Agreement based solely on the parties' intent, as reflected in the language used by the parties, this reasoning highlights the inherent weakness in Abboud's argument. After Abboud began designing

and marketing clothes under his personal name, with great and deserved success, the name "Joseph Abboud" became closely associated with a brand of clothing, and the personal nature of his name naturally lost some of its identity. When Abboud subsequently sold to JA Apparel, for a handsome sum of money, the rights to use his name in connection with the brand of clothing by which it had achieved prominence, he relinquished the right to capitalize on the goodwill associated with his name because that is exactly what JA Apparel purchased to promote its brand. It bears noting that this is not a case where Abboud was the hapless victim of a transaction from which he did not benefit, but which foreclosed his ability to earn a living by identifying himself in a business. For example, in *Gucci v. Gucci Shops, Inc.,* 688 F.Supp. 916 (S.D.N.Y.1988), the court went to great lengths to allow Paolo Gucci to identify himself in his own business following a shareholders agreement between members of the Gucci family, the consideration for which was unclear, not to use the "Gucci" name for business purposes. *Id.* at 926-28; *see also Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 102 (2d Cir.1985) (court held that Harry Lebow was not contractually barred from commercially using his personal name as a result of an agreement, to which he was not a party, transferring rights to the Lebow family name). Here, in stark contrast, Abboud personally sold the right to use his name commercially, for which he was paid $65.5 million.

**\*22** Indeed, Plaintiff's counsel effectively argued that it would defy common sense to accept the premise that JA Apparel paid $65.5 million to acquire the "elusive" right to use "Joseph Abboud" or "by Joseph Abboud" as a trademark, while agreeing to let Abboud use the exact same words with respect to a competing clothing line, but in a non-trademark sense, because Abboud's name and reputation are "embodied in the goodwill and reputation of the trademark."(CA at 61.) In other words, the distinction between the goodwill associated with the name and the goodwill associated with the trademark has been blurred in the eyes of the consumer.[FN24]

> [FN24.](#) This is not to say that Abboud no longer has a separate, personal identity or well-deserved, stellar reputation in the fashion industry, or that Joseph Abboud the person has lost his ability to identify himself.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.


Slip Copy                                                                                                    Page 20
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

The quandary this presents for Abboud likely explains why his counsel was forced to argue, that despite the fact that JA Apparel clearly purchased, among other things, "all rights to use and apply for the registration" of new trademarks "containing the words 'by Joseph Abboud,' " (*see* PX 1 at 1.1. (a)(C)), JA Apparel might not be able to use that mark because "there is a very serious question whether that mark can be registered and used in anything but its primary descriptive sense." (CA at 13.) Cases recognize, however, that a designation "by" a designer can be used as a trademark even if the designer is no longer associated with the company. *See e.g., Nipon, 216 B.R. at 127-28* (former company permitted to use "Executive Dress by Albert Nipon"). Defendants' reading is also completely at odds with the express terms of the Agreement. In all events, it serves to underscore the inability to separate the name from the goodwill of the trademark.

IV. *Permanent Injunctive Relief*

Based on Defendants' breach of the Agreement, and violations of the Lanham Act and the New York General Business Law, Plaintiff seeks a permanent injunction "enjoining Defendants from breaching the ... Agreement and enjoining Defendants' infringing and other wrongful conduct."(*See* Pl.'s Post-Trial Mem., at 88.) [FN25]

> FN25. Plaintiff also seeks an injunction based on Abboud's breach of the Side Agreement. That request will be discussed below.

A. *Legal Standard*

A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."*eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 1839 (2006); see also Roach v. Morse, 440 F.3d 53, 56 (2d Cir.2006)* ("To obtain a permanent injunction, a plaintiff must

succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.") (internal quotations omitted).

A finding that a trademark infringement gives rise to a likelihood of confusion is sufficient to establish irreparable injury if the injunction is not granted. *See, e.g., New York Kayak Pool Corp. v. R & P Pools, Inc., 246 F.3d 183, 185 (2d Cir.2001); Am. Cyanamid Co. v. Campagna Per La Farmacie In Italia S.P.A., 847 F.2d 53, 55 (2d Cir.1988); A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* No. 96 Civ. 9721(PKL)(THK), 98 Civ. 0123(PKL)(THK), 01 Civ. 9645(PKL)(THK), *2005 WL 147364, at *5-7 (S.D.N.Y. Jan. 24, 2005)* (granting permanent injunction regarding use of a personal name in trademark infringement case). This is true because monetary damages stemming from Lanham Act violations are "difficult if not impossible to calculate."*P.F. Cosmetique, S.A. v. Minnetonka, Inc., 605 F.Supp. 662, 667 (S.D.N .Y.1985); see also Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir.1985)* ("Reputation is not calculable nor precisely compensable."); *Geritrex Corp. v. Dermarite Industries, LLC, 910 F.Supp. 955, (S.D.N.Y.1996)* ("[a] finding of likelihood of consumer confusion establishes the risk of irreparable harm ... because of the damage to plaintiff's business reputation that may be presumed to stem from the confusion of its products with another's."). Injunctive relief is also available as a remedy for breach of contract if damages are difficult to quantify. *See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404* ("irreparable harm may be found where damages are difficult to establish and measure"); *Gundermann & Gundermann Ins. v. Brassill, 853 N.Y.S.2d 82, 83-84, 46 A.D.3d 615 (2d Dep't 2007)* (same).

B. *Application*

**\*23** In the instant case, as set forth above, Abboud does not seriously contest that there would be some level of consumer confusion generated if he were allowed to use his name in advertising and marketing the "jaz" line. Based on the evidence submitted at trial, and Defendants' failure to even address the relevant *Polaroid* factors, Plaintiff established that it would be irreparably injured, and would not be able to calculate its damages, if Abboud were permitted to infringe Plaintiff's trademarks by using his name in connection with the "jaz" line. Moreover, if, by the



same conduct, Abboud were to breach the Agreement, there would be no meaningful way for Plaintiff to quantify its damages.

The Court also concludes that the balance of hardships weighs in Plaintiff's favor. At bottom, this case is primarily a contract dispute stemming from a transaction in which Abboud sold the rights to his name in exchange for a payment, which was "allocated 100% to Abboud," of $65.5 million. As set forth above, the Court has concluded that, pursuant to this Agreement, Abboud sold the right to use his name commercially to market, sell, or otherwise promote, goods, products, and services. In light of this reading of the Agreement, the equities weigh in favor of ensuring that Plaintiff reaps the benefits of its bargain-not that Abboud be allowed to capitalize on a right that he previously relinquished. Finally, the public interest also weighs in favor of prohibiting Abboud from using his personal name in relation to the "jaz" line because it is well-established that the public has a right to be free of confusion in the marketplace. *See, e.g., Park 'N Fly v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658 (1985). JA Apparel's products are sold under the name "Joseph Abboud," and JA Apparel purchased all rights to use such designations as "by Joseph Abboud," and anything similar. It is indisputable that if Abboud advertised his products as "by designer Joseph Abboud," the public would have virtually no way of distinguishing Abboud's clothing from JA Apparel's.

Accordingly, the Court concludes that Plaintiff JA Apparel is entitled to a permanent injunction prohibiting Abboud-personally, through Houndstooth, or through any other entity with which he is affiliated-from using his name to market, advertise, promote, sell, offer to sell, or otherwise distribute any goods or services, including, but not limited to, his new "jaz" clothing line, to the consuming public. *Cf., Levitt,* 593 F.2d at 468 ("Where, as here ... the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable.").

The Court is mindful of the general rule that injunctions in trademark cases involving use of an individual's personal name should be narrowly tailored. *See, e.g., Joseph Scott Co. v. Scott*

*Swimming Pools,* 764 F.2d 6267 (2d Cir.1985) (where "a decree serves to limit an individual's use of his own name in a business that he has nurtured, a court must be particularly cautious to enjoin only those uses that are likely to create appreciable confusion, and no more"); *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 735 (2d Cir.1978) ("[w]hen the defendant demonstrates a genuine desire to build a business under his own name, courts have generally been reluctant to proscribe all surname use"); *Gucci,* 688 F.Supp. at 927 ("[c]ourts have often noted their concern that injunctions in cases such as this be drawn as narrowly as possible"); *Paul Frank Indus., Inc. v. Sunich,* 502 F.Supp.2d 1094, 1102 (C.D.Cal.2004) ("Because this case involves use of Mr. Smith's personal name, the Court must tailor an appropriate injunction so as to limit use of the Paul Frank name only to the extent necessary to avoid public confusion.") (internal citations omitted). But these cases are clearly distinguishable from the instant case because they do not involve a contract for the sale of the individual's name and the goodwill related thereto. Abboud sold his name for a substantial sum of money and is not an uninvolved bystander who is being precluded from earning a living or running a business under his own name. Thus, this is a case in which "sweeping injunctive relief is more tolerable."*Levitt,* 593 F.2d at 468.

**\*24** In all events, however, the Court recognizes that a permanent injunction regarding the use of one's own name is bound to raise thorny questions of use in the future. One of the more serious questions is the extent to which Abboud can make personal appearances. Perhaps due to the myriad legal issues that arise from the sale of one's personal name, Plaintiff seemed to vacillate on whether Abboud can make non-competitive appearances as himself. During trial, Staff testified that he had absolutely no doubt that the Agreement prevented Abboud from using his name in any public way, including making public appearances. (TT at 184-86.) Later, during closing arguments, Plaintiff's counsel appeared to soften that position by arguing that advertisements announcing such an appearance, as opposed to the appearance itself, would be the objectionable act:

> COURT: So is your position in this litigation that under the contract [Abboud] no longer has the right to make personal appearances using his name?



COUNSEL: Well, I think, your Honor, he has a right to be who he is, but I think if he publicizes, in other words I don't think there is any question he can go to Bloomingdale's and represent his line. I don't think there is any question in the trade where he is known. He has that reputation.

But, to the extent that it would start advertising that he is making a personal appearance at Bloomingdale's, I think he is forbidden by the terms of the Purchase and Sale Agreement because that is using his name in connection with the business which we bought the right to do.

(CA at 56.)

Finally, in its proposed permanent injunction, Plaintiff does not mention public appearances at all; instead, it requests an injunction that Abboud be permanently restricted and enjoined from (a) using his name in business or commercially in a manner that is likely to confuse the public as to the "source, origin, affiliation, connection, association, sponsorship, approval or endorsement of any *products or services,"* and (b) "manufacturing, advertising, marketing, promoting, offering to sell, selling or otherwise distributing any *goods or services"* in connection with the name Joseph Abboud or anything similar to or derivative thereof. (*See* Pl.'s Proposed Order at 3) (emphasis added.) [FN26]

FN26. Plaintiff's proposed order is attached to its Post-Trial Memorandum.

The Court could not possibly craft an injunction to address all of the questions left open by these arguably fluctuating positions. Without attempting to do so, the Court merely notes that Plaintiff has conceded that Abboud is free to compete and, in doing so, can personally present the "jaz" line to buyers at stores like Bloomingdale's. It must follow, therefore, that Abboud can also personally discuss his line and negotiate agreements with potential licensees.[FN27] The Court also concludes that Abboud can make public appearances at events or on television as, for example, a philanthropist or fashion commentator, if those appearances are unrelated to the promotion or sale of goods and services. This conclusion is consistent with the Court's reading of the Agreement-that Abboud sold the right to use and capitalize on his name, and the goodwill associated with it, in connection with the marketing and sale of goods and services to the consuming public. With respect to personal appearances, questions beyond these pronouncements are not currently before the Court and must be left for another day.

FN27. Although, at first blush, this concession appears to be inconsistent with Plaintiff's position that Abboud sold all rights to use his name, it need not be so. Plaintiff recognizes that Abboud has a personal identity and name that was not sold. Thus, Abboud, the person, is not precluded from being who he is and identifying himself in business transactions.

***25** Thus, to reiterate, Abboud is permanently enjoined and restricted from using his personal name to sell, market, or otherwise promote, goods, products, and services to the consuming public. Abboud is not, however, restricted from identifying himself when he personally presents his line to buyers within the industry or to potential licensees, or in making personal appearances that do not relate to the sale, marketing, or promotion of goods, products, or services.[FN28]

FN28. In its proposed Judgment and Permanent Injunction Order, Plaintiff requests reasonable attorneys' fees under the Lanham Act, 15 U.S.C. 1117(a). The Court declines that request, finding that this is not an "exceptional case" of trademark infringement that would warrant the imposition of attorneys' fees. *Id.* Indeed, any infringement has not yet occurred since Abboud has thus far refrained from using his name in print media to promote the "jaz" line.

V. *Breach Of The Non-Compete Provision*

As set forth above, the Side Agreement contains an extraordinarily broad non-compete provision, pursuant to which Abboud agreed that, for a period of two years following the expiration of the Side Agreement he would not:

directly or indirectly through any partnership, corporation, limited liability company, trust or

other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of the [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

(PX 2 ¶ 2(a)).

During the Restricted Period, Abboud also agreed to obtain written permission from JA Apparel-which JA Apparel could grant, withhold, or condition solely in its discretion-"before becoming associated in *any capacity* with any person, group, business enterprise or other entity," that competed with, or could be expected to compete with, JA Apparel in the future. (*Id.* ¶ 2(b)) (emphasis added).

The Restricted Period expired on July 13, 2007. Plaintiff alleges that Abboud breached the non-compete provision by engaging in a number of acts in preparation for the launch of his new "jaz" line, including: (1) acquiring, through Herringbone, the Fall River Shirt factory, which manufactured shirts that were sold to Nordstrom's, in direct competition with JA Apparel, and attempting to disguise the transaction through a shell company set up by Abboud's attorney, Dinsmoor, and a straw owner; (2) in late March, 2007, agreeing on the essential terms of a business relationship with Jack Victor, which included a licensing arrangement, in connection with the new "jaz" line; (3) agreeing on specific deal points for the purchase of Merrill-Sharpe, a company that produces and imports sportswear and knitwear; (4) negotiating and/or discussing licensing agreements with Cardinal (for coats and outerwear) and J.S. Blank (for ties); (5) negotiating a consulting agreement with Lord & Taylor; and (6) generally remaining an owner, director, and officer of Herringbone, which either engaged in or proposed to engage in business competitive with JA Apparel. (*See* Pl.'s Post-Trial Mem., at 6-8.)

Defendants dispute generally that Abboud became an "owner, director, officer, employee, consultant or other participant" of any third-party competitive

business during the Restricted Period and, specifically, that the "mere planning to compete during a parties' restricted period, as opposed to engaging in commercial activity, is not prohibited where the parties' restrictive covenant does not prohibit such activity."(Defs.' Post-Trial Mem., at 131.) [FN29]More specifically, while Abboud admits "that he made contact during the Restricted Period with several third parties ... about the possibility of doing business with them after his Restricted Period ... the record is clear that Abboud did not execute any agreements with third-parties or engage in commercial activity during the Restricted Period."(*Id.* at 133.)Defendants also argue that the word "participant" in the non-compete provision should be construed to mean something similar to "owner, director, officer, employee [and] consultant, i.e., someone who has an active involvement in the business."(*See id.* at 130.)

> FN29. Defendants also argue that Abboud's ownership and control of Herringbone, cannot, in and of itself, be a breach of the Side Agreement because Abboud would have been in immediate breach of the Side Agreement by virtue of his mere association with Herringbone, which was known to JA Apparel, and because Abboud did not become an owner of a third-party competitive business during the Restricted Period.

A. *Legal Standard*

**\*26** In construing the non-compete provision of the Side Agreement, this Court is, of course, bound by the same principles of contract interpretation that guided its decision on the sale of Abboud's name under the Agreement. Specifically, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accordance with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing."*Innophos,* 10 N.Y.3d at 29 (internal quotations omitted). This concept carries particular force, where, as here, the contract at issue is negotiated by sophisticated, business people with the assistance of counsel. *See Vermont Teddy Bear,* 1 N.Y.3d at 475;*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994).



Slip Copy                                                                                                       Page 24
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

Defendants also encourage the Court to adhere to the doctrine of *ejusdem generis,* which provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."*Wojchowski v. Daines,* 498 F.3d 99, 108 n. 8 (2d Cir.2007) (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114-15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)).

Finally, the parties do not dispute that non-competition provisions are routinely enforced when entered into in connection with the sale of a business. *See, e.g., Purchasing Assocs., Inc. v. Weltz,* 13 N.Y.2d 267, 271-72, 246 N.Y.S.2d 600, 603-04 (1963); *New York Real Estate Inst., Inc. v. Edelman,* 42 A.D.3d 321, 321, 839 N.Y.S.2d 488, 489 (1st Dep't 2007).

Both sides also submit caselaw on what they view as the issue before the Court-whether or not activities engaged in during a restricted period are mere planning or preparation to compete, or, alternatively, constitute actual competition. Defendants rely on *Brooks Automation, Inc., v. Blue Shift Techs.,* No. 06-P-1063, 2007 WL 1713370, at *2 (Mass.App.Ct. June 14, 2007), to argue that mere planning during the restricted period does not constitute competition if the non-compete does not preclude such activity. Although *Brooks,* an unpublished decision from Massachusetts that does not apply New York law, held that the defendant did not violate his restrictive covenant by developing a business plan, commencing work on an invention, incorporating a business entity, and filing a provisional application, in *Brooks* the defendant had not taken many of the affirmative steps Abboud took here, which are set forth in detail below. For example, the defendant had not lined up funding or third-party marketing sources, and did not have completed sample products that he was showing to future business partners and the media. Moreover, unlike *Brooks,* here the non-competition provision precludes association with any entity that "proposes to engage" in competitive activity with Plaintiff. Thus, an association in preparation for competition is precluded.

**\*27** The two other cases relied upon by Defendants, *Cowley v. Anderson,* 159 F.2d 1, 5 (10th Cir.1947) and *Keiser v. Walsh,* 118 F.2d 13, 14

(D.C.App.1941), also do not apply New York law, are more than sixty years old, and do not involve non-competition provisions.

Plaintiff cites two cases, *World Auto Parts, Inc. v. Labenski,* 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dep't 1995) and *De Long Corp. v. Lucas,* 278 F.2d 804, 808-09 (2d Cir.1960)[FN30], which provide more pertinent guidance. In *World Auto Parts,* the court held that the defendant breached the terms of his "Retirement Agreement" by "attending trade shows, distributing his business card and discussing with competitors his plans to re-enter the auto parts business when the non-compete provision expired."217 A.D.2d at 940, 629 N.Y.S.2d at 896. The defendant also breached the agreement "by making personal loans to the principal owners of competitors."*Id.*[FN31]

> FN30. Plaintiff cites to the district court decision, which can be found at 176 F.Supp. 104, 122-23 (S.D.N.Y.1959).

> FN31. Defendants' attempt to distinguish *World Auto* is weak. Defendants argue that because the agreement was called "Retirement Agreement," it is obvious that the parties intended that the defendant would "disappear from the landscape entirely." (*See* Defs.' Post-Trial Mem., at 132.) While here, defendants argue, it is undisputed that Abboud intended to re-enter the clothing business. But this argument ignores the fact that the *World Auto* opinion also specifically references the expiration of the non-compete provision, which indicates that the defendant may have expected to re-enter the market, and otherwise undermines the obviousness of Defendants' assumption. 629 N.Y.S.2d at 896.

In *De Long,* the court found that the defendant's development and engineering of devices during the non-compete period went beyond the planning stages, and, as such, constituted "exactly the kind of head start the agreement not to assist a competitor in engineering during the two-year period was intended to prevent."278 F.2d at 809. Defendants argue that the agreement in *De Long* was more encompassing than the non-compete at issue here because, in addition to agreeing not to compete, the defendant



also specifically agreed not to assist anyone else in competing with plaintiff. This argument ignores the fact that Abboud agreed not to associate with any person or entity that "is engaged in or propose[d] to engage in competition" with JA Apparel. (*See* PX 2 ¶ 2(a).) *De Long* is distinguishable, however, on the ground that the defendant's activities during the restricted period, which included entering into an agreement with a third-party, caused the plaintiff to lose a very lucrative contract. *Id.* at 809-10.

Unfortunately, there is no bright-line test courts can apply to determine whether actions taken during a restricted period constitute non-competitive preparatory planning or more substantial, concrete engagements constituting direct competition. The analysis is largely fact-driven based on the specific actions undertaken and their propriety under the terms of the non-compete provision at issue. Here, the analysis is simplified to a certain extent, and not entirely contingent on whether specific actions constituted actual competition, because JA Apparel need only demonstrate that Abboud indirectly associated himself with a business that "proposed" to compete with JA Apparel. As set forth below, the Court concludes that at least some of Abboud's actions during the Restricted Period constituted breaches of the Side Agreement's broad non-compete provision.

B. *Application*

1. *Fall River*

Particularly troubling is Abboud's "loan" to the Fall River Shirt factory, which manufactured shirts for sale at Nordstrom's, one of JA Apparel's largest customers, in price ranges similar to JA Apparel's shirts. The surrounding factual circumstances are largely undisputed.

**\*28** On March 5, 2007, Abboud visited the Fall River plant and met with its owner. At some point after touring the factory, Abboud decided he was interested in acquiring it so Abboud also met with Robert Kidder ("Kidder"), Fall River's then Vice President of Sales, to discuss the factory. There is documentary evidence, in the form of a communication from Kidder to Abboud, which indicates that Abboud was interested in acquiring the factory for production of his new "jaz" clothing line.

(*See* PX 130 ("I know that Fall River will be something that you will be proud of and something that will contribute to your new brand.").)

During this time, Kidder advised Abboud that Fall River was in severe financial distress and would not be able to survive until after the expiration of Abboud's Restricted Period. Abboud instructed his attorney, Dinsmoor, to investigate Fall River's financial condition, and, in March and April, 2007, Abboud and Dinsmoor received financial information from Fall River's comptroller, John Colucciello. After reviewing the financial information, Dinsmoor concurred with Kidder's assessment that Fall River would not survive until the Fall of 2007 without a significant infusion of cash.

At or around this same time period, Abboud met again with Fall River's owner, reviewed Fall River's financial information with Dinsmoor, and Dinsmoor requested additional financial information from Fall River's comptroller and counsel-which Dinsmoor indicated he needed for his discussions with Abboud regarding a potential transaction. Dinsmoor also began to copy one of his colleagues at his law firm, William Sopp ("Sopp"), of Burns & Levinson, on his e-mails to Fall River's attorney. Dinsmoor also met with representatives of Banknorth, the bank that was going to foreclose on Fall River, in order to discuss ways to save the shirt factory. Ultimately, the only option Banknorth was willing to consider was a secured party sale of Fall River's assets to a new buyer.

On April 27, 2007, Dinsmoor and Sopp created an entity called Alden Street Shirt Company ("Alden"). On the same day, Christina Murray of Burns & Levinson sent a revised redlined Letter of Intent between Fall River and Alden to Fall River's counsel, and copied Dinsmoor, Sopp, and Abboud. The Letter of Intent was executed one day later. On May 14, 2007, Alden acquired Fall River's assets with 100% funding from Abboud's personal line of credit at Merrill Lynch, which first passed through Herringbone (owned by Abboud) as a loan to Alden. (TT at 909, 912, 1059, 1070.) Sopp, who through Burns & Levinson was simultaneously representing both Alden and Herringbone, prepared all of the loan agreements between Alden and Herringbone, which took the form of demand notes that could be called by Herringbone at any point in time.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Dinsmoor, who was working on Abboud's behalf throughout this process, admitted that he was the "architect" of this arrangement. Dinsmoor and his colleagues also installed Kidder as Alden's manager and so-called owner. At trial, Abboud freely admitted that he loaned money to the shirt company, through his bank, in order to keep it alive until his non-compete agreement expired. (TT at 470-71.) He also admitted that Dinsmoor set up this series of loans because Abboud understood that a direct acquisition of Fall River during the Restricted Period would have violated his non-compete obligations. (TT at 470, 474.)

**\*29** After Alden's purchase of Fall River, Alden continued to manufacture men's dress and sport shirts for sale at Nordstrom's and other stores, and Abboud continued to receive financial information, at his Herringbone address, regarding the plant's financial condition. Less than two months after the expiration of the Restricted Period, Herringbone foreclosed on the Demand Notes to Alden-despite there being no record of a written demand by Herringbone to Alden for repayment of the loan. (PX 200; Sopp Tr. 234-35.) At or around this same time, Abboud changed the name of Alden to Herringbone Shirt Manufacturing Company.

In light of this evidence, Abboud admits, as he must, that "he advanced his Merrill Lynch line of credit through Herringbone to Alden Street during the Restricted Period," but argues that "the mere loaning of money does not constitute participation in the debtor business or competition with JA Apparel unless, as is not the case here, the restrictive covenant expressly prohibits the lending of money."(See Defs.' Post-Trial Mem., at 134.) Abboud goes on to say, rather incredibly, that there is no evidence "that Abboud participated in any commercial transaction involving Alden Street" and that "Alden Street was not in competition with JA Apparel, because Alden Street manufactures private label shirts under contract, while JA Apparel wholesales its own shirt brand."(Id.)

Even putting aside the considerable evidence presented at trial that Kidder was the owner of Alden only on the most superficial of levels [FN32]-and that Abboud was the true "owner" of, and decision-maker behind, Alden-Abboud's loan to Fall River, which

kept it alive until after the expiration of the Restricted Period, certainly indicates that, during the Restricted Period, Abboud was, at a minimum, "indirectly" associated with an entity that was either already in competition with, or was proposing to compete with JA Apparel.[FN33] Indeed, it was only due to Abboud's participation and involvement that Fall River was able to continue competing with JA Apparel during the Restricted Period, and in a position to propose to compete with JA Apparel subsequent to the Restricted Period. Defendants' argument that Abboud merely extended funds to Fall River, and did not have any direct participation in the control of Fall River during the Restricted Period, is simply not supportable in light of the evidence at trial.

FN32. At his deposition, Kidder repeatedly testified that he believed Alden was owned by Herringbone, not him, during the Restricted Period. (See Kidder Tr., 101-02, 133, 138-39, 146-47, 150-51.) Seven weeks later, he attempted to change his position on that issue by submitting an affidavit that he, not Herringbone, owned Alden. In all events, however, despite being a graduate of Harvard University and a sophisticated businessman with over 30 years of experience, Kidder (a) did not have his own legal counsel during the transaction (see Sopp Tr., 238; Kidder 142-45), (b) had "no idea" how Alden came to hire Dinsmoor's firm, Burns & Levinson, during the transaction (see id., 107, 112-13), (c) was not involved in the creation of Alden (see id., 130, 132), (d) had no role in negotiating many of the documents leading up to the transaction (see id. at 102-110, 112, 157, 159), (e) was not copied on many of the significant documents and correspondence regarding the transaction (PX 53, 128), (f) did not attend many of the key meetings (see TT 706-07, 1052-54; Kidder Tr., 97-98, 108-110), and (g) did not invest any of his own money in Alden (TT 718-19, 1071, 1074-75; Kidder Tr. 128-29).

FN33. Even assuming *arguendo*, that Defendants are correct in their argument that, under the doctrine of *ejusdem generis*, the word " 'participant' must be construed to mean something similar to 'owner, director,


Slip Copy                                                                                     Page 27
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

officer, employee [and] consultant', i.e., someone who has active involvement in the business,' " (*see* Defs.' Post-Trial Mem., at 30), based on the foregoing evidence, the Court concludes that Plaintiff met this standard. Abboud, through Herringbone, was actively involved as a "participant" in, and the *de facto* owner of, Alden during the Restricted Period.

Plaintiff has, thus, met its burden of establishing a breach of the Side Agreement's non-compete provision.

2. *Jack Victor*

Having already found a breach of the non-compete provision, this Court need delve no further into Abboud's other activities during the Restricted Period. Nevertheless, the Court concludes that Abboud's activities in connection with, at a minimum, the Jack Victor company, also constitute a breach of the non-compete provision. Based on the evidence submitted at trial, Abboud met with the Jack Victor management team as early as January 31, 2007, at which point Abboud presented the new "jaz" logo, toured the factory, and generally discussed "what a collection would look like ."(TT 458; Victor Tr. 135-36.) Abboud then had additional meetings with representatives of Jack Victor and began to discuss the structure of a possible license agreement, which Abboud wrote to Mr. Victor about, as "President" of Herringbone, on February 20, 2007. In his letter, Abboud enclosed a list of fourteen subjects for a proposed licensing agreement and stated as follows:

**\*30** After a considerable amount of research over the last 18 months, my team and I are absolutely convinced that the market is ready and more than eager for a new tailored collection. As I have mentioned before, I have spoken to retailers at the highest levels who are very supportive of this new concept in menswear.

(PX 137.)

Thereafter, Abboud had additional meetings and exchanged drafts of terms for a licensing agreement, which led to Dinsmoor sending a detailed 30-page license agreement between "Houndstooth

Corporation and [_____]" to Jack Victor's counsel.[FN34]In late April, Abboud met again with the Jack Victor management team to work on the "jaz" line. (TT at 677; PX 122.) On May 1, 2007, Abboud sent Alan Victor a detailed set of design notes for "jaz" suits (PX 172; TT 686) and, on May 2, 2007, Jack Victor purchased 700 yards of fabric, at least some, if not all, of which was ordered for "jaz" suits. (TT 696-98.) During this time, attorneys for Abboud and Jack Victor continued to negotiate the licensing agreements, and at least in Dinsmoor's eyes, had it within "an hour" of completion. (PX 147.)[FN35]

FN34. The final executed license agreement between Abboud and Victor closely tracks the agreement that Dinsmoor provided during this time. (PX 140; DX 192.)

FN35. There is also evidence that Abboud knew that he was skating dangerously close to the limits of his non-compete provision. For example, in advance of a press conference to present and announce the "jaz" line, on July 30, 2007, Abboud instructed Jack Victor's representatives to avoid answering any questions regarding his non-compete provision. (*See* TT 730; PX 160 (Abboud advised them to "avoid completely" any discussion of **"[a]ny interaction during my non-compete period")** (emphasis in original).)

These actions go beyond mere preparation. For all practical purposes, during the Restricted Period, Abboud, through Herringbone, had in place a fully negotiated licensing agreement for his new "jaz" line with a third-party, Jack Victor, in anticipation of competing with JA Apparel. This constitutes a breach of the Side Agreement which forbade "directly or indirectly through any partnership, corporation ... or other entity," association as "an owner, director ... or other participant," with any "person, group, business enterprise or other entity which is engaged in or proposes to engage in," competition with JA Apparel. (*See* PX 2 ¶ 2(a).)

\* \* \*

Consequently, the Court concludes that Abboud's actions in connection with, at a minimum, Fall River/Alden, and Jack Victor constitute breaches of



the non-compete provision in the Side Agreement in that they entailed impermissible association with individuals or entities that were proposing to engage in competition with JA Apparel during the Restricted Period. The only remaining question, therefore, is the remedy, if any, to which Plaintiff is entitled.

### C. Remedy

The non-compete provision at issue specifically discusses the type of remedy to which JA Apparel is entitled in the event of a breach by Abboud:

> Abboud acknowledges that ... in the event of any breach by Abboud of his agreements set forth in such Sections [1 and 2 (the non-compete provision) ] the Buyer will not have an adequate remedy at law and therefore will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements.

(PX 2 at ¶ 2(d).)

Based on Abboud's breaches of the Side Agreement, Plaintiff seeks an injunction barring "defendants from competing with JA Apparel for 90 days from the date of entry of the Court's order, which is the period of time that Mr. Abboud breached the non-competition provisions of his Side Letter Agreement prior to July 13, 2007."(*See* Pl.'s Post-Trial Mem., at 164-65.) As support for the propriety of this form of injunctive relief, which would be imposed after the expiration of the non-compete agreement, Plaintiff relies on *New York Real Estate Inst. v. Edelman, 42 A.D.3d 321, 839 N.Y .S.2d 488 (1st Dep't 2007)* and *J.H. Goldberg Co., Inc. v. Stern, 53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dep't 1976)*. Both cases hold that, despite the fact a non-compete period has terminated, a court can prospectively preclude competition for the period of time that the defendant was in breach of the non-compete. *See New York Real Estate, 42 A.D.3d at 321-22, 839 N.Y.S.2d at 488; J.H. Goldberg, 53 A.D.2d at 252, 385 N.Y.S.2d at 432.*

**\*31** In a post-trial letter submitted to the Court, Defendants argue that "such injunctive relief is beyond a federal court's Article III jurisdictional power."(*See* Letter from Defendants' counsel, dated April 15, 2008 ("Defs.' Ltr.") at 1).)

Whether or not the Court has jurisdiction to grant the type of injunctive relief Plaintiff seeks is a purely academic question here because, even assuming *arguendo* that it could grant the relief sought, it would decline to do so in this case. Although the Court does, as set forth above, believe that Abboud breached the broad non-compete provision, he did not actually compete with Plaintiff through the sale of merchandise. Indeed, the Court perceives little, if any, damage flowing to JA Apparel as a result of the breaches. Plaintiff claims that Abboud's activities during the Restricted Period "enabled him to sell products in competition with JA Apparel a full season earlier than he would have been able to do without his breach."(Pl.'s Ltr., at 1.) Plaintiff did not present sufficient evidence at trial to prove this assertion. Abboud intends to commence sales of his new "jaz" line in the Fall of 2008-more than a year after the expiration of his non-compete provision. Plaintiff did not establish that Abboud could not have commenced sales in the Fall of 2008 without having breached his non-compete provision before July 13, 2007. Alternatively stated, Plaintiff did not prove that only because of Abboud's breaches is he in a position to commence sales this Fall.[FN36]Plaintiff does not allege any other specific damage resulting from Abboud's activities during the Restricted Period.

> FN36. In fact, at least with respect to the manufacturing of clothes, some of the evidence suggests that Abboud could have been prepared for the Fall 2008 season-at least fourteen months after the expiration of the non-compete-even without his three month head-start. (*See* TT at 74 (Staff testifying: "Well, designing, getting fabric for and making a suit is not dissimilar in time from having a baby. It takes months.").)

The Court, therefore, is unable to discern significant damage to JA Apparel stemming from Abboud's activities during the Restricted Period. Consequently, the Court exercises its discretion not to grant an injunction precluding Abboud from marketing his "jaz" line in the coming months. *See, e.g., Kapps v. Wing, 404 F.3d 105, 122 (2d Cir.2005)* ("district courts have broad discretion in deciding whether to award injunctive relief") (internal quotations omitted). On the other hand, if the Court were to



grant Plaintiff an injunction, it would certainly have the effect of precluding Abboud from marketing his Fall 2008 line of clothing; indeed, by now, he has no doubt licensed and manufactured the line, and taken orders from customers for sales. (*See* Defs.' Ltr., at 3.) Therefore, an injunction would cause clear harm to third-parties, not just Abboud. That concrete harm would, in the Court's view, far outweigh Plaintiff's speculative injury resulting from Abboud's activities during the Restricted Period.

Plaintiff also seeks monetary relief as a result of Abboud's breaches of the non-compete provision. Specifically, Plaintiff seeks $578,104.10 in damages, which purportedly represents Alden's profits during the Restricted Period. The Court is likewise disinclined to grant this relief. As an initial matter, the request for monetary relief is somewhat inconsistent with JA Apparel's request for equitable relief in the way of an injunction, which, of course, assumes an inability to establish an adequate remedy at law. Morever, the Side Agreement itself provides that injunctive relief, not monetary damages, would be the relief available in the event of a breach. (PX 2 at ¶ 2(d).) Finally, Plaintiff is correct that, having established Alden's revenues during the Restricted Period, Defendants had the burden of proving the amount of Alden's variable expenses in order to establish its actual profits, and Defendants failed to meet their burden. At trial, however, Abboud did testify under oath that Alden lost between $400,000 and $700,000 in 2007, and continued to lose money in 2008. (TT at 477.) Indeed, it was because it was on the verge of bankruptcy that Abboud advanced it funds. Although it would have been preferable for Defendants to have submitted documentary evidence to support Abboud's assertion, the Court credits Abboud's statement that the company has been operating at a loss and, therefore, for this additional reason, declines to award Plaintiff the monetary damages it seeks based simply on Alden's gross revenues.

## VI. *Defendants' Counterclaims*

**\*32** Defendants assert counterclaims against JA Apparel and Staff for false endorsement, false advertising, violation of New York civil rights and general business laws, and common law unfair competition, stemming from activities in which JA Apparel and Staff engaged subsequent to the

execution of both the Purchase and Sale Agreement and Side Agreement. Essentially, Defendants contend that Plaintiff exploited the name and reputation of Joseph Abboud the individual by using, in connection with its products under the "Joseph Abboud" and "JOE" labels, promotional and advertising campaigns with slogans such as "Hey Joseph, What Should I Wear?" "Do You Know Joe?" and "Ask Joseph Abboud." Under all five Counterclaims, Defendants seek the same damages-$37.5 million-which they contend equates to a 10% royalty on Plaintiff's wholesale sales from July, 2005 until the present.

Due to the fact that all of these claims, with the exception of a small portion of one claim, are premised, either explicitly or implicitly, on a position that the Court has already rejected-specifically, that Plaintiff did not purchase the exclusive right to commercially use the Joseph Abboud name in connection with goods and services-these claims must be dismissed for the reasons set forth below.[FN37]

> [FN37.] The one portion that is unrelated to that legal position is an argument, under Defendants' common law unfair competition claim, that Plaintiff and Staff wrongfully contacted people in the industry in an attempt to prevent or impede the launch of Abboud's new venture, and otherwise injure Abboud. This claim will be addressed below.

### A. *Violations of Abboud's "Right Of Publicity" Under 15 U.S.C.A. § 1125(a) & §§ 50-51 of N.Y. Civil Rights Law*

In his first Counterclaim, under Section 43(a) of the Lanham Act, Abboud alleges that Plaintiff violated his right of publicity "by using Abboud's name in such a fashion as to mislead consumers into believing that Abboud is still associated with JA Apparel and/or sponsors and endorses JA Apparel's products."(*See* Defs.' Post-Trial Mem., ¶ 229.) Similarly, in connection with his third Counterclaim, under New York Civil Rights Law §§ 50 and 51, Abboud argues that Plaintiff violated his right of publicity "by using Abboud's name in a non-trademark fashion in advertising and promotional materials without Abboud's consent."(*See id.* ¶ 249.)These claims, however, are expressly based on the following argument:



[B]y way of the Purchase and Sale Agreement, Abboud only conveyed or assigned to JA Apparel the trademarks and the goodwill pertaining thereto, as well as license agreements. Abboud did not convey or assign to JA Apparel the "exclusive right" to use his name in any way, shape or form, nor did Abboud contract away his right to use his name in connection with his future design efforts in the apparel industry following the expiration of his two year Restricted Period.

(*See id.* ¶¶ 240, 256.)As set forth above, the Court rejects this interpretation of the Agreement, and concludes that Abboud did sell all rights to use his name for commercial purposes. Thus, the platform for these two Counterclaims is a legal position that has no merit, and the counterclaims must, therefore, be dismissed.[FN38]

> FN38. Despite its holding that JA Apparel bought the exclusive right to commercially use the Joseph Abboud name, the Court believes that there remain ways JA Apparel could improperly use the name by invoking images of Joseph Abboud the individual, as opposed to Joseph Abboud the brand. As an extreme example, JA Apparel would likely be intruding on Joseph Abboud's personal rights, and misleading the public as well, by stating: "Joseph Abboud, the designer, will be at Bloomingdale's to present JA Apparel's new fall line of menswear."This situation, however, has not been presented to the Court and it is difficult to fashion an injunction that could contemplate all potential encroachments on Abboud's individual rights. In this context, the appropriate course of conduct may be similar to Justice Stewart's statement regarding obscenity in *Jacobellis v. Ohio, 378 U.S. 184, 197 (1964),* "I know it when I see it."In all events, however, Defendants have not made such a showing here.

It is also worth noting that Defendants did not present credible evidence, as they were required to do for their Lanham Act claim, that consumers have been or are likely to be misled into believing that the "Do You Know Joe?" "Hey Joseph, What Should I Wear?" or "Ask Joseph Abboud" campaigns

indicated an association with Joseph Abboud the individual, as opposed to Joseph Abboud, the brand. *See* 15 U.S.C. § 1125(a). Defendants also fail to acknowledge that to prevail on their state law publicity claims, they were required to show that Plaintiff used Abboud's name "without [his] written consent." *See* N.Y. Civil Rights Law § 51. As set forth above, Abboud provided his consent to use his name by way of the Agreement. Indeed, by selling to Plaintiff the right to use such designations as "by Joseph Abboud," "designed by Joseph Abboud," and "JOE," Defendants' contention that Plaintiff is improperly invoking an association with the individual Joseph Abboud rings hollow.

**\*33** Finally, to the extent that Abboud bases these counterclaims on the argument that he "reserved his personal publicity rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop his reputation" (*see* Defs.' Post-Trial Mem., ¶¶ 240, 256), this argument has also already been rejected because this provision of the Side Agreement terminated on July 13, 2007, and Abboud did not reserve the right to make media appearances, or otherwise use his name, in a way that competed with JA Apparel. (*See* Section I.B. 4.(e), *supra.*)[FN39]

> FN39. As set forth above, however, Abboud still has the right to make personal appearances that do not relate to the marketing, sale, and promotion of goods and services. However, that Joseph Abboud the person retains the right to his personal identity, does not mean that JA Apparel cannot creatively use the names it purchased to promote its brand by, for example, an advertising slogan "ask Joseph Abboud."

**B.** *False Advertising Under* 15 U.S.C. § 1125(a)(1)(B)

In his second Counterclaim, under Section 43(a)(1)(B) of the Lanham Act, Abboud seeks relief based on his assertion that the advertising and promotional campaigns set forth above either explicitly or implicitly "create the false impression that Abboud is still associated with JA Apparel and that JA Apparel still possesses Abboud's individual reputation as a designer, as well as his unique talents, skills and artistic abilities to design menswear and


Slip Copy                                                                                                   Page 31
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

other consumer products for JA Apparel."(Defs.' Post-Trial Mem., at 146-47.) Abboud submits authorities for the proposition that if JA Apparel's statements in its advertising campaigns are explicitly false, the Court may grant relief without a showing that the advertisement had an impact on the buying public. (*See id.* ¶ 265 (citing *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991)). However, if JA Apparel's statements are only implicitly false, Abboud must demonstrate that the advertisements tend to mislead or confuse consumers, *see, e.g., Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992), and can only avoid that burden if he can show that JA Apparel intentionally set out to deceive the public with egregious conduct. *See id. at 298-99:Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found.,* 926 F.2d 134, 140 (2d Cir.1991).

This Counterclaim must also be dismissed. The campaigns used by JA Apparel do not contain statements that are explicitly false because the statements merely use the Abboud marks and names, including "JOE" and "Joseph Abboud," which Plaintiff owns, to promote its brands. Indeed, Staff testified that Plaintiff developed the "JOE" campaign to promote a younger, less expensive line of clothing that would be popular among men between the ages of twenty-two and thirty. (*See* TT at 61-62.) The campaign, according to Staff, does not seek to evoke images of Joseph Abboud, the individual, because that is not the right demographic for the JOE line. (*Id.*)

Even assuming *arguendo* that the statements are implicitly false, which the Court does not believe they are, Defendants have not made a sufficient showing of consumer confusion, and Plaintiff's conduct could hardly be labeled as egregious in light of its justifiable (and ultimately correct) belief that it can creatively use the Joseph Abboud name and related trademarks to promote its brands.

**\*34** Consequently, for these reasons and those set forth above, Defendants' second Counterclaim for false advertising must be dismissed.[FN40]

> FN40. This is not to say that Plaintiff could never use the Joseph Abboud name in a way that constituted false advertising. As set

forth above, a statement that Joseph Abboud, the individual, will be at a certain location or endorses a certain statement or brand, would likely violate Abboud's rights and mislead the public. But the campaigns Abboud complains of here do not meet that standard.

C. *Deceptive Acts and Practices Under New York G.B.L. § 349 & Common Law Unfair Competition*

In his fourth and fifth Counterclaims, Abboud argues, based on the same conduct set forth above, that Plaintiff engaged in deceptive business practices and unfair competition, respectively. In order to prove a claim for deceptive business practices, Defendants were required to show, among other things, a misleading act or practice that caused direct harm to consumers at large. *See Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264-65 (2d Cir.1995). Aside from the fact that the Court does not believe that the complained of campaigns constitute misleading practices, Abboud has also failed to submit credible evidence that the campaigns caused the requisite injury to consumers at large. *See Gaetano Assocs., Ltd. v. Artee Collections, Inc.,* No. 05 Civ. 3329(DLC), 2006 WL 330322, at \*3 (S.D.N.Y. Feb. 14, 2006) ("A non-consumer plaintiff can, in rare cases, plead a cause of action under Section 349, but only if the gravamen of the complaint [is] consumer injury or harm to the public interest.") (internal quotations omitted). This claim must therefore be dismissed.

Abboud's unfair competition claim fares no better. To prove such a claim, Abboud is required to show, among other things, that Plaintiff acted in bad faith. *See, e.g., Computer Assocs. Int'l, Inc. v. Computer Automation,* 678 F.Supp. 424 (S.D.N.Y.1987). For all of the reasons set forth above, the Court does not believe that Plaintiff acted in bad faith by creatively using the Joseph Abboud name and trademarks that it owns to promote its brand.[FN41]

> FN41. For these reasons, the Court also rejects Defendants' argument that Plaintiff is not entitled to an injunction because of its "unclean hands" in connection with its advertising and promotional campaigns using the Joseph Abboud name. (*See* Defs.'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Post-Trial Mem., at 116-19.)

In the only portion of Abboud's Counterclaims that is unrelated to Plaintiff's use of Abboud's name in the advertising and promotional campaigns set forth above, Abboud argues that Plaintiff and Staff engaged in unfair competition by wrongfully contacting individuals in the industry in an attempt to prevent or impede the launch of Abboud's new “jaz” line, and otherwise injure Abboud. The evidence presented to support this claim was thin, and, in all events, these allegations are not the proper basis for an unfair competition claim because (a) unfair competition claims under New York law are analyzed in the same manner as a trademark infringement claim under the Lanham Act, *see e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.* 454 F.3d 108, 119 (2d Cir.2006), and (b) Defendants provided no legal support for the position that interference with existing or prospective business relations constitutes unfair competition, as opposed to tortious interference, a claim Defendants did not assert. (*See generally* Defs.' Post-Trial Mem., SI 289.)

* * *

For all of these reasons, Defendants' Counterclaims are dismissed in their entirety.[FN42]

FN42. Although the Court's resolution of Defendants' counterclaims renders discussion of the damages they seek unnecessary, it is worth noting that even if Defendants had prevailed on their claims, they did not adequately establish any damages. Under all five Counterclaims, Defendants seek $37.5 million, which they contend equates to a 10% royalty on Plaintiff's wholesale sales from July, 2005 until the present. Defendants did not, however, establish what profits, if any, resulted from the campaigns which they claimed were objectionable. Because such profits surely count for a small percentage of Plaintiff's overall profits, the Court could not accept Defendants' damage calculations in any event.

## CONCLUSION

***35** For all of the foregoing reasons, IT IS HEREBY ORDERED:

1) In the June 16, 2000 Purchase and Sale Agreement, Abboud sold, and JA Apparel purchased, all rights that exist in, and all rights to use and apply for the registration of, the names, trademarks, trade names, service marks, logos, insignias, and designations that contain the words “Joseph Abboud,” “designed by Joseph Abboud,” “by Joseph Abboud,” or anything similar to or derivative thereof, either alone or in conjunction with other words or symbols, for any and all products and services;

2) Abboud's proposed use of his name in connection with his new “jaz” line would constitute (a) a breach of the June 16, 2000 Purchase and Sale Agreement and (b) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

3) Abboud is permanently enjoined and restricted from using his personal name to sell, market, or otherwise promote, goods, products, and services to the consuming public;

4) Abboud engaged in activities during the Restricted Period set forth in the July 13, 2000 Side Letter Agreement, which constituted breaches of that agreement's non-competition provision; nevertheless, the Court exercises its discretion not to award Plaintiff damages as a result of these breaches;

5) Plaintiff's claims for (a) dilution, unfair competition, and false designation of origin under Sections 43(a) & (c) of the Lanham Act, 15 U.S.C. §§ 1125(a)(1) & (c)(1), N.Y. Gen. Bus. Law §§ 360-61, and the common law, and (b) false and deceptive trade practices under N.Y. Gen. Bus. Law §§ 349-50, are hereby dismissed; and

6) Defendants' counterclaims for (a) right of publicity, false designation of origin and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (b) right of publicity under N.Y. Civil Rights Law §§ 50-51, (c) false and deceptive trade practices under N.Y. Gen. Bus. Law § 349, and (d) unfair competition under the common law, are hereby dismissed.

The Clerk of Court shall enter Judgment consistent with the terms of this Memorandum Opinion and



Slip Copy
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)
**2008 WL 2329533 (S.D.N.Y.)**

Order.

S.D.N.Y.,2008.
JA Apparel Corp. v. Abboud
Slip Copy, 2008 WL 2329533 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.